IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LEVEL 3 COMMUNICATIONS, LLC, and BROADWING COMMUNICATIONS, LLC, | ) ) ) ) | CASE NO.:  4:13-cv-01080 |
| Plaintiffs, | ) ) | Judge Carol E. Jackson |
| vs. | ) ) ) | |
| ILLINOIS BELL TELEPHONE COMPANY, et al., | ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Prepared & Submitted By:

Joseph E. Jones, *pro hac vice*
Timothy J. Thalken, *pro hac vice*
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE  68102-2663
(402) 341-6000
jjones@fraserstryker.com
tthalken@fraserstryker.com

and

Erik O. Solverud, #44291 MO
SPENCER FANE BRITT & BROWN, LLP
1 North Brentwood Boulevard, Suite 1000
St. Louis, MO  63105-3900
(314) 863-7733
esolverud@spencerfane.com

ATTORNEYS FOR PLAINTIFFS

## INTRODUCTION

AT&T entered into Interconnection Agreements ("ICAs") with Level 3 in 2005 and with Broadwing from 2000-2005. Pursuant to those ICAs, AT&T charged cost-based rates for entrance facilities used for interconnection. However, in 2008, AT&T began unilaterally raising the rates from lower cost-based rates to higher tariff rates. It did so without regard to the ICAs. AT&T described its unilateral price increase project as "non-voluntary" and insisted that Level 3 and Broadwing "are required to comply."

The entire premise of AT&T's price increase project was its interpretation of a 2005 FCC order known as the Triennial Review Remand Order ("TRRO"). AT&T claimed the TRRO said it no longer had to provide entrance facilities used for interconnection at cost-based rates. The parties expressly reserved all of their rights and remedies related to the TRRO in the ICAs. Litigation over the interpretation of the TRRO began in 2005 almost immediately after it was issued, and concluded in the United States Supreme Court's *Talk America* decision on June 9, 2011. The Supreme Court held AT&T's interpretation of the TRRO was wrong and that AT&T is and always was required to charge the lower cost-based rates for entrance facilities used for interconnection. Rather than change the prices it had previously increased back to cost-based rates, AT&T has instead utilized a series of ever-changing pretexts for refusing to follow the Supreme Court's decision.

Plaintiffs are seeking summary judgment on all liability issues.

## SUMMARY JUDGMENT STANDARD AND APPLICABLE LAW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is proper even when parties disagree over the interpretation of their

interconnection agreements. *See Coretel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 372 (4th Cir. 2014).

The ICAs are "governed by and construed in accordance with the Act, the FCC Rules and Regulations interpreting the Act and other applicable federal law." JA-61 (Level 3 ICA §22.1). "In the event of a conflict between the provisions of [the ICAs] and the Act, the provisions of the Act shall govern." JA-9 (Level 3 ICA §2.6.1). To the extent state law would apply to a statute of limitations or other contract interpretation issue, the law of each state where the services were rendered applies. JA-61 (Level 3 ICA §22.1); Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 10); JA-8552 (Broadwing Michigan ICA §29.6); JA-8893 (Broadwing Texas ICA §49.0); JA-8031 (Broadwing Illinois ICA §1.45); JA-7317 (Broadwing California ICA §27.5); JA-6653 (ICG Ohio ICA § 22.1).

## STATEMENT OF FACTS

Pursuant to E.D.Mo. L.R. 7-4.01(E), the statement of uncontroverted material facts relevant to Plaintiffs' Motion is attached.

## ARGUMENT

## I.     AT&T BREACHED THE ICAS.

To establish a breach of contract, Plaintiffs must show (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that the party seeking to enforce the contract has performed all the terms and conditions required under the contract; (4) that the defendant breached the contract; and (5) that the party seeking to enforce the contract suffered damages as a result of the breach. *Waldner v. Carr*, 618 F.3d 838, 849 (8th Cir. 2010). It is undisputed that Level 3 and Broadwing (sometimes collectively referred to as "Level 3") are parties to ICAs with AT&T. (JA-1 to -6136). Level 3 and AT&T entered into ICAs in February, 2005, as a part of a settlement of arbitration proceedings pending in 13 states. (Plaintiffs' Statement of Facts ("SF")

¶¶22-27, 31-34). The Broadwing ICAs were entered into from 2000-2005. (SF ¶¶184, 191, 197, 203). Level 3 acquired Broadwing in January, 2007. (SF ¶178). The ICAs provide the terms on which AT&T and Level 3 interconnect with each other's network so that customers on one network can call customers on the other. *Talk America, Inc. v. Michigan Bell Telephone Co.*, 131 S. Ct. 2254, 2257-58 (2011).

### A.  Pursuant To The ICAs, AT&T Provided Level 3 Entrance Facilities At Cost-Based Rates, Then Unilaterally Increased The Prices To Higher Tariff Rates In Breach Of The ICAs.

After AT&T entered into the ICAs with Level 3 and Broadwing, AT&T charged Level 3 and Broadwing cost-based rates for entrance facilities used for interconnection. (SF ¶60). However, in October, 2005, only ten months after signing the Level 3 ICAs, AT&T decided it would increase those rates based on its interpretation of the TRRO. (SF ¶¶62-64). In October, 2005, AT&T sent Level 3 and Broadwing a letter stating that based on its interpretation of the TRRO, AT&T was no longer required to charge lower cost-based rates for entrance facilities, and that it was unilaterally increasing the pricing to higher tariff rates. (SF ¶64).

To accomplish AT&T's unilateral price increase, AT&T developed and implemented a large scale project it called the "EF2AC Project" (short for Entrance Facility to Access Charge). (SF ¶¶66-81). AT&T employed a "core team" of at least 27 AT&T personnel to design and carry out the EF2AC Project. (SF ¶70). This team generated a vast catalog of protocols, manuals, summaries, notifications, approvals, and communications. AT&T's price increase project included:

- Obtaining internal legal, regulatory, and other internal departmental approval to increase the entrance facility rates in each state based on its interpretation of the TRRO. (SF ¶73).

- Monitoring proceedings in each state regarding the TRRO's interpretation. (SF ¶74).

- Prioritizing its efforts to increase prices so that circuits that would generate the greatest revenue increase were converted first. (SF ¶71).

- Drafting, revising, and issuing five separate "accessible letters" notifying CLECs, including Level 3, of AT&T's price increase. (SF ¶¶62-65).

- Developing and revising detailed internal protocols and criteria for identifying and converting the pricing for local interconnection circuits. (SF ¶75). These protocols established that the increase was "non-voluntary" and that "[e]ven if the CLEC does not amend their ICA, they are required to comply with the new language." (SF ¶76).

- Removing identifiers from the prior circuit identification numbers that identified the circuits as being used for local interconnection. (SF ¶97).

- Unilaterally changing the billing characteristics of each circuit. (SF ¶77).

- Converting both DS1 and DS3 circuits to higher tariff rates. (SF ¶78). DS1s and DS3s are different sizes of entrance facilities. DS1s can carry 24 telephone calls simultaneously while a DS3 is larger and is comprised of 28 separate DS1s (and can therefore can carry 672 calls simultaneously). *See, e.g., Covad Comm. Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006).

- Implementing and charging a conversion fee for each circuit converted. (SF ¶89).

- Charging the new higher tariff prices retroactive back to when circuits were first established in Michigan, as early as March 10, 2006. AT&T retroactively charged Level 3 $246,328.31 in Michigan. (SF ¶90).

From December, 2007, through February, 2009, without amending the ICAs or seeking agreement from Level 3, AT&T identified Level 3's and Broadwing's local interconnection entrance facilities and unilaterally increased the charges for those facilities from lower cost-

based (or "TELRIC") rates to higher tariff prices. (SF ¶86). AT&T acknowledges that the tariff rates are higher than the cost-based TELRIC rates. (SF ¶16).

AT&T increased the prices for the entrance facilities without regard for the terms of the ICAs. (SF ¶81). AT&T claimed the price increase was necessary to comply with the TRRO. (SF ¶72). AT&T also stopped allowing Level 3 to order new entrance facilities at cost-based rates under the ICAs and instead forced Level 3 to order new entrance facilities under higher priced tariffs. (SF ¶¶83-84).

AT&T's only justification for its unilateral price increase was AT&T's interpretation of the TRRO (SF ¶¶62-103). In fact, for almost six years, from October, 2005, until June, 2011, AT&T consistently claimed the TRRO was the **sole** justification for AT&T's unilateral price increase. (SF ¶¶62-103). AT&T repeated its reliance on the TRRO again and again. For example:

- In its October 17, 2005 accessible letter in Texas. (SF ¶64) (Pls. Ex. 3J (Hein Depo. Ex. 1 at 5)).

- In its September 21, 2007 accessible letters  in Arkansas, Kansas, Oklahoma, Ohio, and Connecticut. (SF ¶65) (Pls. Ex. 3J (Hein Depo. Ex. 1)).

- In its May 16, 2008 accessible letter in Michigan. (SF ¶65) (Pls. Ex. 3K (Hein Depo. Ex. 2)).

- In its internal EF2AC Project summary. (SF ¶72) (Pls. Ex. 3N (Hein Depo. Ex. 6)).

- In its executive overview of the EF2AC Project specific to Level 3. (SF ¶72) (Pls. Ex. 3AD (Hein Depo. Ex. 25 at 2)).

- In various internal e-mails to AT&T personnel. (SF ¶72) (Pls. Ex. 3R (Hein Depo. Ex. 12)).

- In three separate articles in AT&T's internal newsletter "The Fast Track." (SF ¶72) (Pls. Exs. 4A, 4B, 4C (Hein Exs. 16-18)).

- In a May 16, 2008 email to Level 3 which stated: "As a result of the FCC's Triennial Review Order and Triennial Review Remand Order (2005), AT&T is no longer required to provide entrance facilities at TELRIC rates." (SF ¶72) (Pls. Ex. 4M (Putman Ex. 5 at 2-3, May 16, 2008 AT&T Email to Level 3)

- In its July 8, 2008 denials of Level 3's disputes related to the price increase. (SF ¶72) (Pls. Ex. 2 (Putman Dec. ¶12))**.**

- In a July 23, 2009 email to Level 3 explaining its charge in Michigan of $246,328.31. (SF ¶¶72, 103) (Pls. Ex. 4L (Putman Ex. 3 at 3)).

- In denying Level 3's disputes related to the Michigan retroactive charges on September 24, 2009. (SF ¶¶72, 103) (Pls. Ex. 2 (Putman Dec. ¶15)).

At no time did AT&T ever provide any other justification for its unilateral price increases other than its interpretation of the TRRO. The ICAs are not referenced even once in any of AT&T's communications, either internal or external, as a basis for its unilateral price increase project. According to AT&T, the ICAs were completely irrelevant. AT&T stated in its protocols, "[e]ven if the CLEC does not amend their ICA, they are required to comply" with AT&T's interpretation of the TRRO. (SF ¶76).

### B.  The Supreme Court Rules That AT&T's Justification For Its Unilateral Price Increase Was Wrong.

Litigation in Michigan regarding AT&T's interpretation of the TRRO began on February 16, 2005, only days after the TRRO's release. (SF ¶104). The Michigan Public Service Commission's ruling interpreting the TRRO was appealed through the United States District Court for the Eastern District of Michigan, the United States Court of Appeals for the Sixth Circuit, and was ultimately resolved by the United States Supreme Court. The Supreme Court granted certiorari on December 10, 2010, while AT&T's price increase project was ongoing. *Talk*

*America, Inc. v. Michigan Bell Telephone Co.*, 562 U.S. 1104 (2010). When the Supreme Court granted certiorari, AT&T suspended its price increase project, because, in AT&T's words, there was "[n]o sense in converting [the prices] and then converting them back" if the Supreme Court ruled against AT&T. (SF ¶91). On June 9, 2011, the Supreme Court unanimously held that AT&T must provide, *and has always had to provide*, entrance facilities used for interconnection at TELRIC rates, and that AT&T's interpretation of the TRRO (and its only rationale for increasing Level 3's rates) was wrong. *Talk America*, 131 S. Ct. at 2258-60; 2263-65.

### C.     AT&T Refused To Comply With The *Talk America* Decision And Began Offering New Reasons Why Level 3 Was Not Entitled To The Lower Rates.

Despite the Supreme Court's ruling *directly against AT&T*, AT&T has not converted even one of Level 3's circuits back to cost-based rates. (SF ¶122). After AT&T failed to voluntarily convert Level 3's pricing back to cost-based rates in compliance with *Talk America*, Level 3 raised the issue with AT&T in various ways, including telephone calls, disputes, and correspondence. (SF ¶¶123-139). Instead of lowering the rates for Level 3's circuits back to the legally-mandated cost-based rates, AT&T began changing its reasons for not charging cost-based rates. (SF ¶¶144-155).

For example, when Level 3 raised the TELRIC issue with AT&T after *Talk America*, AT&T claimed, for the first time, that the ICAs "do not provide for TELRIC-based pricing" for entrance facilities and Level 3 will not get TELRIC rates unless it formally amends the ICAs. (SF ¶138). AT&T issued the same denials for both Level 3's and Broadwing's disputes, even though the Broadwing ICAs *expressly include* specific TELRIC rates for entrance facilities, and even though AT&T had *actually charged* Level 3 cost-based (TELRIC) rates for entrance facilities under the ICAs before it unilaterally raised Level 3's rates without any amendment. (SF ¶¶138-139, 146). AT&T concocted this argument after the fact. AT&T would not have devoted

the extraordinary amount of resources, time, and energy it did to its EF2AC price increase project based entirely on a legal interpretation — its interpretation of the TRRO — if to raise its rates, all it had to do was simply say the ICAs do not provide for cost-based pricing.

When Level 3 responded to AT&T's initial dispute denial in March of 2012, AT&T added even more new reasons why Level 3 was not entitled to cost-based pricing. It stated that even if Level 3 amended the ICAs as AT&T insisted was required, AT&T would still not charge Level 3 TELRIC rates because "in many instances the facilities in dispute are not being used for interconnection." (SF ¶154). Not only was this position brand new and wrong, but inherent in that response is the admission that in at least *some* instances, even AT&T agreed that the facilities *were* being used for interconnection. AT&T's own analysis shows that many of the circuits at issue were used for local interconnection. (SF ¶155). Obviously the circuits AT&T converted to higher prices were used for local interconnection, or AT&T would not have needed to increase the prices in the first place. AT&T has the ability to identify circuits used for interconnection just as it did before. But instead of doing that, it summarily denied all of Level 3's disputes holistically, refusing to lower the price on even one Level 3 circuit.

After Level 3 filed suit on June 7, 2013, AT&T came up with even more pretexts for why it would not charge Level 3 cost-based rates for entrance facilities. In AT&T's Answers to Level 3's Interrogatories, served over a year after Level 3 filed its lawsuit and over nine years after AT&T first notified Level 3 of AT&T's price increase project, AT&T contended, for the first time, that AT&T "erroneously" charged Level 3 TELRIC rates for entrance facilities used for interconnection under the current ICAs. (SF ¶159) (Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 3)). Not only was this new (and wrong) but if AT&T really believed it had made an error in billing, it would have been much simpler to say so in 2007, and increase Level

3's prices on that basis rather than engage in the massive undertaking of its EF2AC price increase project. AT&T's real error was its interpretation of the TRRO.

Even more new reasons for denying Level 3 cost-based rates emerged in discovery when AT&T claimed, again for the first time, that the Superseding Amendment and Further Amendment (both signed in 2005) required Level 3 to pay tariff rates for entrance facilities used for local interconnection. (SF ¶159) (Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 6)). The first time AT&T claimed the Superseding Amendment or the Further Amendment had any bearing on these issues or the prices Level 3 was supposed to pay was almost *ten years* after the amendments were signed. All of the arguments AT&T raised after *Talk America* contradict the very specific reason upon which AT&T had relied on for years (the TRRO) for its unilateral price increase.

Not only are all of AT&T's newly asserted positions wrong as a matter of fact and law, they are also a breach of AT&T's contractual obligation to act in good faith. "A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990). The doctrine, called "mend the hold," is "a common law doctrine that limits the right of a party to a contract suit to change his litigating position." *Harbor*, 922 F.2d at 363. The doctrine is a "corollary of the duty of good faith" imposed on parties to a contract. *Id.*; *see also Railway Co. v. McCarthy*, 96 U.S. 258, 267-68 (1878) ("Where a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law.");

*Genesco, Inc. v. Visa U.S.A., Inc.*, 296 F.R.D. 559, 577 (M.D. Tenn. 2014) ("In its majority version, the mend the hold doctrine limits a nonperforming party's potential defenses for breaking a contract to those based on the prelitigation explanation for nonperformance that was given to the other party. In its minority form, mend the hold permits the changing of a contracting party's litigation posture only when that change comports with the implied duty of good faith that modern courts read into every contract."); *Larson v. Johnson*, 116 N.E.2d 187 (Ill. Ct. App. 1953) (holding that a party in a breach of contract case was barred from changing his argument pursuant to the mend the hold doctrine); *Gibson v. Brown*, 73 N.E. 578, 582 (Ill. 1905) (invoking the mend the hold doctrine to bar a party from asserting a new argument, holding "by placing his refusal to perform the contract on those grounds he waived all other contentions which he now makes as a reason why he should not perform the contract").

Here, for almost six years before litigation, AT&T relied solely on the TRRO to justify its price increases. (SF ¶¶62-113). Level 3 relied on AT&T's stated positions, knowing that its rights under the TRRO were expressly reserved by the ICA, and could be enforced once those rights were clarified. (SF ¶43) (JA-59 to -61 (Level 3 ICA § 21.1)). After the Supreme Court held AT&T's interpretation of the TRRO was wrong, AT&T began "trying on other defenses for size." First it claimed that the ICAs didn't provide TELRIC pricing, then it claimed that the facilities were not used for interconnection, later AT&T claimed that it "erroneously" billed Level 3, and later still, that the Superseding Amendment required Level 3 to pay higher rates.

When AT&T's defense is shown to be incorrect, it simply tries another one. AT&T's conduct in perpetually changing defenses is, in and of itself, a breach of AT&T's obligation of good faith under the ICA. This Court has recognized that when AT&T is proven wrong, it simply changes its position. (Filing No. 35 at 8).

10

Consistent with the mend the hold doctrine, and the duty of good faith, AT&T's conduct of continually changing and inventing new arguments should not be condoned when it so consistently relied on the TRRO to justify its price increase. AT&T should not be allowed to argue it was justified in raising Level 3's rates based on anything *other* than the TRRO.

**D.    The ICAs Require AT&T To Charge Cost-Based Rates For Entrance Facilities Used For Interconnection, And Preserved All Of The Parties' Rights And Remedies Under The TRRO.**

   **1.    The General Terms And Conditions Of The ICAs Require TELRIC Prices.**

The ICAs require AT&T to provide Level 3 with entrance facilities used for interconnection at cost-based rates. AT&T actually provided those services to Level 3 at cost-based rates for years.

The General Terms and Conditions of Level 3's ICAs require the Parties to comply with their obligations under the Act. The General Terms and Conditions in the Level 3 ICAs are identical in all relevant states. The ICAs are "governed by and construed in accordance with the Act, the FCC Rules and Regulations interpreting the Act and other applicable federal law." (SF ¶38) (JA-61 (Level 3 ICA § 22.1)). **In the event the ICA conflicts with the Act, "the provisions of the *Act* shall govern."** (SF ¶39) (JA-9 (Level 3 ICA § 2.6.1)) (emphasis added). **"Nothing in [the ICA] shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law"** (i.e., the Act, FCC orders, and court orders). (SF ¶40) (JA-63 (Level 3 ICA §§ 22.1, 25.1)). More specifically, with regard to AT&T's obligation to provide facilities, **nothing in the ICA is "intended to modify SBC-13STATE's [AT&T's] obligation to provide services and facilities under the Act."** (SF ¶41) (JA-75 (Level 3 ICA § 43.1)).

The Broadwing ICAs in Illinois, California, Michigan, and Texas contain similar general terms and conditions requiring both parties to comply with their obligations under Sections 251 and 252 of the Act.[1] (SF ¶¶178-215).

The Level 3/ICG ICAs in Ohio and Indiana also contain similar language incorporating the Act's requirements.[2] (SF ¶¶161-173).

**The Act requires AT&T to provide entrance facilities used for local interconnection at cost-based rates.** *Talk America*, 131 S. Ct. at 2258, 2260 ("it is undisputed that … interconnection must be provided at cost-based rates"). Section 251(c)(2)(d) of the Act requires interconnection be provided on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.". 47 U.S.C. § 251(c)(2)(d). AT&T's obligation under Section 251(c)(2) includes the requirement to provide entrance facilities necessary for interconnection. *Talk America*, 131 S. Ct. at 2258, 2260. Section 252(d)(1) of the Act expressly requires the rates for interconnection facilities under Section 251(c)(2) to be priced

---

[1] *See* **Illinois** Broadwing ICA at p. 462 ("AT&T is required to provide access to facilities that CLEC requests to interconnect with AT&T's network … in accordance with the requirements of Section 251(c)(2) of the Act."); Broadwing Illinois ICA §3.12 at p. 74 ("Interconnection shall be … on rates, terms and conditions consistent with Section 251(c)(2)(D) of the Act."); Broadwing Illinois ICA §3.2.2 at p. 64 (providing Broadwing may request interconnection facilities as provided by Section 251(c)(2)); Broadwing Illinois ICA §1.36 at p. 55 (requiring both parties to comply with the intent of the Act); Broadwing **California** ICA §3 at p. 8 (requiring both parties "act in good faith and consistently with the intent of the Act"); Broadwing **Michigan** ICA §3.1 at p.16 (providing that each Party shall interconnect their networks "pursuant to Section 251(c)(2) of the Act"); Broadwing Michigan ICA §19.2 at p.92 (requiring each party to comply with all applicable law and stating "[n]othing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law"); Broadwing **Texas** ICA at General Terms §8.1 at p.22 ("Nothing in [the ICA] shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law."); Broadwing Texas ICA §40.0 at p.40 ("the Parties will act in good faith and consistently with the intent of the Act."); §1.8 at p.9 (acknowledging that AT&T is obligated to provide "Interconnection under Section 251(c)(2) of the Act").

[2] *See* ICG **Ohio** ICA at §25.1 at p.72 ("Nothing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law."); ICG Ohio ICA at §2.6.1 at p.92 ("In the event of a conflict between the provisions of [the ICA] and the Act, the provisions of the Act shall govern."); ICG Ohio NIM Appendix § 1.1 at p.230 (allowing ICG to obtain interconnection "pursuant to Section 251(c)2) of the Act."); ICG **Indiana** ICA at §19.2.2 at p.133 ("Nothing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law."); ICG Indiana ICA at §1.3(e) at p.11 ("In the event of a conflict between the provisions of [the ICA] and the Act, the provisions of the Act shall govern.").

at cost-based rates. 47 U.S.C. § 252(d)(1); s*ee also Southwestern Bell Tel. v. Mo. PSC*, 461 F. Supp. 2d 1055, 1072-73 (E.D. Mo. 2006) (holding interconnection must be provided at cost-based TELRIC rates).

TELRIC rates are public and set by each State Commission. (SF ¶15) *See* 47 U.S.C. § 252(d)(1) (requiring state commissions to determine the cost-based rate applicable to interconnection facilities). AT&T appears to claim that because some of the Level 3 ICAs do not specifically set out these publically-available TELRIC rates (expressed in the ICA as a number with a dollar sign in front of it) it defeats Level 3's right to receive these rates. In other words, that this omission — i.e. what is *not* in the ICAs — somehow negates all of the words that actually *are* in the ICAs — words stating specifically that Level 3 is entitled to interconnection in accordance with the Act, and the requirement in the Act that interconnection facilities must be provided by ILECs at cost. AT&T's position makes no sense. And it makes even less sense in the face of ICA language stating that if the ICA and the Act conflict, *the Act prevails*. (SF ¶39).

The ICAs should be interpreted based on their plain and ordinary meaning. *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1212 (8th Cir. 2012). The ICAs should be interpreted to avoid rendering any of the terms meaningless. *Rosemann v. Sigillito*, 956 F. Supp. 2d 1082, 1104 (E.D. Mo. 2013); *Smith*, 664 F. 3d at 1213. The ICAs require the Parties to comply with the Act and specifically requires AT&T to provide the facilities required by the Act. (SF ¶¶38-48). The Act requires AT&T to charge cost-based rates for interconnection entrance facilities. Therefore, the ICAs require AT&T to charge cost-based rates for interconnection entrance facilities. Any other reading would impermissibly render these provisions and their incorporation of the Act meaningless. *Rosemann*, 956 F. Supp. 2d at 1104.

  2.  **The NIM Appendix Of The Level 3 ICAs Requires Cost-Based Prices.**

The Network Interconnection Methods ("NIM") Appendix in the Level 3 ICAs goes even further, specifically citing the very section of the Act requiring interconnection to be provided at cost-based rates. The NIM Appendix (identical in each Level 3 state) provides specifically that Level 3 may exercise its interconnection "pursuant to Section 251(c)(2) of the Act." (SF ¶48) (JA-224 (NIM Appendix § 1.1)). Section 251(c)(2)(d) of the Act requires, among other things, that interconnection be provided "in accordance with . . . the requirements of this section and section 252 of this title." Section 252(d)(1) of the Act expressly requires the rates for interconnection facilities under Section 251(c)(2) to be priced at cost-based rates. The NIM Appendix further provides Level 3 the right to request interconnection facilities from AT&T and provides that "Network Interconnection Methods (NIMs) include, but are not limited to … Leased Facilities Interconnection … and other methods as mutually agreed to by the Parties." (SF ¶48) (JA-224, JA-228 (NIM Appendix §§ 1.1, 1.2, 4.2)). Upon written notice from Level 3 to AT&T, the NIM Appendix requires AT&T to lease Level 3 interconnection entrance facilities pursuant to AT&T's obligations under the Act. (SF ¶47) (JA-224, JA-228 (NIM Appendix §§ 1.1, 1.2, 4.2)). From the inception of the ICAs, AT&T has leased Level 3 entrance facilities used for interconnection. (SF ¶60).

The General Terms and Conditions of the ICAs require the Parties to comply with the Act and require AT&T to provide all facilities required under the Act. (SF ¶¶38-42) (JA-61, JA-63, JA-75 (ICA General Terms §§ 22.1, 25.1, 43.1)). To further effectuate those rights and obligations, the NIM Appendix expressly provides Level 3 the right to lease interconnection facilities from AT&T pursuant to Section 251(c)(2) of the Act, which incorporates the requirements of Section 252 of the Act. Section 252(d) of the Act provides that the rates charged for Section 251(c)(2) interconnection must be cost-based rates. (SF ¶¶46-48). Allowing AT&T to

14

avoid its mandatory obligations under the Act would render the ICA provisions requiring AT&T to lease entrance facilities required by Section 251(c)(2) of the Act meaningless. *See Rosemann*, 956 F. Supp. 2d at 1104.

> **3.** **The Broadwing ICAs, The Level 3 California ICA, And The Level 3 ICG ICAS Contain Specific Cost-Based Rates For Entrance Facilities.**

In addition to requiring AT&T to comply with the Act and preserving each Parties' rights regarding the TRRO, the Broadwing ICAs, the Level 3 California ICA, and the ICG ICAs also contain specific cost-based pricing for entrance facilities expressed in dollars and cents. (SF ¶¶169, 173, 176, 190, 196, 200, 207).

> **4.** **The Parties Agreed That Any Court Action On The TRRO Affecting The Parties Rights Would Be Immediately Incorporated Into The ICA.**

Consistent with the requirement that the Parties comply with the terms of the Act, the Parties expressly agreed in the Level 3 ICAs that "[i]f any action" by a court "affects the rights or obligations of either party that are addressed by this Agreement, specifically including" the TRRO, "the affected Provision(s) [of the ICA] shall be **immediately invalidated, modified, or stayed consistent with the action** of the . . . court of competent jurisdiction upon the written request of either Party." (The "Intervening Law Provision") (SF ¶44) (JA-59 (Level 3 ICA General Terms § 21.1) (emphasis added)).

Similar to the Level 3 Intervening Law Provision, the "Further Amendment," entered into by Broadwing and AT&T in each of the applicable states, expressly reserves Broadwing's rights and remedies with regard to the TRRO. (SF ¶209) (JA-7838 to -41 (Further Amendment at §§ 1.2; 2.1)). Each party "expressly reserve[d], all of its rights, remedies and arguments with respect to" the TRRO. *Id.* Further, in the event any court order "affects any of the rates, terms

and/or conditions" in the Broadwing ICAs, the ICAs are immediately modified in order to effectuate the order. *Id*.

The Supreme Court in *Talk America* held that AT&T's interpretation of the TRRO was wrong (holding implicitly that AT&T's price increase project was wrong) and that AT&T is, and always has been, required to provide interconnection entrance facilities at cost-based rates. *Talk America*, 131 S. Ct. at 2258-60; 2263-65. Under the Intervening Law Provision, the ICA was immediately modified consistent with what the Supreme Court held - that Level 3 was and always has been entitled to cost-based pricing for entrance facilities. While AT&T claims the need for an ICA amendment to implement *Talk America*, no amendment is necessary, because AT&T's EF2AC project increased the rates Level 3 was paying under the ICA without amending the ICA. AT&T just unilaterally increased the rates. A formal amendment is unnecessary to "undo" what AT&T did wrongly in the first place without an amendment.

AT&T acknowledges it has a duty to comply with FCC and court orders. Lori Hein, the AT&T product manager in charge of coordinating AT&T's price conversion project, testified that one of AT&T's purposes in undertaking its EF2AC Project was to comply with the TRRO. (SF ¶72). (Pls. Ex. 4D (Hein Depo. at 70:7-16)). She testified that, while AT&T wanted to increase its revenue, the EF2AC Project "was also a compliance issue, which is just as, if not more, important." *Id.* She further agreed that if an order required the reversal of the EF2AC Project, AT&T would need to comply with that order. (SF ¶93) (Pls. Ex. 4D (Hein Depo. at 70:7-16)). However, rather than comply with the TRRO as interpreted by the Supreme Court, AT&T has offered ever-changing excuses for why it has not complied with the explicit ruling in *Talk America*. (SF ¶¶145-155).

To implement *Talk America*, this court should order that AT&T (1) breached the ICAs; (2) is and always was required to charge Plaintiffs lower cost-based prices for entrance facilities used for interconnection; (3) should immediately begin charging TELRIC prices for local interconnection; and (4) allow Level 3 to order entrance facilities at TELRIC rates. The issue of damages has been reserved for Phase II of this litigation. Filing No. 54 at 2.

### 5. The State-Specific TRRO Amendments Are Not Relevant.

Level 3 and Broadwing each entered into TRRO amendments with AT&T in certain states in an attempt to comply with the particular law and rulings in those states while the *Talk America* litigation was pending. AT&T may argue that some of these amendments are relevant to this case and favorable to AT&T, but they are not, and are red herrings. For starters, each of these amendments expressly preserved Level 3's rights to interconnect with AT&T pursuant to Section 251(c)(2) of the Act. (SF ¶¶174-177, 188, 192-193, 202, 206, 208-209). Separately, pursuant to the Intervening Law Provision and the Further Amendment, following *Talk America*, whatever those amendments previously said, they were immediately modified to be consistent with the *Talk America* order. (SF ¶¶44, 209). As the Fourth Circuit explained in *AT&T Communication of the Southern States, Inc. v. Bellsouth Telecommunications, Inc.*, these amendments were attempts to comply with the current state of the law and are reformed when the controlling law changes. 229 F.3d 457, 465 (4th Cir. 2000). The district court noted, allowing AT&T to enforce an ICA provision that no longer complies with the law would allow "AT&T to have its cake and eat it too." *Id.* at 464.

### 6. The Level 3 Superseding Amendment And The Broadwing Further Amendment Do Not Limit Plaintiffs' Rights To Obtain Interconnection At Cost-Based Rates.

Over *one year after Level 3 filed this lawsuit*, AT&T claimed for the first time in its discovery responses that the Level 3 Superseding Amendment and the Broadwing Further Amendment barred Plaintiffs' claims. (SF ¶159) (Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 6)). AT&T's new  argument asserted after its reliance on the TRRO was proven wrong is a breach of the obligation of good faith and should be ignored, and is also entirely inconsistent with AT&T's actions.

The Superseding Amendment and Further Amendment provide Plaintiffs the option, but does not require them, to establish points of interconnection by obtaining Special Access services from AT&T, or by obtaining other "facilities" from AT&T, stating that Level 3 or Broadwing may "at its sole option, establish a POI by obtaining dedicated Special Access services or facilities from SBC ILECs." (SF ¶¶55, 212) (JA-428-29 (Superseding Amendment at § 4.6); JA-7844 (Further Amendment at § 4.1(d)). While AT&T will almost certainly highlight this clause for the Court, nothing about it is mandatory or limiting. It is entirely discretionary at the "sole option" of Level 3 or Broadwing. Further, the use of the term "or facilities" makes the clause endlessly broad in terms of what Level 3 has the option to buy from AT&T. The telecom industry defines "facilities" as "[a] stupid, imprecisely defined word that means anything and everything." Harry Newton, Newton's Telecom Dictionary 319 (20th Ed. 2004).

The Superseding Amendment was executed in February, 2005, and the Further Amendment was executed in June, 2005. (SF ¶¶54, 209) After the amendments were signed, AT&T continued to charge Plaintiffs TELRIC rates for entrance facilities used for interconnection until AT&T unilaterally increased the prices for those facilities in 2007-2009 *for an entirely different reason*. (SF ¶¶60, 215). AT&T increased those rates based on AT&T's interpretation of the TRRO, not on the Superseding or Further Amendments. (SF ¶72). Nothing

18

in the Superseding Amendment or Further Amendment requires Level 3 or Broadwing to only purchase entrance facilities used for interconnection at tariff rates. (SF ¶¶58-59,213-214). And nothing in these amendments limits Level 3 or Broadwing from exercising their rights under the ICAs to obtain interconnection from AT&T pursuant to Section 251(c)(2) of the Act. (*Id.*).

More than four years after the *Talk America* decision, AT&T continues to charge Level 3 and Broadwing tariff prices for entrance facilities used for local interconnection instead of the cost-based rates required under the law and the ICAs. (SF ¶5). Despite AT&T's duty to comply with the law, and despite AT&T's acknowledgement that it could (and should) change back to TELRIC pricing if it lost *Talk America*, AT&T has refused to do so. (SF ¶¶91-93). AT&T's price increase was a breach of the ICAs and its failure to comply with the ruling in *Talk America* is a continuing breach. Plaintiffs are entitled to judgment as a matter of law and a holding that AT&T breached the ICAs.

## II.   AT&T IS REQUIRED TO CHARGE COST-BASED RATES FOR THE PORTION OF EACH ENTRANCE FACILITY USED FOR INTERCONNECTION.

After the Supreme Court ruled in *Talk America* that AT&T has always been required to provide entrance facilities used for interconnection at cost-based rates, AT&T insisted that Level 3 must amend its ICAs in order to receive the cost-based rates mandated by the Act. (SF ¶149).When Level 3 discussed a potential amendment with AT&T (even though the ICAs already required AT&T to provide entrance facilities at TELRIC rates), AT&T raised even more obstacles to Level 3's ability to receive TELRIC rates. AT&T claimed (for the first time) that, even if they did amend the ICAs, AT&T was under no obligation to charge Level 3 TELRIC rates if any portion of the entrance facility was used for non-interconnection purposes. (SF ¶153). AT&T asserted the *Talk America* decision was actually favorable to AT&T and somehow held

that AT&T did not have to charge TELRIC rates for interconnection facilities if any part of the facility was used for other purposes. *Id.* This was not only new, but is wrong.

The TRRO provides that "competitive LECs will have access to these [entrance] facilities at cost-based rates *to the extent* that they require them to interconnect with the incumbent LEC's network." TRRO ¶140 (emphasis added). If an entrance facility is used for both interconnection and non-interconnection purposes, AT&T is required to charge TELRIC rates on the portion of the entrance facility used for local interconnection, and may charge higher rates only on any remaining portion of the entrance facility which is not used for interconnection. (SF ¶¶49-51) TRRO ¶140; *CAF Order*, 26 FCC Rcd. 17603, ¶972; JA-224 (Level 3 ICA NIM Appendix §1.1). This concept is sometimes referred to as commingling or ratcheting.

CLECs are entitled to cost-based rates on any portion of entrance facilities used for interconnection. *See Puerto Rico Telephone Co. v. Telecommunications Regulatory Bd.*, No. 11-1152 (D.P.R. March 31, 2014), Pls. Ex. 3H at 60-61 (holding that requiring an ILEC to charge TELRIC "for the actual portion of the facility used for interconnection and at tariffed [commission] rates for the actual portion of the facility used for backhaul" follows "settled law" and complies with *Talk America*).

Interestingly, AT&T operates as an ILEC in the states relevant to this litigation, but is a CLEC in other states where it is not the incumbent telephone company, like South Dakota and Washington. *See infra*. When operating as a CLEC, AT&T actually agrees with Level 3's views on commingling, and has argued to various state commissions that the Act *requires* it. *See e.g.,* Pls. Ex. 3G (Washington Utilities and Transportation Commission Docket Nos. UT-003022; 003040, AT&T Comments on Revised Initial Order, September 14, 2000, at p. 7) ("To the extent a CLEC uses a portion of a special access facility for interconnection services, the

Telecommunications Act requires that such entrance facilities be priced at TELRIC rates."); Pls. Ex. 3F (South Dakota Public Utilities Commission Docket No. TC01-165, Affidavit of Kenneth L. Wilson on Behalf of AT&T, March 18, 2002, at p. 13) ("AT&T simply seeks the right to pay the correct price for the facility depending on the use to which the facilities are put.  To the extent that special access facilities are used to provide access services or are idle, special access rates should apply. However, to the extent spare capacity on such facilities is devoted to providing local interconnection, only TELRIC prices may be applied.").

FCC regulations and orders also provide that interconnection facilities leased pursuant to Section 251(c)(2) may be used for both interconnection and non-interconnection purposes. The FCC promulgated 47 C.F.R. § 51.305(b), which provides that "A carrier that requests interconnection **solely** for the purpose of originating or terminating its interexchange traffic on an incumbent LEC's network and not for the purpose of providing to others telephone exchange service, exchange access service, **or both**, is not entitled to receive interconnection pursuant to section 251(c)(2) of the Act." (emphasis added). In other words, if a carrier uses a facility for only non-interconnection traffic, it is not entitled to cost-based rates under Section 251(c)(2). However, if a facility is used for interconnection purposes, or for both interconnection and non-interconnection purposes, Section 251(c)(2) and its cost-based rates apply.

The FCC confirmed this rationale in 2011: "[A]s long as an interconnecting carrier is using the Section 251(c)(2) interconnection arrangement to exchange **some** telephone exchange service and/or exchange access traffic, Section 251(c)(2) does not preclude that carrier from relying on that same functionality to exchange other traffic with the incumbent LEC, **as well**." *CAF Order*, 26 FCC Rcd. 17603, ¶972 (emphasis added).

Consistent with FCC orders and regulations, AT&T and Level 3 agreed that Level 3 could use entrance facilities for both interconnection and non-interconnection purposes. The ICAs' NIM Appendix provides specifically that Level 3 can obtain facilities "pursuant to Section 251(c)(2) of the Act; provided, however, **Interconnection may not be used *solely* for purposes not permitted under the Act.**" (SF ¶¶49, 189, 201) (JA-224 (Level 3 ICA NIM Appendix § 1.1) (emphasis added); JA-8036, JA-8457) (Broadwing Michigan and Illinois ICAs at § 3.1)). As long as Level 3 does not use an entrance facility *solely* for non-interconnection purposes, Level 3 is entitled to those facilities pursuant to Section 251(c)(2) of the Act at cost-based rates for those portions of the entrance facility used for interconnection. If the Parties had intended that Level 3 could not commingle interconnection and non-interconnection uses, they would have said so in the NIM Appendix, as they did elsewhere in the ICA. For example, the Parties specifically prohibited commingling/ratcheting in the UNE Appendix. The UNE Appendix provides that AT&T is not required to provide "ratcheting," which is defined as "a pricing mechanism that involves billing a single circuit at multiple rates to develop a single, blended rate." (SF ¶50) (JA-191 (UNE Appendix § 2.17.5)). The Parties expressly acknowledged in the UNE Appendix that entrance facilities are not UNEs. (SF ¶52) (JA-179 to -180 (UNE Appendix § 2.1.2.1)). The Parties prohibited ratcheting for UNEs but not for entrance facilities used for interconnection. AT&T clearly knows how to prohibit ratcheting in an ICA. However, the Level 3 ICAs do not prohibit ratcheting for non-UNE facilities. Rather, the NIM Appendix *expressly provides the opposite* … that Level 3 may use facilities for both interconnection and non-interconnection purposes "pursuant to Section 251(c)(2)," as long as they are not used *solely* for non-interconnection purposes. (SF ¶¶49, 189, 201).

The Court in *Talk America* did not address the commingling issue. But AT&T (speaking as an ILEC as opposed to as a CLEC (where it says the opposite) will likely try to take a line of the Court's opinion out of context to support AT&T's incorrect view that if any portion of an entrance facility is used for purposes other than interconnection, the entire facility is ineligible for cost-based pricing. *Id.* Under AT&T's view, if a single one of the 672 channels of a DS3 entrance facility is not used for interconnection, none of the DS3 qualifies for cost-based pricing. AT&T's position is contrary to Congressional intent to foster competition through the Act. When the Supreme Court's opinion is viewed as a whole, and in light of the FCC rules and the intent of the Act, it is clear that was not the Court's intention either.

The Court in *Talk America* stated that "entrance facilities leased under § 251(c)(2) can be used only for interconnection." *Talk America*, 131 S. Ct. at 2264. But this statement is general and vague, and commingling was not a topic the Court was even considering. The Court was not considering whether the same facility could have multiple uses when it said generally that 251(c)(2) circuits must be used for interconnection, a general proposition that is accurate only as far as it goes. The Court did not have any reason to address, and did not address, what happens when an interconnection facility is used in part for interconnection and in part for other purposes. In such cases, the law, the ICAs, and even AT&T's own words fully support Level 3's view that interconnection facilities must be priced at cost-based rates to the extent they are used for interconnection.

For the foregoing reasons, Plaintiffs are entitled to judgment as a matter of law and a holding that AT&T is required to charge cost-based rates to the extent any portion of an entrance facility is used for interconnection.

## III.    AT&T UNLAWFULLY VIOLATED SECTIONS 251 AND 252 OF THE ACT.

As discussed in Section I above, AT&T has breached the ICAs by failing to charge cost-based rates for entrance facilities used for interconnection. *Supra*. An ILEC's breach of an ICA not only constitutes a breach of contract, but also a violation of the Act itself. *See Core Communications Inc. v. Verizon Md., Inc.*, 18 FCC Rcd. 7962, 7971-7973 (2003) ("[T]he Act . . . require[s] Verizon not only to enter into interconnection agreements, but also to comply with their terms."); 47 U.S.C. § 251(c)(2) (requiring ILECs to provide interconnection "on rates … in accordance with the terms and conditions of any agreement"); Filing No. 35 at 7-9. As a result, AT&T's conduct constitutes both a breach of the ICAs, as well as a direct violation of Sections 251 and 252 of the Act. Plaintiffs are entitled to summary judgment finding that AT&T violated Sections 251 and 252 of the Act.

## IV.    PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT.

This Court has already held that it has the power to render a declaratory judgment in this matter. *See* Feb. 2, 2014 Order, Filing No. 35 at 10-11; *Century Indemnity Co. v. Anheauser-Busch Inc.*, 4-11-CV-1097-CEJ (E.D.Mo. Mar. 19, 2012) (A federal court may declare the rights and legal relations of a party in a case of actual controversy); *Hatridge v. Aetna Cas. & Sur. Co.*, 415 F.2d 809, 812 (8th Cir. 1969). Because, almost five years after *Talk America*, AT&T continues to refuse to charge cost-based TELRIC rates for *any circuits at all*, a declaratory judgment is necessary here. (SF ¶5). Level 3 and Broadwing request an order declaring that AT&T must (1) charge cost-based rates on all entrance facilities used for local interconnection; (2) allow Level 3 and Broadwing to order new entrance facilities under the ICAs at TELRIC rates; and (3) charge TELRIC rates for all or any portion of entrance facilities used for interconnection.

## V.    AT&T HAS BEEN UNJUSTLY ENRICHED.

In the alternative, AT&T has been unjustly enriched by increasing prices from cost-based rates to higher tariff rates, in not allowing Level 3 and Broadwing to order entrance facilities at cost-based rates, and refusing to charge cost-based rates for local interconnection entrance facilities. AT&T was always required to charge cost-based rates. *Talk America*, 131 S. Ct. at 2258-60; 2263-65. It should not be rewarded for its heavy-handed one-sided price increase and its continued efforts to stonewall Level 3 from obtaining the cost-based rates the law requires AT&T to provide.

Unjust enrichment is an equitable remedy based in quasi-contract. *Affordable Cmtys. of Mo. v. Fannie Mae*, 714 F.3d 1069, 1077 (8th Cir. 2013) *citing Reyner v. Crawford*, 334 S.W.3d 168 (Mo. Ct. App. 2011). "The basis for the unjust-enrichment doctrine is that no one ought to enrich himself unjustly at the expense of another." *Weitz Co., LLC v. Lexington Ins. Co.*, 786 F.3d 641, 648-49 (8th Cir. 2015). To prove a claim of unjust enrichment one must show (1) a benefit conferred by the plaintiff on the defendant; (2) the defendant's appreciation of the fact of the benefit; and (3) the acceptance and retention of the benefit by the defendant in circumstances rendering the retention inequitable. *Topchian v. JP Morgan Chase Bank, N.A.*, 760 F. 3d 843, 854 (8th Cir. 2014). To the extent the Court determines that the ICAs do not provide for TELRIC prices (which they do) Level 3 and Broadwing are entitled to recovery of their damages under the doctrine of unjust enrichment. It would be unjust to allow AT&T to benefit from its oppressive tactics, particularly by unilaterally increasing Level 3's pricing and disregarding the rights Level 3 previously enjoyed under the ICAs when the Supreme Court has specifically held that AT&T was wrong. Plaintiffs are entitled to summary judgment on their claims made in the alternative, that AT&T has been unjustly enriched by the difference of the tariff rates it charged and the TELRIC rates it should have charged.

## VI.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON AT&T'S COUNTERCLAIM.

AT&T has asserted a counterclaim against Plaintiffs alleging Plaintiffs violated AT&T's tariffs by refusing the pay tariff rates for certain entrance facilities in the states of Michigan, Texas, and Kansas. (Filing No. 47 at 20). In some instances in those states, Plaintiffs paid AT&T the lawful TELRIC rate for Plaintiffs' entrance facilities used for interconnection, instead of the higher tariff rate billed by AT&T. (SF ¶144). Plaintiffs paid the TELRIC rate because AT&T is required under the ICAs, the Act, and *Talk America* to charge the TELRIC rate. AT&T tries to support its counterclaim by again claiming the ICAs "do not contain provisions requiring Defendants to provide, or entitling Plaintiffs to obtain, entrance facilities used for interconnection at TELRIC rates." (Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 17)). For all the reasons discussed above supporting Level 3's motion for summary judgment, Level 3 is entitled to summary judgment on AT&T's counterclaim.

## VII.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON AT&T'S AFFIRMATIVE DEFENSES.

### A.    Plaintiffs Have Stated Claims Upon Which Relief May Be Granted.

AT&T asserts in its first affirmative defense that "The Amended Complaint fails to state a claim upon which relief can be granted." Answer, Filing No. 47 at 19. This Court has already ruled on this issue and held that Plaintiffs have stated claims upon which relief can be granted. *See* Feb. 2, 2014 Order, Filing No. 35. Accordingly, Plaintiffs are entitled to summary judgment on AT&T's first affirmative defense.

### B.    Plaintiffs' Claims Are Timely And Not Barred By Any Statute Of Limitations Or Any Limitation Contained In The ICAs.

AT&T asserts in its second affirmative defense that Level 3's and Broadwing's claims are "barred, in whole or in part, by the applicable statute of limitations, by laches or by other

doctrines relating to the passage of time." Answer, Filing No. 47 at 19. AT&T asserts in its fifth affirmative defense, that Plaintiffs' claims are "barred by the terms of the parties' interconnection agreements." *Id.* AT&T claims that a section of the ICA that relates to back-billing and credit claims bars Plaintiffs' claims. (Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 10); JA-32 (Level 3 ICA §8.11); JA-8877 (Broadwing Texas ICA §11.8)). Because discussion of the ICA provisions relied on by AT&T overlaps with AT&T's arguments concerning time limitations, AT&T's second and fifth affirmative defenses will both be discussed in this Section.

Plaintiffs timely filed their claims on June 7, 2013, less than two years after the June 9, 2011 *Talk America* decision, which finally resolved the industry controversy surrounding AT&T's prior interpretation of and its unilateral, and wrong, implementation of the TRRO. The Parties expressly reserved all of their "rights and remedies" with respect to FCC Orders, including specifically the TRRO. (SF ¶¶43-45, 209). The TRRO was issued by the FCC on February 4, 2005, shortly before Level 3 and AT&T agreed to settle their arbitrations and enter into the ICAs. Within days, litigation over the TRRO began in Michigan that ultimately culminated in the *Talk America* decision. No action was required by Level 3 before Talk America was decided, and Level 3 and Broadwing filed their claims well within any applicable statute of limitations period. *See, e.g.,* Mo. Rev. Stat. § 516.120 (five year statute of limitations for actions upon contracts); Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 10) (stating Plaintiffs' claims are subject to the applicable statute of limitations in each state whose laws govern the ICA).

AT&T alleged in its second affirmative defense not only that Level 3's damages are barred "in part" by a statute of limitations, but also that Level 3's damages are barred "in whole" by a statute of limitations. Level 3's damages could not be barred "in whole" by any statute of

limitations because AT&T continues to breach the ICAs and the Act. Because AT&T continues to refuse to charge cost-based rates for entrance facilities, Plaintiffs' damages are continuing and cannot be *entirely* barred by any statute of limitations. Level 3 and Broadwing are entitled to summary judgment on Defendants' second and fifth affirmative defenses.

### 1. The Parties Reserved All Of Their Rights And Remedies Related To The TRRO.

The Parties agreed in the ICAs that "**neither Party waives, but instead expressly reserves, all of its rights, remedies and arguments with respect to … the FCC's Order on Remand** (FCC 04-290), WC Docket No. 04-312 and CC Docket No. 01-338 (rel. Feb. 4, 2005) **("TRO Remand Order")"** (SF ¶43) (JA-59 to -61 (Level 3 ICA § 21.1) (emphasis added)). The "TRO Remand Order" is the TRRO. 20 FCC Rcd. 2533 (2005). This language was negotiated as part of settling 13 separate arbitration proceedings. (SF ¶¶22-27, 31- 34, 43-44). The Broadwing ICAs have words to similar effect. (SF ¶209). By expressly reserving all of their rights, remedies, and arguments related to the TRRO, the Parties agreed that claims related to the TRRO were tolled until finally decided by the courts. (SF ¶45).

Not only did the parties reserve their arguments, but they reserved all of their *rights and remedies* associated with those arguments. (SF ¶¶43, 209). "**A right is a** well-founded or acknowledged **claim**; **a remedy is the means** employed **to enforce a right** or redress an injury." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 445 (2001). Every word of the Parties' reservation must be given meaning. *Rosemann v. Sigillito*, 956 F. Supp.2d 1082, 1104 (E.D. Mo. 2013); *Smith*, 664 F. 3d at 1213. The Parties not only agreed that they each preserved the rights afforded to them under the TRRO, but they also preserved the remedies and means to enforce those rights (i.e., to bring a lawsuit if necessary to enforce their right to obtain entrance facilities at cost-based rates). (SF ¶¶43, 45, 209).

Courts have found that similar language reserving rights and remedies is a tolling agreement when the parties are settling and staying a dispute and the parties are on notice of the issues. *See Corp. v. Massachusetts Highway Dept.*, No. 050487BLS, 2005 WL 705097 (Mass. Feb. 23, 2005) (holding that where parties settle and stay a dispute, provide notice to the other, and agree that "neither [party] waives, and each expressly reserves, any and all rights, claims, defenses and remedies they may have under, and with respect to, the Contract," they have effectively entered into a "tolling agreement").

Litigation over AT&T's interpretation of the TRRO began in Michigan on February 16, 2005, almost immediately after the TRRO was issued. (SF ¶¶104-113). The issues in the Michigan litigation were resolved by the Supreme Court in 2011 with *Talk America*. (*Id.*).

AT&T had both actual and written notice of the scope of the Parties' reservation of rights and remedies regarding the TRRO. AT&T was a party in the Michigan litigation. The Michigan litigation progressed to the Supreme Court and was finally decided by the Court's *Talk America* decision. AT&T was also aware of the issues in 2007-2009, when, as part of its EF2AC price increase project, it identified Plaintiffs' entrance facilities used for interconnection and increased the prices AT&T charged for those facilities. Also, in 2008, Level 3 disputed the price increase, AT&T's removal of the "JK" circuit identifier, and AT&T's retroactive charges in Michigan. (SF ¶¶97-103). AT&T tracked the increased revenue it received from its price conversion. (SF ¶71). After *Talk America*, Level 3 notified AT&T of the nature of the TELRIC issue by filing formal disputes on 141 Level 3 and Broadwing circuits located in Michigan, Kansas, and Texas. (SF ¶¶134). Level 3 notified AT&T of the broad scope of the dispute by using global dispute remarks implicating all entrance facilities used for interconnection, even though AT&T's billing system required disputes to reference individual circuits. (SF ¶134). For example, Level 3 notified

29

AT&T that it was "disputing Special Access billing of facilities that are ordered for the purpose of Local Interconnection facilities." (*Id.*). Level 3 went further and referenced the *Talk America* decision and demanded it receive cost-based rates for its entrance facilities. (*Id.*).

To further effectuate their reservation of rights and remedies, the Parties agreed the ICAs would be immediately modified consistent with any applicable court order. (SF ¶¶44, 209). Specifically, the Parties agreed that if any court or other body issues an order that interprets the TRRO and affects the rights or obligations of either Party, the ICA "shall be immediately invalidated, modified or stayed consistent with the action of the regulatory or legislative body or court of competent jurisdiction upon the written request of either Party." (SF ¶¶44, 209) (JA-59 to -61 (Level 3 ICA § 21.1); JA-7838 to -41 (Broadwing Further Amendment at §§ 1.2; 2.1)). The Supreme Court held that AT&T *has always* been required to provide entrance facilities used for interconnection at TELRIC rates and that ruling was immediately incorporated into the ICAs pursuant to the Intervening Law Provision. *See Talk America*, 131 S. Ct. at 2258-60; 2263-65. This immediate modification of the ICAs is exactly what AT&T argued to the Michigan Commission. AT&T argued the TRRO was "self-effectuating" and ICAs automatically provide for the TRRO's provisions. (SF ¶109).

> ### 2. The Tariffs Require Retroactive Application Of *Talk America* Back To The Date The Tariffs Were Issued.

AT&T increased the prices it charged Plaintiffs from cost-based rates to tariff rates. AT&T also forced Plaintiffs to order entrance facilities under AT&T's tariffs. (SF ¶¶2,84). Like the ICAs, those tariffs also entitle Level 3 "retrospective" application of an applicable court order. Specifically, the AT&T state tariffs in Texas, Michigan, Ohio, Wisconsin, Indiana, and

Kansas incorporate one of two FCC tariffs (FCC Tariff Nos. 2 and 73). (SF ¶95)[3]. Those FCC tariffs provide, in relevant part, "Rates contained in this transmittal are subject to subsequent adjustment, effective retrospectively back to the transmittal's original effective date … in the event of any other adjustment pursuant to an order of the Commission or a court." (SF ¶¶94-96) (*Southwestern Bell Telephone Company* Tariff FCC No. 73 3rd Revised Page 6-126.1, p. 166/318); *see also* Pls. Ex. 3AX, *Ameritech Operating Companies* Tariff FCC No. 2, 17th Revised page 230.2.1, p 661/709 (providing similar language)).

Here, the Supreme Court held AT&T was always required to charge Level 3 cost-based prices for entrance facilities used for interconnection. Because AT&T wrongfully increased the prices they charged Plaintiffs from TELRIC rates to tariff prices and required Plaintiffs to order all entrance facilities under the tariffs, AT&T is required under the language of the very tariffs to which AT&T converted Level 3's circuits, to "retrospectively" apply cost-based rates back to the original date of the tariff. Level 3 is entitled to a judgment as a matter of law to that effect.

### 3.    AT&T's Actions Demonstrate Plaintiffs' Claims Are Timely.

In addition to the plain language of the ICA and the tariff, AT&T's conduct demonstrates that Plaintiffs' claims are timely. When AT&T unilaterally raised the prices on Level 3's entrance facilities in Michigan, AT&T also billed Level 3 for a retroactive "true-up" amount consisting of the difference between the tariff and TELRIC rate for a period of time *before* the price increase. (SF ¶90). On July 1, 2009, AT&T invoiced Level 3 $246,328.31 to "true-up" Michigan circuits back to the dates the circuits were first established, either March 10, 2006, or June 8, 2006. (SF

---

[3] *See* Texas Interstate Access Tariff Section 6 (incorporating FCC No. 73); Michigan Bell Telephone Company Tariff MPSC No. 20R Part 21 - Access Services; Section 1- General (incorporating FCC No. 2); Ohio Bell Telephone Company Tariff PUCO No. 20; Part 21 - Access Services; Part 1 - General (incorporating FCC No. 2); Wisconsin Bell, Inc. Access Service Tariff, Part A002- General Regs. (incorporating FCC No. 2); Indiana Bell Telephone Co., Inc IURC No. 20- Part 21, Section 1 (incorporating FCC No. 2); Kansas Access Service Tariff Sections 2 and 6 (incorporating FCC No. 73).

¶90). In other words, once AT&T decided to unilaterally raise the rates charged to Level 3, it applied its rate increase retroactive to the date the circuit was established, which in Michigan was over three years earlier. What is good for the goose is good for the gander. Based on its own actions, AT&T cannot now legitimately claim that Level 3 is barred by a limitations period which prevents the implementation of the ruling in *Talk America*.

AT&T also alleged in its second affirmative defense that Level 3 was barred by the doctrine of laches. (Answer, Filing No. 47 at 19). The doctrine of laches is inapplicable because Level 3 has not acted inequitably and is not barred by any statute of limitations. *See Harlysville Worchester Ins. Co. v. Diamondhead Prop. Owners Ass'n.*, 741 F.3d 1336 (8th Cir. 2014); *Union Elec. Co. v. Southwestern Bell Tel. L.P.*, 378 F.3d 781, 787 (8th Cir. 2004).

AT&T wrongfully converted Level 3's circuits in violation of its obligations under the ICAs, the Act, and its obligation of good faith. AT&T should not be allowed to profit from its wrongdoing. Allowing AT&T to profit when it wrongfully increased the rates for Level 3's circuits and then refused and delayed any attempt to remedy that breach is inequitable and contrary to the law. *See Entergy Ark. Inc. v. Nebraska*, 226 F. Supp. 2d 1047 (D. Neb. 2002) ("Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred."); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483 (8th Cir. 1992) ("Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.").

### 4.    The ICA Provisions Related To "Back-Billing And Credit Claims" Are Not Applicable Here.

AT&T argues that Plaintiffs' claims are barred by the ICAs because (1) the ICAs do not provide for TELRIC pricing, and (2) the ICAs place a time limit on Plaintiffs' claims. Pls. Ex

3AL (AT&T Answers to Interrogatory Nos. 6, 10). As discussed above, the ICAs do require AT&T to charge TELRIC rates for interconnection entrance facilities. *Supra*. In AT&T's answers to interrogatories requesting it identify the facts which support its second affirmative defense, AT&T identified Section 8.11 of the Level 3 ICA and Section 11.8 of the Broadwing ICA as the sections that contain time limitation bars to Plaintiffs' claims. Pls. Ex. 3AL (AT&T Answer to Interrogatory No. 10). These sections pertain to billing errors, not to larger policy-based disputes subject to the reservation of rights contained in the Intervening Law Clause. In addition, AT&T was on actual notice of the TELRIC issue (so providing even more notice was unnecessary), the parties had agreed that additional disputes were unnecessary, and it would have been futile for Plaintiffs to file more disputes only to have those disputes denied by AT&T.

(a)  <b>The Billing Provisions Do Not Override The Reservation Of Rights.</b>

AT&T again ignores that the Parties expressly reserved all of their rights and remedies with respect to the TRRO. (SF ¶¶43, 209). AT&T increased prices (and breached the ICAs) based on the TRRO. The ministerial billing dispute notice provisions do not override the Parties' express reservation of their rights and remedies related to the TRRO. (SF ¶61). The claims in this lawsuit are not "back-billing and credit claims" which are governed by Sections 8.11 and 11.8 of the respective ICAs.

If disputes relating to the TRRO were time-barred under the billing dispute notice provisions, as AT&T argues, the express reservation of rights and remedies provision would be meaningless. *See Rosemann*, 956 F. Supp.2d at 1104 ("[E]ach term of a contract is construed to avoid rendering other terms meaningless."). It would not make sense for the Parties to have dismissed the 13 state arbitrations and reserve all rights and remedies with regard to the TRRO if claims related to the TRRO were subject to the short time limitation applicable to ministerial

33

billing disputes and errors. In any event, these are not billing disputes, as the United States Supreme Court did not decide a "billing dispute." The Supreme Court resolved a conflict in the federal circuits regarding the interpretation of the TRRO, an issue expressly reserved by the Parties.

Even if the time limitations applicable to ministerial billing disputes were applicable here (and they are not), AT&T is not entitled to enforce those provisions because it materially breached the contract. AT&T did not accidentally bill Level 3 incorrectly, it did so wrongly and on purpose, then failed to reverse course when the Supreme Court told AT&T that its price conversions were unlawful.  Through each of these actions, AT&T materially breached the contract, and lost its right to thereafter enforce the contract against the non-breaching party. *See Arthur L. Christoffersen Irrevocable Trust v. Yellow Book USA, Inc.*, No. 06-CV-79-LRR, 2007 WL 2610955 at *9 (N. D. Iowa Sept. 6, 2007) *aff'd sub nom.*; *Christoffersen v. Yellow Book USA*, 536 F.3d 947 (8th Cir. 2008) ("Once one party commits a material breach of the contract, the other party is no longer obligated to continue performing, that is, they are discharged from their duty to perform"); *Monarch Photo, Inc. v. Qualex, Inc.*, 935 F. Supp. 1028 (D. N.D. 1996) ("a material failure of performance by one party to a contract, not justified by the conduct of the other, discharges the latter's duty to give the agreed exchange").

### (b)    AT&T Had Actual And Written Notice Of The TELRIC Issue.

The purpose of any billing dispute notification provision is to provide notice. Here, AT&T was well-aware of the issues in dispute in this lawsuit. AT&T was a party to the Michigan litigation and identified and converted Plaintiffs' circuits from 2007-2009. Plaintiffs also provided AT&T written notice of the broad scope of the disputes. (SF ¶¶122-144).

**AT&T and Level 3 even reached an agreement that Level 3 would not file more disputes on these issues.** (SF ¶132). Echo Putman, a Level 3 Network Expense Manager,

testified that Level 3 and AT&T specifically agreed that neither party wanted Level 3 to flood the AT&T dispute system with a large number of disputes all related to the same TELRIC issue. (SF ¶132). Ms. Putman has worked for Level 3 since Level 3 acquired her former employer, TelCove, Inc., in 2006. (SF ¶125). At various times Ms. Putman has been responsible for ordering facilities from AT&T and identifying and escalating disputes with AT&T. (SF ¶126).

Although AT&T technically operates different entities for each state, for purposes of these disputes, AT&T operates as a single, unified company. (SF ¶137). Lori Hein described all Defendants as "AT&T." *Id.* All disputes with AT&T are sent to AT&T's centralized dispute system. (SF ¶135). All of Plaintiffs' disputes were handled by the same AT&T personnel. (SF ¶139). AT&T was fully aware of the TELRIC dispute as a party in the *Talk America* decision. It knew full well when it increased the pricing on Plaintiffs' circuits it would have to convert them back if AT&T lost the *Talk America* decision (SF ¶91); s*ee, e.g., Jack v. Craighead Rice Milling Co.*, 167 F.2d 96, 100-01 (8th Cir. 1948) (stating that if a breaching party "already had knowledge or was chargeable with knowledge of the default, then failure to give notice in the form required by the stipulation would not relieve it from liability").

### (c)   It Would Have Been Futile For Plaintiffs To File More Disputes.

In addition to the agreement the Parties reached that there was no need to file additional disputes, it would have been futile for Plaintiffs to have filed more disputes. **AT&T directed Level 3 not to file any more disputes and directed its personnel in advance to deny any more TELRIC disputes from Level 3.** (SF ¶¶138-140). Level 3 submitted disputes and re-disputes on many circuits and requested AT&T keep the disputes in an "open/referred/escalated status." (SF ¶148). AT&T repeatedly denied every one of Level 3's and Broadwing's disputes and issued a blanket statement declaring AT&T "will be denying the disputes related to this issue and

**would expect that Level 3 not resubmit them to ATT**." (SF ¶139) (emphasis added); *see also* (SF ¶154) (Pls. Ex. 3AR (March 30, 2012 AT&T Email) (telling Level 3 the ICAs do not provide for TELRIC pricing "making any disputes filed invalid."). **AT&T even directed its personnel *in advance* to deny *all* TELRIC disputes coming from Level 3.** (SF ¶140) (Pls. Ex. 3AU (October 5, 2012 AT&T Email) ("If you see any come in for this please deny them"). AT&T's own internal price increase protocols stated that Level 3's actions did not matter because the price conversion was "non-voluntary" and applied whether Level 3 agreed or not. (SF ¶76). Filing a dispute when the other party has already implemented procedures in advance to deny that dispute is the quintessential futile act.

"The law does not require the doing of a futile act." *Wis. Res. Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 710 (7th Cir. 2013); *United States v. Tirado-Tirado*, 563 F.3d 117, 123 (5th Cir. 2009) (same); *see also Rosenbloom v. New York Life Ins. Co.*, 163 F.2d 1, 4 (8th Cir. 1947) ("a party is not required to do a useless, futile act"). Submitting a dispute to another party is futile if the other party "will almost certainly deny" the dispute because they have "a preconceived position" on the matter. *See Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986). Similarly, a party does not have to undertake an act "incapable of producing the desired result" such that the party is "butting its head against a stone wall." *Liberty Entl. Sys. v. County of Westchester*, No. 94 Civ. 7431, 2000 WL 1752927, at *18 n.4 (S.D.N.Y. Nov. 29, 2000); *see also Trietsch v. Cent. Benefits Mut. Ins. Co.*, No. 1:07-cv-0469, 2007 WL 4285365, at *6-7 (S.D. Ind. Dec. 3, 2007) ("He had encountered such a solid stone wall up to that point that the law did not require him to send a fifth request.").

AT&T epitomizes the "stone wall" description used by courts to explain a futile act. It is uncontroverted that AT&T directed Level 3 not to file additional disputes, and directed its

dispute team *in advance* to deny *any other disputes* filed by Level 3. AT&T had "a preconceived position" on the TELRIC issue. Even if Level 3 had filed a thousand more disputes, AT&T already made its position known in advance that it would have denied every one of those disputes. (SF ¶¶138-140). AT&T cannot now legitimately claim that Plaintiffs' claims are limited because Plaintiffs did not file additional disputes, only to have those disputes denied.

Not only would it have been futile for Level 3 to file more disputes, it may have been detrimental to Level 3's business. AT&T had threatened Level 3 with a "default order embargo" which meant AT&T would not process Level 3's service request orders if Level 3 continued to file what AT&T considered "frivolous disputes." (SF ¶143). Because AT&T charges Level 3 monthly recurring charges for each circuit, a dispute for a single entrance facility generates a new, separate dispute every month. (SF ¶¶141-142). In this case, Plaintiffs' initial disputes on 141 circuits quickly ballooned into over 8,700 individual dispute items. (SF ¶142). Had Level 3 filed thousands of additional disputes, AT&T (under its preconceived position on the disputes) may have found those disputes to be "frivolous" and may have carried out its threats of refusing to provide new services requested by Level 3. Level 3 cannot properly serve its customers if AT&T refuses to sell Level 3 services that only AT&T can provide. Plaintiffs' claims are not time-barred and Plaintiffs are entitled to summary judgment on AT&T's second and fifth affirmative defenses.

### C.    Plaintiffs' Claims Are Not Barred By Estoppel Or Waiver.

AT&T asserts in its third affirmative defense that Plaintiffs' claims are "barred, in whole or in part, by the doctrine of estoppel and/or waiver." Answer, Filing No. 47 at 19. The doctrines of waiver and estoppel are different defenses with different elements. *Spirtas Co. v. Ins. Co. of the State of Penn.*, 2006 WL 1300669 (E.D. Mo. May 9, 2006).

### 1.    Estoppel.

The doctrine of equitable estoppel is not favored. *Schultis v. Advanced Healthcare Mgmt. Servs., LLC*, 2011 WL 3444076 (E.D. Mo. Aug. 8, 2011). Equitable estoppel would only apply as a defense here if allowing Plaintiffs to assert their rights would be unfair. *Id.* The elements of estoppel are: "(1) an admission, statement or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement or act." *Gannon Int'l, LTD v. Lexington Ins. Co.*, 2008 U.S. Dist. LEXIS 60175 (E.D. Mo. Aug. 6, 2008).

Plaintiffs did not make any statements or take any actions inconsistent with the claims they are making here. AT&T, on the other hand, changed its arguments after the Supreme Court said AT&T was wrong. For years, AT&T's only basis for increasing to higher prices was AT&T's incorrect interpretation of the TRRO. After the Supreme Court held AT&T's interpretation of the TRRO was wrong, AT&T steadfastly refused to comply with the Court's ruling and lower the prices back to cost-based prices. Instead, AT&T came up with new argument after new argument in an attempt to delay or avoid compliance with the Supreme Court's ruling. It would be unfair not to allow Plaintiffs' claims. AT&T should not be rewarded for its heavy-handed conduct.

## 2. Waiver.

Waiver "is the intentional relinquishment of a known right by one of the parties to a contract." *Id.* Wavier may be implied from conduct, but "the conduct must clearly and unequivocally show a purpose to relinquish the right." *Id.* In order to meet this requirement, "the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation is possible." *Id. citing MCI Metro Access Transmission Servs., Inc. v. City of St. Louis*, 941 S.W.2d 634, 639-40 (Mo. Ct. App.

1997). Level 3 has not waived any of its rights. Level 3 *expressly reserved* all of its rights and remedies with regard to the TRRO. (Intervening Law Provision). Plaintiffs are entitled to summary judgment on AT&T's third affirmative defense.

### D.      AT&T Is The Only Party With Unclean Hands.

AT&T asserts in its fourth affirmative defense that Plaintiffs' claims are "barred, in whole or in part, by the doctrine of unclean hands." Answer, Filing No. 47 at 19. "The underlying principle in the equitable rule of 'unclean hands' is that a court of conscience will not grant relief to one who, at the time, is acting inequitably in connection with the subject-matter of the controversy." *Aetna Ins. Co. v. Hyde*, 34 F.2d 185 (D. Mo. 1929). The doctrine of unclean hands does not apply to a claim for money damages for breach of contract. *See Herd v. Am. Sec. Ins. Co.*, 556 F. Supp. 2d 992, 1001 (W.D. Mo. 2008); *Union Elec. Co. v. Southwestern Bell Tel. L.P.*, 378 F.3d 781, 788 (8th Cir. 2004). Even though the doctrine of unclean hands is usually a question of fact, Plaintiffs are entitled to summary judgment because here there is no dispute of any material fact.

Plaintiffs have acted consistently and equitably throughout the TELRIC dispute. After the TRRO was released, Level 3 settled the arbitrations pending in 13 states and reserved all of its rights and remedies with regard to the TRRO. When AT&T began increasing the rates for Level 3's circuits from TELRIC to tariff rates, Level 3 disputed AT&T's price increase. AT&T steadfastly relied on the TRRO to justify its actions. When AT&T retroactively charged higher rates going back three years in Michigan, Level 3 filed a dispute and AT&T again relied on the TRRO. After the Supreme Court issued the *Talk America* decision, Level 3 raised the TELRIC issue with AT&T and filed suit within two years.

The only party acting inequitably in this case is AT&T. Despite AT&T's clear obligations under the Act, the TRRO, the ICAs, and *Talk America*, AT&T has not provided Level 3 or

Broadwing a single entrance facility at cost-based rates since AT&T unilaterally increased its prices in 2007-2009. (SF ¶5). AT&T even charged Level 3 a conversion charge, apparently for the privilege of receiving AT&T's unilateral price increase, and forced Plaintiffs to order facilities under AT&T's tariffs. (SF ¶¶2, 84). Despite an unambiguous mandate from the Supreme Court telling AT&T that it was obligated to charge cost-based rates for entrance facilities, AT&T refuses to do so and instead has forced Level 3 to file suit to enforce its rights. AT&T changes its arguments when convenient, even after litigation has been filed. Plaintiffs, on the other hand, have been subjected to AT&T's heavy-handed actions, and seek that to which they have always been entitled. Plaintiffs are entitled to summary judgment on AT&T's fourth affirmative defense.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request an order: (1) holding that AT&T breached the ICAs; (2) holding that AT&T is required to charge cost-based rates for any portion of an entrance facility used for interconnection; (3) holding that AT&T violated Sections 251 and 252 of the Act; (4) declaring that AT&T must (a) charge cost-based rates on all entrance facilities used for local interconnection; (b) allow Level 3 and Broadwing to order new entrance facilities under the ICAs at TELRIC rates; and (c) charge TELRIC rates for all or any portion of entrance facilities used for interconnection; (5) in the alternative, holding that AT&T has been unjustly enriched by the difference of the tariff rates it charged and the TELRIC rates it should have charged; (6) granting Plaintiffs summary judgment on Defendants' counterclaim; and (7) granting Plaintiffs summary judgment on AT&T's affirmative defenses.

DATED this 31st day of March, 2016.

Respectfully submitted,

BY:   /s/ Joseph E. Jones
        Joseph E. Jones, *pro hac vice*
        Timothy J. Thalken, *pro hac vice*
        FRASER STRYKER PC LLO
        500 Energy Plaza
        409 South 17th Street
        Omaha, NE  68102-2663
        (402) 341-6000
        jjones@fraserstryker.com
        tthalken@fraserstryker.com

                and

        Erik O. Solverud, #44291 MO
        SPENCER FANE BRITT & BROWN, LLP
        1 North Brentwood Boulevard, Suite 1000
        St. Louis, MO  63105-3900
        (314) 863-7733
        esolverud@spencerfane.com

        ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically with the United States District Court for the Eastern District of Missouri on March 31, 2016, using the CM/ECF system which sent notification of such filing to all CM/ECF participants.

        /s/ Joseph E. Jones

1413776.21