IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LEVEL 3 COMMUNICATIONS, LLC, and BROADWING COMMUNICATIONS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:13-CV-1080 |
| ILLINOIS BELL TELEPHONE COMPANY, INDIANA BELL TELEPHONE COMPANY, INCORPORATED, MICHIGAN BELL TELEPHONE COMPANY, NEVADA BELL TELEPHONE COMPANY, THE OHIO BELL TELEPHONE COMPANY, PACIFIC BELL TELEPHONE COMPANY, SOUTHWESTERN BELL TELEPHONE COMPANY, and WISCONSIN BELL, INC., | ) ) ) ) ) ) ) ) ) ) ) ) | Judge Carol E. Jackson |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Dennis G. Friedman (*pro hac vice*)
Hans J. Germann (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
dfriedman@mayerbrown.com
hgermann@mayerbrown.com
ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................... 1

Argument ....................................................................................................................... 3

    I.      The Parties' ICAs Did Not Require AT&T To Provide Entrance Facilities
          At TELRIC-Based Rates .................................................................................... 3

          A.      The ICAs' General Terms And Conditions Do Not Help Plaintiffs .......... 3

          B.      The NIM Appendix Does Not Save Plaintiffs ........................................... 8

                1.      Nothing in the NIM Appendix requires AT&T to provide
                        entrance facilities ......................................................................... 9

                2.      The interconnection provisions of the Superseding
                        Amendment also do not require AT&T to provide cost-
                        based entrance facilities ............................................................. 11

          C.      The ICAs' Intervening Law Provisions, Including In The Level 3
                Superseding Amendment And The Broadwing Further
                 Amendment, Do Not Help Plaintiffs ...................................................... 14

    II.     The "Mend The Hold" Doctrine Does Not Permit Plaintiffs To Evade The
          Terms Of Their Contracts ............................................................................... 17

    III.    In No Event Would Plaintiffs Be Entitled To Cost-Based Rates For
          Facilities Not Used Solely For Interconnection. ............................................. 23

    IV.    AT&T Is Entitled To Summary Judgment On Plaintiffs' Unjust
          Enrichment Claim ........................................................................................... 26

    V.     Plaintiffs' Claims Are Barred To The Extent Plaintiffs Failed To Submit
          Timely Disputes In Accordance With The ICAs And The Federal Two-
          Year Statute of Limitations (AT&T's Second Affirmative Defense) ................. 27

          A.      Plaintiffs' Claims Are Barred To The Extent They Concern
                 Charges Billed More Than Two Years Before Plaintiffs Filed This
                 Lawsuit .................................................................................................. 28

          B.      Plaintiffs' Reliance On AT&T's Tariffs Is Misplaced ............................ 29

          C.      Plaintiffs' Attempts To Excuse Their Noncompliance With The
                 ICA Dispute Requirements Are Baseless ............................................... 30

    VI.    Plaintiffs Are Not Entitled To Summary Judgment On AT&T's Third And
          Fourth Affirmative Defenses (Estoppel/Waiver and Unclean Hands) ............... 35

Conclusion .................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Judicial Decisions**

*ABKCO Music, Inc. v. LaVere*,
217 F.3d 684 (9th Cir. 2000) ................................................16

*Am. Sulphur Royalty Co. of Texas v. Freeport Sulphur Co.*,
276 S.W. 448 (Tex. App. 1925), *writ granted* (Dec. 10, 1925), *aff'd*, 117 Tex.
439, 6 S.W.2d 1039 (1928) ................................................23

*Amerisure Ins. Co. v. Scottsdale Ins. Co.*,
795 F. Supp. 2d 819 (S.D. Ind. 2011) ................................................22

*Ark. La. Gas Co. v. Hall*,
453 U.S. 571 (1981) ................................................27, 30

*Barnett v. Kemp*,
167 S.W. 546 (Mo. 1914) ................................................23

*Bourbon v. Kmart Corp.*,
223 F.3d 469 (7th Cir. 2000) ................................................22

*Burlington Ins. Co. v. PMI Am., Inc.*,
862 F. Supp. 2d 719 (S.D. Ohio Mar. 23, 2012) ................................................23

*Dahlmann v. Geico Gen. Ins. Co.*,
2016 WL 1125976 (Mich. Ct. App. Mar. 22, 2016) ................................................23

*Endl v. Sch. Dist. of Beloit*,
2002 WI App 1, 249 Wis. 2d 490, 639 N.W.2d 224 (Wis. Ct. App. 2001) ................................................23

*Express Phone Service, Inc. v. Florida Pub. Serv. Comm'n*,
2013 WL 6536748 (N.D. Fl. Dec. 12, 2013) ................................................32

*Fed. Ins. Co. v. Infoglide Corp.*,
2006 WL 2050694 (W.D. Tex. July 18, 2006) ................................................23

*First Nat'l Bank of Ely v. Progressive Cas. Ins. Co.*,
2012 WL 5944847 (D. Nev. Nov. 27, 2012) ................................................22

*Firstcom, Inc. v. Qwest Corp.*,
555 F.3d 669 (8th Cir. 2009) ................................................27

*Franke v. Greene*,
4:11-CV-1860-JCH (E.D. Mo. Aug. 6, 2012) ................................................26

ii

*Fry v. Am. Home Assur. Co.*,
   2015 WL 519706 (E.D. Okla. Feb. 9, 2015)..........................................................................23

*Genesco, Inc. v. Visa U.S.A., Inc.*,
   302 F.R.D. 168 (M.D. Tenn. 2014) ......................................................................................22

*Harbor Ins. Co. v. Cont'l Bank Corp.*,
   922 F.2d 357 (7th Cir. 1990) ...............................................................................................20

*Howard v. Turnbull*,
   316 S.W.3d 431 (Mo. App. W.D. 2010)................................................................................26

*Kirschner v. Process Design Associates, Inc.*,
   592 N.W.2d 707 (Mich. 1999)..............................................................................................23

*Lakeview Collection Inc. v. Bank of Am., N.A.*,
   942 F. Supp. 2d 830 (N.D. Ill. 2013) ...................................................................................22

*Law Offices of Curtis V. Trinko, LLP v. Bell Atl. Corp.*,
   305 F.3d 89 (2d Cir. 2002), *rev'd in part on other grounds sub nom. Verizon
   Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..............4, 5, 6

*Mich. Bell Tel. Co. v. MCIMetro Access Trans. Servs., Inc.*,
   323 F.3d 348 (6th Cir. 2003) ...........................................................................................4, 30

*Michigan Bell Tel. Co. v. Lark*,
   2007 WL 2868633 (E.D. Mich. Sept. 26, 2007), *rev'd sub nom. by Talk
   America* ............................................................................................................................6, 21

*Monarch Photo, Inc. v. Qualex, Inc.*,
   935 F. Supp. 1028 (D.N.D. 1996)..........................................................................................34

*Nationwide Prop. & Cas. Ins. Co. v. Faircloth*,
   2015 WL 4943962 (E.D. Ark. Aug. 19, 2015) .....................................................................22

*Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*,
   273 F. Supp. 2d 436 (S.D.N.Y. 2003)....................................................................................5

*On-Site Screening, Inc. v. United States*,
   687 F.3d 896 (7th Cir. 2012) ...............................................................................................22

*Rivers v. Roadway Express, Inc.*,
   511 U.S. 298 (1994)..............................................................................................................16

*Rosemann v. Sigillito*,
   956 F. Supp. 2d 1082 (E.D. Mo. 2013)..................................................................................6

*Rupracht v. Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0146LDUSA0701030,*
2012 WL 4472158 (D. Nev. Sept. 25, 2012) ........................................................22

*Ryerson Inc. v. Federal Ins. Co.,*
676 F.3d 610 (7th Cir. 2012) .....................................................................17, 20

*SprintCom, Inc. v. Comm'rs of the Ill. Commerce Comm'n,*
790 F.3d 751 (7th Cir. 2015) .........................................................................26

*Sw. Bell Tel. Co. v. Allnet Commc'ns Servs., Inc.,*
789 F. Supp. 302 (E.D. Mo. 1992).................................................................27

*Talk America Inc. v. Michigan Bell Tel. Co.,*
131 S. Ct. 2254 (2011) ........................................................................... *passim*

*Verizon Cal., Inc. v. Peevey,*
462 F.3d 1142 (9th Cir. 2006) .........................................................................5

*Verizon Maryland, Inc. v. RCN Telecom Servs.,*
232 F. Supp. 2d 539 (D. Md. 2002) ................................................................5

*Verizon New Jersey v. Ntegrity Telecontent Servs., Inc.,*
219 F. Supp. 2d 616 (D.N.J. 2002) .................................................................4

**FCC Orders**

*American Cellular Corp. v. BellSouth Telecommc'ns, Inc.,*
22 FCC Rcd. 1083, 2007 WL 268574 ........................................................28, 29

*In the Matter of Connect America Fund,*
2011 WL 584497 (FCC Nov. 18, 2011) ...........................................................25

*Core Communications, Inc. v. SBC Communications Inc.,*
18 FCC Rcd. 7568, 2003 WL 1884294 (April 10, 2003), *vacated on other grounds by SBC Commc'ns Inc. v. FCC,* 407 F.3d 1223 (D.C. Cir. 2005) ........................3, 4

*In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchanger Carriers,*
18 FCC Rcd. 16978, 2003 WL 22175730 (2003).......................................... *passim*

*In re Unbundled Access to Network Elements,*
20 FCC Rcd. 2533, 2005 WL 289015 (2005)................................................ *passim*

*Valenti v. AT&T,*
12 FCC Rcd. 2611 (1997), available at
https://transition.fcc.gov/Bureaus/Common_Carrier/Orders/1997/fcc97026.txt....................29

**Statutes**

47 U.S.C. § 201(b)..................................................................................................27

47 U.S.C. § 251.............................................................................................. *passim*

47 U.S.C. § 251(b).................................................................................................5, 7

47 U.S.C. § 251(b)(5)..............................................................................................11

47 U.S.C. § 251(c)................................................................................................5, 7

47 U.S.C. § 251(c)(2)....................................................................................... *passim*

47 U.S.C. § 251(c)(3)...........................................................................................4, 24

47 U.S.C. § 252.........................................................................................................4

47 U.S.C. § 252(a)(1)......................................................................................3, 4, 5, 7

47 U.S.C. § 415.......................................................................................................29

47 U.S.C. § 415(b)..................................................................................................27

**Other Authorities**

17A Am. Jur. 2d Contracts § 731 ..............................................................................34

47 C.F.R. § 51.5.....................................................................................................25

47 C.F.R. § 51.305(b)..............................................................................................25

# Introduction

Plaintiffs' breach of contract argument is based on rhetoric, not the actual language of the parties' contracts or the law. Prior to 2005, AT&T provided Plaintiffs entrance facilities at TELRIC-based rates because the parties' then-operative contracts required it. In February 2005, shortly after the FCC issued the *TRRO*[1] and modified many of its rules, Level 3 entered into new contracts (the ones at issue here) that no longer required AT&T to provide entrance facilities. While many CLECs continued to fight with AT&T over how the *TRRO* and earlier *TRO*[2] should be interpreted and reflected in interconnection agreements – including specifically with respect to entrance facilities, in the various state commission proceedings that led to various federal court appeals that led to *Talk America*[3] – Level 3 chose to sit out of that fight. Instead, it negotiated an agreement with AT&T to settle the parties' pending arbitrations before twelve state commissions by entering into a uniform 12-state ICA, including an overarching Superseding Amendment. Pl. Ex. 3AK. In the Superseding Amendment, the parties expressly set forth how they would interconnect their networks, which did not include any provision of entrance facilities by AT&T – and the parties expressly *waived* any reservation of rights or change-of-law rights with respect to such matters. Broadwing entered into the similar Further Amendment.

In connection with implementing the changes to the FCC's regulations, AT&T undertook the "EF2AC project" to identify circuits billing at TELRIC-based rates that AT&T believed should be billing at tariffed rates. AT&T identified some Level 3 circuits in six states that were still billing at TELRIC-based rates, so it converted the prices to tariffed rates. When Level 3 questioned this (which it did for only two states), AT&T's representatives did not refer to Level

---

[1] *In re Unbundled Access to Network Elements*, 20 FCC Rcd. 2533, 2611, 2005 WL 289015 (2005).
[2] *In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchanger Carriers*, 18 FCC Rcd. 16978, 2003 WL 22175730 (2003).
[3] *Talk America Inc. v. Michigan Bell Tel. Co.*, 131 S. Ct. 2254 (2011).

3's contracts, but referred to the *TRO* and *TRRO* – the orders that were the basis for new contract provisions AT&T had proposed, and Level 3 had accepted, withdrawing the provision of entrance facilities.  Plaintiffs did not pursue the matter until years later, after *Talk America* issued, when they disputed the pricing of certain circuits in three states.  They now claim that they are entitled to TELRIC-based rates, back to 2005, for all entrance facilities in all twelve states.

Plaintiffs' principal argument in support of their breach of contract claim is not that anything in the contracts required AT&T to provide entrance facilities, but that because AT&T referred to the *TRO* and *TRRO* in connection with the EF2AC project, AT&T should not be able to make any arguments about the contracts.  That is nonsense.  As early as 2011, in connection with Plaintiffs' post-*Talk America* disputes, AT&T made clear its position that the parties' contracts did not require AT&T to provide cost-based entrance facilities, and hence AT&T continued to bill Plaintiffs at tariffed rates.  Even as to earlier charges, AT&T's references to the *TRO* and *TRRO* were entirely consistent with its position in this litigation, because those orders were the basis for the parties' ICA provisions withdrawing the provision of entrance facilities.  While *Talk America* later clarified that AT&T's interpretation of the *TRO* and *TRRO* regarding entrance facilities was not correct, that does not help Plaintiffs because they had already voluntarily accepted AT&T's interpretation and incorporated it into their agreements, while also waiving any change-of-law rights regarding such matters.  Plaintiffs may regret their decision, but that is no basis to ignore their contracts.

In the end, Plaintiffs' breach of contract claims must be evaluated under the contracts themselves.  As explained below, those contracts did not require AT&T to provide cost-based entrance facilities, and hence Plaintiffs are not entitled to summary judgment.  AT&T is.

**Argument**

**I.     The Parties' ICAs Did Not Require AT&T To Provide Entrance Facilities At TELRIC-Based Rates.**

As AT&T explained in its opening brief, nothing in the parties' contracts required AT&T to provide Plaintiffs with entrance facilities at TELRIC-based prices.  AT&T Br. (ECF No. 90) at 14-19.  Plaintiffs, in their opening brief, fail to identify any contract provision that expressly entitled them to obtain TELRIC-priced entrance facilities.  Instead, they point to various general provisions that, according to Plaintiffs, should be construed to address the provision of entrance facilities.  As explained below, none of these provisions can be construed as Plaintiffs suggest.

**A.     The ICAs' General Terms And Conditions Do Not Help Plaintiffs.**

Unable to identify any contract provisions expressly requiring the provision of entrance facilities, Plaintiffs instead point to a handful of provisions in the General Terms and Conditions that, they assert, "require the Parties to comply with their obligations under the Act."  Pl. Br. (ECF No. 86) at 11.  But that leads nowhere, even to the extent Plaintiffs accurately characterize these provisions.

AT&T's obligation under the Act is to provide interconnection in accordance with the terms of the parties' "binding" ICAs (*see* 47 U.S.C. § 252(a)(1)), and nothing more.  Indeed, this Court has already held that "Section 251(c)(2) expressly requires defendants to provide interconnection 'on rates . . . *in accordance with the* terms and conditions of any agreement.'" ECF No. 35 at 9 (emphasis in original).  AT&T has no obligation under the Act to provide anything that is not included in the parties' voluntarily-negotiated contracts.  The FCC resolved this issue long ago, holding that a CLEC, such as Plaintiffs, "cannot rely upon the general section 251 duties to circumvent the terms of its agreement."  *Core Communications, Inc. v. SBC Communications Inc.*, 18 FCC Rcd. 7568, 2003 WL 1884294, ¶ 32 (April 10, 2003), *vacated on*

3

*other grounds by SBC Commc'ns Inc. v. FCC,* 407 F.3d 1223 (D.C. Cir. 2005). While the FCC's

regulations (at the time) implementing the Act required ILECs to provide unbundled shared

transport under section 251(c)(3), Z-Tel (one of the complainants in *Core*) had entered into an

ICA with SBC that did not provide for unbundled shared transport. The FCC squarely rejected

Z-Tel's argument, indistinguishable from the argument Plaintiffs make here, that SBC was

nevertheless obligated under the Act to provide unbundled shared transport. The FCC concluded

that "the obligations created by section 251 and our rules are effectuated through the process

established in section 252 – that is, by reaching agreement through negotiation," and hence Z-Tel

"is bound by the terms of its agreement." *Id.* ¶ 30. Thus, to the extent Z-Tel's contract "does not

provide shared transport," Z-Tel "effectively waived any right to insist upon different terms,"

and "[i]n light of the specific processes established in section 252 for effectuating the obligations

set forth in section 251," it "cannot rely upon the general section 251 duties." *Id.* ¶ 32.

Federal courts have consistently reached the same conclusion. As the Sixth Circuit has

explained, "once an agreement is approved," the parties are "governed by the interconnection

agreement" and "these general duties [under the 1996 Act] do not control" and "no longer

apply." *Mich. Bell Tel. Co. v. MCIMetro Access Trans. Servs., Inc.*, 323 F.3d 348, 359 (6th Cir.

2003). *See also Law Offices of Curtis V. Trinko, LLP v. Bell Atl. Corp.*, 305 F.3d 89, 104 (2d

Cir. 2002), *rev'd in part on other grounds sub nom. Verizon Commc'ns, Inc. v. Law Offices of

Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ("the fact that the Telecommunications Act allows

parties to negotiate interconnection agreements without regard to subsections (b) and (c) of

section 251, *see* 47 U.S.C. § 252(a)(1), indicates that Congress envisioned the possibility that the

negotiated parts of the interconnection agreement could result in a different set of duties than

those defined by the statute"); *Verizon New Jersey v. Ntegrity Telecontent Servs., Inc.*, 219 F.

Supp. 2d 616, 633 (D.N.J. 2002) ("Upon the approval of the agreements, the duties of each party are defined by the parameters of their agreement rather than section 251(b) and (c). [The CLEC] may not rely upon the general duties imposed by section 251 to litigate around the specific language provided in the negotiated contracts"); *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 459 (S.D.N.Y. 2003) ("[o]nce an interconnectivity agreement such as those between the parties in the present dispute is formed and approved by government regulators, 'the [C]ommunications Act intends that the [local exchange carrier] be governed directly by the specific agreement rather than the general duties described in . . . section 251'" (quoting *Trinko*, 305 F.3d at 103)).

   As a result, none of the ICA provisions cited by Plaintiffs (at 11) help their cause:[4]

- § 22.1 provides that the ICAs are "governed by and construed in accordance with the Act, the FCC Rules and Regulations interpreting the Act and other applicable federal law." JA61. But under federal law (including the Act and the FCC's regulations), the duties of section 251(c) must be implemented via interconnection agreements, and AT&T has no obligation to provide something that has not been incorporated into the ICA. An ICA departing from the FCC's rules "would be binding on the parties regardless of" the FCC's orders, because "[p]arties who enter into a voluntary interconnection agreement need not conform to the requirements of the Act." *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1151 (9th Cir. 2006). "[F]ederal law thus gives [AT&T] the right to insist that it be held only to the terms of the interconnection agreement to which it actually agreed." *Verizon Maryland, Inc. v. RCN Telecom Servs.*, 232 F. Supp. 2d 539, 551 (D. Md. 2002).

- § 2.6.1 provides that "[i]n the event of a conflict between the provisions of this Agreement and the Act, the provisions of the Act shall govern." JA9. The fact that the ICAs do not obligate AT&T to provide entrance facilities at TELRIC does not and cannot mean that the ICAs "conflict" with the Act, because the Act expressly permits the parties to enter into a "binding agreement . . . without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a)(1).

- § 25.1 provides that "[n]othing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law." JA63. The interconnection duties imposed by section 251(c) are not

---

[4] Plaintiffs' reliance (at 12 nn.1 & 2) on similar language in the Broadwing and ICG ICAs fails for the same reasons.

"mandatory," because, again, the Act expressly permits parties to enter into agreements without regarding to those requirements (in other words, Plaintiffs could enter into agreements waiving various rights, which is precisely what they did). *See, e.g.*, *Trinko*, 305 F.3d at 104.

- § 43.1 states that nothing in the ICA is "intended to modify [AT&T's] obligation to provide services and facilities under the Act." JA75. But AT&T's "obligation to provide services and facilities under the Act" is to provide those services and facilities that the parties have incorporated into their ICA, and nothing more.

Indeed, this principle was directly incorporated into the ICAs, in another sentence in § 43.1 that Plaintiffs completely ignore: "Except as agreed upon in writing, neither Party shall be required to provide the other Party a function, facility, product, service or arrangement described in the Act that is not expressly provided herein." JA75. The provision of entrance facilities plainly was not "expressly provided" in the parties' ICAs. To the contrary, Level 3 agreed in the UNE Appendix that "network elements that have been Declassified and *are not provided under this Agreement* include at least the following: (i) entrance facilities." JA180 (§ 2.1.2.1, emphasis added). Plaintiffs' suggestion that the ICAs somehow obligated AT&T to provide entrance facilities notwithstanding the absence of any express provision to that effect would impermissibly render § 43.1 meaningless—a result the Plaintiffs themselves admit is to be avoided. *See* Pl. Br. at 13 ("[t]he ICAs should be interpreted to avoid rendering any of the terms meaningless"); *accord, e.g.*, *Rosemann v. Sigillito*, 956 F. Supp. 2d 1082, 1104 (E.D. Mo. 2013).

Pointing to *Talk America*, Plaintiffs argue (at 12) that the Act requires AT&T to provide entrance facilities used for local interconnection at cost-based rates. *Talk America*, however, only addressed whether the interconnection duties of section 251(c)(2) – not any particular ICA – could be interpreted to include a duty to provide entrance facilities for purposes of local interconnection. *Talk America* arose in a very different context, namely the review of a state commission decision arbitrating and approving terms of *new* interconnection agreement amendments to reflect the FCC's *TRRO*. *Michigan Bell Tel. Co. v. Lark*, 2007 WL 2868633, at

*4 (E.D. Mich. Sept. 26, 2007), *rev'd sub nom.* by *Talk America*. It did not address whether any CLEC was entitled to entrance facilities under the terms of any *existing*, voluntarily negotiated agreement. Nor did it address, much less purport to overrule, the principle that section 251(c) duties must be implemented via ICAs, or hold that entrance facilities must be provided at TELRIC-based rates irrespective of the terms of a particular contract. That would fly in the face of the text of section 252(a)(1), which expressly permits carriers to enter into a "binding agreement . . . without regard to the standards set forth in subsections (b) and (c) of section 251."

Finally, Plaintiffs pose a straw-man argument, suggesting (at 13) that it is AT&T's position they are not entitled to TELRIC-based rates merely "because some of the Level 3 ICAs do not specifically set out these publically-available TELRIC rates (expressed in the ICA as a number with a dollar sign in front of it)." The fact that most of the pricing appendices of the ICAs do not set forth rates for entrance facilities is a clear indication that the parties did not intend for those ICAs to require the provision of entrance facilities. That, however, is not the crux of AT&T's position. Rather, it is the absence of ICA terms requiring the provision of entrance facilities at cost-based rates (whether or not such rates are listed in the pricing appendices) that compels the conclusion that AT&T could not have—and did not—breach the ICAs by failing to provide such facilities at cost-based rates. As § 43.1 of the Level 3 ICA makes clear, "Except as agreed upon in writing, neither Party shall be required to provide the other Party a function, facility, product, service or arrangement described in the Act that is not *expressly* provided herein." JA75 (emphasis added). No such language appears in the ICAs.

The language of Level 3's *prior* agreements, pursuant to which AT&T *was* obligated to provide entrance facilities, illustrates the difference. Those agreements were entered into before the FCC's *TRO* and *TRRO* decisions, at a time when it was clear section 251(c) imposed a duty

to provide entrance facilities at cost-based rates (as unbundled network elements), *and the parties incorporated this duty into their agreements*.  The agreements expressly required AT&T to provide "unbundled dedicated transport," defined to include "an interoffice transmission path dedicated to a particular CLEC that provides telecommunications . . . between Wire Centers owned by [AT&T], or requesting CLEC, or between switches owned by [AT&T] or CLEC." Appendix UNE, § 10.3.1 (attached as Exhibit 1 hereto).[5]  The agreement expressly provided that such unbundled dedicated transport "includes the following elements: . . . <u>Entrance Facility</u> – Is a circuit from [AT&T] serving Wire Center to Level 3's Wire Centers or Switches . . . ."  *Id.* § 10.3.3, 10.3.3.2.  It provided further specifications relating to the entrance facilities, such as speed, diversity, ordering, provisioning, and maintenance terms.  *Id.* §§ 10.3.2, 10.4, 2.9.  In stark contrast, no such express provisions regarding entrance facilities were included in the ICAs at issue here.  Plaintiffs cannot possibly establish a breach of a contractual provision that does not exist.

### B.      The NIM Appendix Does Not Save Plaintiffs.

In their opening brief, Plaintiffs identify provisions of the "Network Interconnection Methods" ("NIM") Appendix to the Level 3 ICA that they contend support their position.  Pl. Br. at 13-15.  Plaintiffs did not bother to identify the NIM Appendix in their discovery responses, when AT&T asked them to identify the specific language in each ICA that Plaintiffs contend require the provision of entrance facilities at cost-based rates.  ECF No. 91, Ex. 2 (Interrog. #3). That comes as no surprise, because once again these ICA provisions say nothing about the provision of entrance facilities at cost-based rates.

---

[5] Because ICAs are filed with and approved by state commissions, they are matters of public record. This ICA can be found at, among other places, the Illinois Commerce Commission's eDocket, (https://www.icc.illinois.gov/docket/Search.aspx), where it was filed on February 26, 2001 in Docket 01-0190.

### 1. Nothing in the NIM Appendix requires AT&T to provide entrance facilities.

Plaintiffs argue (at 14) that the ICAs required AT&T to provide entrance facilities at cost-based rates because § 1.1 of the NIM Appendix "cit[es]" section 251(c)(2). Pl. Br. at 14. That falls far short of constituting a contract provision that "expressly provide[s]" that AT&T is required to provide such facilities, as required by § 43.1 of the General Terms and Conditions in order for AT&T to be required to provide such facilities. Moreover, § 1.1 is merely a prefatory provision, explaining that "[t]his Appendix describes the physical architecture for Interconnection of the Parties' facilities and equipment for the transmission and routing of Telephone Exchange Service traffic and Exchange Access traffic between the respective Customers of the Parties pursuant to Section 251(c)(2) of the Act." JA224. In other words, the NIM Appendix sets forth how the parties contractually agreed to implement section 251(c)(2) interconnection.

Contrary to Plaintiffs' suggestion, in entering into the NIM Appendix to implement section 251(c)(2) interconnection, the parties did *not* agree that AT&T would provide cost-based entrance facilities. Plaintiffs hang their hat on the provision of the NIM Appendix stating that network interconnection methods include "Leased Facilities Interconnection . . . and other methods as mutually agreed to by the Parties," and argue that this means that "[u]pon written notice from Level 3 to AT&T, the NIM Appendix requires AT&T to lease Level 3 interconnection entrance facilities pursuant to AT&T's obligations under the Act." Pl. Br. at 14. The problem for Plaintiffs is that that is not what the contracts say. Section 1.2 lists several network interconnection methods (*e.g.*, Leased Facilities Interconnection, Physical Collocation Interconnection, etc.), and § 3 ("Methods of Interconnection") further describes each of these potential methods. Leased Facility Interconnection is explained in § 3.3.1: "LEVEL 3 may lease

facilities from a third party." JA226. As a result, Leased Facility Interconnection plainly does not encompass AT&T's provision of entrance facilities at cost-based rates.

This is further confirmed by the contract language that Level 3 originally proposed – but eventually agreed to exclude – from the ICA. Prior to February 2005, because the parties could not agree upon all the terms to include in their new agreements, Level 3 had initiated state commission arbitration proceedings. *See, e.g.*, Pl. Ex. 3I (Level 3 Petition for Arbitration in Texas). With respect to Leased Facility Interconnection, Level 3 proposed to state in § 3.3.1 that "[w]here facilities are available, LEVEL 3 may lease facilities from [AT&T] . . . ." Exhibit 2 hereto (excerpt of Level 3 Petition App. C (setting forth level 3's proposed contract language)). In its Petition, Level 3 explained: "SBC believes, based on its interpretation of the FCC's *TRO* and certain court cases that it is not under an obligation to provide leased facilities to Level 3," but "Level 3 disagrees." Pl. Ex. 3I at 36. However, on February 10, 2005, the parties reached a global settlement to resolve the pending arbitration proceedings. Pl. Ex. 3AK (Memorandum of Understanding ("MOU")). They agreed to enter into the Superseding Amendment and a particular version of the UNE Appendix, both attached to the settlement agreement, and for all other contract terms to use the draft language they had agreed to in the Texas arbitration, with AT&T's proposed language for those terms that were disagreed upon. *Id.* (p.2). Thus, Level 3 agreed to AT&T's proposed language for the NIM Appendix, stating that Leased Facility Interconnection means Level 3 "may lease facilities from a third party." Level 3 also agreed in the UNE Appendix, § 2.1.2.1, that "network elements that have been Declassified and *are not provided under this Agreement* include at least the following: (i) entrance facilities." *Id.* Ex. A (emphasis added). In short, in entering into the ICAs Level 3 gave up its position that AT&T was required to provide entrance facilities or lease facilities for interconnection under the ICA.

Finally, Plaintiffs note (at 14) that § 1.2 refers to "other methods as mutually agreed to by the Parties." Section 3.5.1 explains that "Other Interconnection methods that are technically feasible may be mutually agreed to by the Parties." JA228. These provisions do not help Plaintiffs because there has been no "mutual agreement" that AT&T will provide entrance facilities at cost-based rates under the contracts.

## 2. The interconnection provisions of the Superseding Amendment also do not require AT&T to provide cost-based entrance facilities.

In any event, Plaintiffs' reliance on the NIM Appendix is misplaced because that Appendix is superseded by Level 3's Superseding Amendment. As AT&T explained in its opening brief (at 14-15), the Superseding Amendment expressly modifies and controls over any conflicting provisions in the underlying ICA, which includes the NIM Appendix. JA-425 (§§ 1.1, 1.2). Section 4 of the Superseding Amendment sets forth "Network Architecture Requirements," and § 4.7 makes clear that "[t]he Parties will use the interconnection architecture described in this Section 4 … to exchange Section 251(b)(5) [*i.e.,* local], ISP-bound, IP-PSTN, PSTN-IP, intraLATA and interLATA [*i.e.*, long distance] traffic." JA429. Thus, the interconnection provisions of the Superseding Amendment trump anything to the contrary in the NIM Appendix.

The Superseding Amendment makes clear that, to the extent Level 3 wanted to lease facilities from AT&T to interconnect, it had to do so pursuant to AT&T's tariffs. Section 4.5 provides that "Level 3 shall be financially responsible for one hundred percent (100%) of the facilities, trunks, and equipment on its side of the POI [point of interconnection between the parties' networks]," and § 4.6 specifies the methods by which Level 3 may satisfy this obligation: "Level 3 may, at its sole option, establish a POI ***by obtaining dedicated Special Access services or facilities from SBC*** [AT&T] ILECs (without the need for Level 3 equipment,

facilities, or collocation at the SBC ILECs' offices), or services or facilities from a [third] party, by establishing collocation, or by provisioning such services or facilities for itself." (Emphasis added.) Thus, where Level 3 sought to obtain facilities from AT&T to establish a point of interconnection (as opposed to self-provisioning the facilities or obtaining them from a third party), the only option was for Level 3 to "obtain[] dedicated Special Access services or facilities from [the AT&T ILECs]." *E.g.*, JA-428 through JA-429. As AT&T explained in its opening brief (ECF No. 90 at 18-19), the Broadwing/Focal Further Amendment contains virtually the same language, specifying that to interconnect "Focal may, at its sole option, establish a POI by obtaining ***dedicated Special Access services or facilities*** from SBC ILECs . . . , or services or facilities from a third party, by establishing collocation, by establishing a fiber meet, or by provisioning such services or facilities for itself." JA-8379; JA-8792; JA-7844 (emphasis added). Dedicated Special Access services and facilities are *tariffed* services, provided at tariffed rates rather than TELRIC-based rates. DUF (ECF No. 91) at 11.[6]

Plaintiffs argue that the Superseding Amendment and Further Amendment "do not limit Plaintiffs' rights to obtain interconnection at cost-based rates" (Pl. Br. at 17). But that argument cannot be squared with the plain contract language. Indeed, Plaintiffs' primary argument (at 18) is not based on any contract language at all, but rather on their suggestion that the Court should ignore the Superseding Amendment and Further Amendment because AT&T did not cite these contract provisions until its discovery responses. That suggestion is nonsense, for the reasons explained below in Section II. It also ignores the fact that Plaintiffs similarly did not cite the contract provisions they now rely upon until their discovery responses.

---

[6] The Superseding Amendment and Further Amendment refute Plaintiffs' suggestion (at 15) that they are entitled to cost-based entrance facilities merely because a handful of the underlying ICAs list entrance facility rates in their pricing appendices. Even if merely listing a rate were sufficient to otherwise require AT&T to provide a service or facility (though it is not), the Superseding Amendment and Further Amendment expressly trump any inconsistent provisions in the underlying ICAs.

As for the actual language of these Amendments, the best Plaintiffs can muster is to suggest that the pertinent provisions (§ 4.6 of the Superseding Amendment and § 4.1(d) of the Further Amendment) give Plaintiffs the discretionary "option" to obtain Special Access services from AT&T, or to obtain "other 'facilities' from AT&T." Pl. Br. at 18. The point, however, is that where Plaintiffs opt to obtain facilities from AT&T to establish interconnection, as opposed to using one of the other specified options, they are limited to purchasing "dedicated Special Access services or facilities from [AT&T]."

Plaintiffs suggest (at 18) that the words "dedicated Special Access" modifies only "services," and not "facilities," such that the provisions give Plaintiffs an "endlessly broad . . . option to buy" any "facilities" from AT&T, whether or not they are dedicated Special Access facilities. But it makes no sense that the parties, in entering into an agreement to specifically set forth the manner in which they would interconnect, would use "endlessly broad" terminology that, Plaintiffs contend (at 18), is "stupid," "imprecisely defined," and "means anything and everything." In addition, the very next sentence of § 4.6 makes clear that "dedicated Special Access services or facilities" means dedicated Special Access services or dedicated Special Access facilities – it states that "[i]f Level 3 utilizes *dedicated Special Access facilities*, it shall be required to begin paying SBC ILEC for such facilities once the facilities are jointly tested and accepted at a trunk level." JA429 (emphasis added). On the other hand, interpreting the provision to refer broadly to any kind of "facility," which means "anything and everything," would impermissibly render the specific reference to dedicated Special Access services entirely superfluous, as the "endlessly broad" reference to "facilities" would necessarily include dedicated Special Access services.

C.    **The ICAs' Intervening Law Provisions, Including In The Level 3 Superseding Amendment And The Broadwing Further Amendment, Do Not Help Plaintiffs.**

Plaintiffs also assert (at 15-16) that the "Intervening Law" provisions in § 21.1 of the Level 3 ICA and § 2.1 of the Broadwing Further Amendment required the parties to immediately incorporate any court rulings regarding the *TRRO*, including *Talk America*. Plaintiffs are wrong.

In § 21.1, the parties did reserve certain rights, including some rights to demand incorporation into the ICA of subsequent changes of law. The parties expressly waived these rights, however, with respect to matters specifically addressed by the Superseding Amendment:

> Notwithstanding the foregoing, nothing in this Intervening/Change in Law paragraph is intended nor should be construed as modifying or superseding the rates, terms and conditions in the Parties' [Superseding Amendment], in which the Parties waived certain rights they may have under this Intervening/Change in Law paragraph with respect to any reciprocal compensation or Total Compensable Local Traffic (as defined in the Superseding Amendment), <u>*POIs*</u> or trunking requirements that are the subject of the Superseding Amendment.

JA60 (§ 21.1, emphasis added). The change-of-law provision of the Superseding Amendment (§ 2.1, JA426-427) in turn states:

> During the period from January 1, 2005 up through and including the Termination Date, the Parties waive any rights they may have under the Parties' current ICAs or any future interconnection agreement(s) to which this First Amendment is added, or any other amendments thereto with respect to Total Compensable Local Traffic (as defined herein), POIs or trunking requirements that are subject to this First Amendment, except as set forth in Sections 7 below. . . . . Except with respect to the specific exceptions in this Section 2.2 as to the specific provisions relating to Total Compensable Local Traffic (as defined herein), POIs or trunking requirements, during the time period from January 1, 2005 up through and including the Termination Date, each Party shall otherwise have full intervening law rights under the underlying ICAs or future interconnection agreement(s), . . . .

In short, the intervening law provisions do not apply to, and the parties did not reserve any rights with respect to, the POI (point of interconnection) requirements of the Superseding

Amendment.  As explained above, in the Superseding Amendment Level 3 agreed that if it were to obtain facilities from AT&T to interconnect, it would do so via AT&T's Special Access tariffs.  Pursuant to the express waiver in § 21.1 of the Level 3 ICA and § 2.1 of the Superseding Amendment, Level 3 waived any right to invoke those provisions to escape its agreement under the Superseding Amendment, and *Talk America* thus does not help Plaintiffs.

The same is true under the Broadwing Further Amendment.  Its intervening law provision includes the same express waiver: the parties agreed that "during the Term the Parties waive any rights they may have under the Intervening/Change of Law provisions in this Further Amendment, the Parties' current ICAs or any future interconnection agreement(s) to which this Further Amendment is added, or any other amendments thereto with respect to any . . . POIs or trunking requirements that are subject to this Further Amendment . . . ."  JA7841 (§ 2.2).

Further, wholly apart from Plaintiffs' express waiver of their intervening law rights, their reliance on the intervening law provision in the Level 3 ICA fails for another reason: *Talk America* did not constitute a change-of-law event within the meaning of the provision.  The intervening law provision does not permit the immediate incorporation of every adjudicatory decision that may impact the parties' rights and obligations.  Instead, it applies more narrowly, to "any action by any state or federal regulatory or legislative body or court of competent jurisdiction [that] invalidates, modifies, or stays the enforcement of laws or regulations that were the basis or rationale for any rate(s), term(s) and/or condition(s) ('Provisions') of the Agreement and/or otherwise affects the rights or obligations of either Party that are addressed by this Agreement."  JA60 (§ 21.1, emphases added).  In other words, the agency or court decision must be one that "*invalidates, modifies, or stays the enforcement of*" some law or regulation that (a) was the basis for particular terms in the ICA, or (b) otherwise affects the rights and obligations

15

addressed by the ICA.

Talk America did not "invalidate, modify, or stay" the enforcement of any law or regulation. Prior to Talk America, there undoubtedly was a dispute over the interpretation of section 251(c)(2) and the FCC's implementing rules, specifically whether and how they applied to entrance facilities. But Talk America did not actually invalidate, modify, or stay any law or regulation. Instead, the pertinent law (47 U.S.C. § 251) and FCC regulations have remained the same, as Plaintiffs themselves admit (at 7 & 16). In Talk America, the Supreme Court relied entirely upon the FCC's interpretation of its existing regulations. The Court made clear that no existing law or regulation was being modified when it concluded that "there is no danger that deferring to the Commission would effectively 'permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.'" 131 S.Ct. at 2263. As a result, there has been no "change" in any law or regulation; rather, Talk America established what the law and FCC's regulations always meant, even before the parties entered into their ICA. Compare, e.g., Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-313 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."); ABKCO Music, Inc. v. LaVere, 217 F.3d 684, 691 (9th Cir. 2000) (distinguishing between a "change" of existing law, and a "clarification" of what it "has meant all along"). Indeed, Plaintiffs admit that Talk America did not invalidate, modify, or stay any law or regulation, but instead merely declared what the law had always meant, when they assert (at 16) that Talk America means AT&T "always has been[] required to provide interconnection entrance facilities at cost-based rates." As a result, Talk America does not fall within the scope of § 21.1, even if the Superseding Amendment did not already waive Level 3's rights to invoke § 21.1.

## II. The "Mend The Hold" Doctrine Does Not Permit Plaintiffs To Evade The Terms Of Their Contracts.

Plaintiffs' lead argument makes no mention of the actual language of the parties' contracts, but instead attempts to convince the Court that it should ignore the contracts. Pl. Br. at 3-11. According to Plaintiffs, AT&T offered purportedly shifting, pretextual reasons for why it would not provide TELRIC-based pricing, and as a result Plaintiffs suggest that AT&T's contract arguments should be barred under the "mend the hold" doctrine. Plaintiffs did not, however, assert "mend the hold" as an affirmative defense in response to AT&T's counterclaims seeking to recover the billed charges that Plaintiffs refused to pay, and hence Plaintiffs have waived any such argument. In any event, Plaintiffs' argument leads nowhere.

Plaintiffs sued AT&T for breach of contract. As a result, Plaintiffs bear the burden of establishing that the contracts required AT&T to provide them entrance facilities at cost-based rates. Whether Plaintiffs can satisfy this burden depends upon the terms of the contracts, because Plaintiffs cannot possibly establish breach of a contractual provision that does not exist (namely, a provision that required AT&T to provide entrance facilities). The contracts cannot be deemed to say whatever Plaintiffs wished they said, irrespective of their plain text, merely because prior to the litigation AT&T did not anticipate and refute all the contract arguments Plaintiffs might make. *See, e.g.*, *Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 614 (7th Cir. 2012) ("To require a potential defendant to commit irrevocably to defenses before he is sued would be unreasonable to the point of absurdity. Until he receives and reads the complaint he cannot have a clear idea of how best to defend.").

This is all the more true because, prior to filing suit, Plaintiffs did not rely upon contract arguments – rather, AT&T did. In September 2011, after *Talk America* issued, Level 3 submitted disputes regarding the pricing of certain circuits in Texas, Kansas, and Michigan. *See*

DUF ¶ 3. In submitting these disputes, Level 3 did not claim that anything in the parties' contracts entitled Level 3 to TELRIC-based prices. Rather, Level 3 merely pointed to *Talk America*: "Level 3 disputes based on the Supreme Court Reversed decision on entrance facilities, dated 6/9/2011," where "the FCC's view that EF should be provided at cost-based rates is upheld by the court ruling." Pl. SF (ECF No. 86-1) ¶ 134. In its response that same month, AT&T specifically asked Level 3 to identify the ICA provisions that supported its position that it was entitled to entrance facilities at cost-based rates. *Id.* ¶ 145. On September 29, 2011, AT&T asked Level 3 to "provide the section/provision of the contract/ICA that Level 3 feels supports [its] disputes." Pl. Ex. 3AN. The next day, another AT&T representative told Level 3 that "[w]e need the ICA section that you believe addresses this situation." *Id.* In response, Level 3 again merely referenced the *Talk America* decision (*id.*), and AT&T responded that "[t]he ICA doesn't necessarily support the use of these facilities." *Id.* "The agreement governs the relationship as it entered into voluntarily between the parties," and thus AT&T again asked Level 3 to "[p]lease provide the ICA section that Level 3 believes supports the use of these services." *Id.*

On January 30, 2012, AT&T denied Level 3's disputes, stating that "Level 3's current ICAs in MI, KS, and TX do not provide for TELRIC-based pricing for these facilities." Pl. SF ¶ at 146. Thereafter, AT&T continued to deny Level 3's disputes, pointing out that the parties' contracts did not provide for TELRIC-priced entrance facilities:

- On March 30, 2012, AT&T emailed Level 3 stating that "AT&T has reviewed the response from Level 3 and upholds the original denial" of Level 3's disputes. Pl. Ex. 3AT. That is because "Level 3's current ICAs in MI, KS, and TX do not contain provisions for entrance facilities at TELRIC rates." *Id.* AT&T also noted that "in many instances the facilities in dispute are not being used for interconnection and would not qualify for TELRIC-based pricing, even after the ICAs are amended." *Id.*

- On October 2, 2012, AT&T emailed Level 3 saying "I did some double-checking and confirmed that Level 3's currently effective ICAs in KS, TX and MI do not

contain rates, terms and conditions for entrance facilities." Pl. Ex. 3AT.

- On October 8, 2012, AT&T reiterated that "the ICAs between Level 3 and AT&T govern the local interconnection relationship between the parties," and "[w]hen Level 3 signed the current ICAs for KS, TX and MI, it knew, or should have known, that these ICAs did not contain rates, terms or conditions for entrance facilities." Exhibit 3 hereto (Herrick Dep. Ex. 1). Thus, "entrance facilities were no longer available pursuant to the ICA at TELRIC rates." *Id.*

Until filing this litigation in 2013, Level 3 never attempted to refute AT&T's assertions by identifying all the ICA provisions that Level 3 now contends required the provision of entrance facilities. Rather, it continued to insist that its dispute was based solely on *Talk America*, and it went so far as to suggest that the ICA language is beside the point: in response to AT&T's October 2, 2012 email (quoted above), Level 3's representative stated "[n]ot seeing how the ICA's connect with this issue." Exhibit 3 hereto (Herrick Dep. Ex. 1). Instead, he pointed to *Talk America. Id.* Level 3's representative did the same thing in response to AT&T's January 30, 2012 email asserting that the ICAs did not provide for TELRIC-priced entrance facilities. Exhibit 4 hereto (Bruny Dep. Ex. 5). Indeed, the Level 3 employee primarily responsible for the disputes Level 3 submitted to AT&T admitted that she made no attempt to review the ICAs in response to AT&T's request, and did not know if anyone else at Level 3 did. Exhibit 5 hereto (Putman Dep. at 73). Similarly, the Level 3 Director of Network Expense who took over for Ms. Putman in 2012 admitted that he did not review the ICAs and did not know if anyone at Level 3 did (Exhibit 6 hereto (Herrick Dep. at 17, 32-33, 35)), nor did he ask anyone at Level 3 if they had reviewed the ICAs, because he instead "used the Supreme Court ruling as my foundation" (*id.* at 51).

Thus, *Plaintiffs* concocted new arguments in litigation about the ICAs purportedly requiring AT&T to provide entrance facilities at TELRIC-based rates. In disputing and refusing to pay tariffed charges billed by AT&T, Plaintiffs pointed to *Talk America*, as if that decision

entitled them to TELRIC-based prices no matter what their contracts said. Until initiating this litigation, Plaintiffs ignored AT&T's repeated request that Plaintiffs identify ICA provisions, if any, that supported their position.[7]

Despite this, Plaintiffs complain that *AT&T* did not, prior to the litigation, provide an exhaustive inventory of all the specific contract provisions in support of AT&T's position. That is beside the point. Plaintiffs identify no support for the proposition that the mend the hold doctrine requires parties to a dispute to specifically identify all contract provisions in support of their position pre-litigation, or that later identifying all such specific provisions somehow constitutes a change in position. That would be "unreasonable to the point of absurdity." *Ryerson*, 676 F.3d at 614 (7th Cir. 2012).

In addition, Plaintiffs' complaint about AT&T's allegedly conflicting positions is based on statements AT&T made before 2011, when AT&T referred to the *TRO* and *TRRO* in connection with the "EF2AC" project that converted the prices of some circuits in six states.[8] ECF No. 86, Ex. 2 (Putman Dec.) ¶ 6. But in response to Plaintiffs' 2011 disputes, AT&T explained that its position was based on the terms of the ICAs. At a minimum, from this point forward, AT&T cannot be accused of relying on any position inconsistent with its position in this litigation. That is, for bills issued since 2011, AT&T's "defense to the performance of [its] contractual duties" plainly was based on the absence of any ICA terms requiring the provision of TELRIC-priced entrance facilities. *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990).

---

[7] There is one exception. In an April 17, 2012 letter from counsel for Level 3 to counsel for AT&T, Level 3's counsel asserted that GT&C § 2.6.1, stating that the Act controls in the event of a "conflict" between the ICA and Act, entitled Level 3 to cost-based entrance facilities. ECF No. 91, Ex. C, pp. 1-2. As explained above, there is no conflict because the Act permitted the parties to enter into agreements that did not provide for entrance facilities.
[8] AT&T did not convert the prices of circuits in the other six states at issue here – meaning the circuits Plaintiffs now challenge in those states have *always* been priced at tariffed rates.

Even with respect to bills prior to the 2011 dispute, Plaintiffs blow AT&T's communications regarding its EF2AC project out of all proportion. While AT&T's representatives did not point to Level 3's ICAs in their 2008 and 2009 communications with Level 3 after Level 3 questioned EF2AC conversion charges in Texas and Michigan (*see* Pl. SF ¶¶ 99, 101, 103), their explanation that AT&T was converting the prices because AT&T was no longer required to provide cost-based entrance facilities under the FCC's orders was entirely consistent with the parties' ICAs. AT&T's belief that the FCC's orders meant AT&T was no longer required to provide entrance facilities is the reason AT&T sought contract amendments industry-wide to withdraw the provision of entrance facilities – and Level 3 had effectively *accepted* AT&T's position in its ICAs. Prior to February of 2005, there was no question that AT&T had to provide Level 3 with entrance facilities at TELRIC-based rates, as the contracts expressly required this. But in February of 2005 (shortly after issuance of the *TRRO*), Level 3 entered into the ICAs at issue here, in which it agreed that "network elements that have been Declassified and *are not provided under this Agreement* include at least the following: (i) entrance facilities." JA180 (Level 3 ICA, Appendix Lawful UNEs, § 2.1.2.1) (emphasis added). As a result, there was nothing contradictory about AT&T's statements.[9]

Finally, and in any event, Plaintiffs misstate the law in suggesting that the "mend the

_____

[9] While Level 3 had agreed to this language in light of the *TRO* and *TRRO*, many other CLECs had ICAs that did not reflect those decisions. As a result, after the *TRRO* issued, AT&T undertook in multiple jurisdictions to implement that decision and negotiate conforming interconnection agreement amendments. Pl. SF ¶¶ 104-111; *Lark*, 2007 WL 2868633, at *4. Because the *TRRO* invalidated and modified certain FCC regulations, AT&T was entitled under its intervening law contract provisions to immediately implement certain pricing changes, even while negotiating conforming ICA amendments. *See* Pl. Ex. 3C at 5-6 (Michigan PSC ruling, concluding that while AT&T could not "unilaterally dictate to CLECs the changes to their interconnection agreements necessary to implement the FCC's findings," it could nevertheless immediately bill higher, tariffed rates to implement the FCC's order). Thus, AT&T began implementing the EF2AC project, informing CLECs about that project through the issuance of Accessible Letters. *See* Pl. Ex. 3J. Starting in 2008, AT&T identified some Level 3 circuits that were being billed at TELRIC-based rates and hence converted the prices of these circuits. However, by this point Level 3's contracts had already been amended to remove any requirement that AT&T provide entrance facilities.

hold" doctrine broadly applies here.  The doctrine does not even appear to be good law in most

of the states at issue, or is strictly limited to circumstances not at issue here:[10]

- Under Illinois law the doctrine "does not prohibit the addition of a defense after suit is filed or otherwise limit a defendant to defenses announced before a suit is filed," but applies only to the changing of defenses midstream in the litigation itself.  *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 899 n.2 (7th Cir. 2012).  In addition, "[t]he party invoking the doctrine must suffer prejudice for the doctrine to bar a defense."  *Lakeview Collection Inc. v. Bank of Am., N.A.*, 942 F. Supp. 2d 830, 846 (N.D. Ill. 2013).  To the extent AT&T did not make any particular contract argument until the litigation ensued, Plaintiffs suffered no prejudice.

- "[I]t is not entirely clear whether Indiana recognizes the mend the hold doctrine" because the "only Indiana case even mentioning the doctrine . . . was decided over eighty years ago."  *Amerisure Ins. Co. v. Scottsdale Ins. Co.*, 795 F. Supp. 2d 819, 825 (S.D. Ind. 2011).  "The Court's own research reveals that there are only a handful of states that have recognized the mend the hold doctrine," and "[o]f those states, the case law discussing the doctrine is most developed in Illinois."  *Id.*  Even "[a]ssuming that the mend the hold doctrine is recognized in Indiana, the Court believes that Indiana would apply the doctrine in the same manner as it is applied in Illinois."  *Id.*

- In Arkansas, for the doctrine to apply there must be "prejudice," and there must be "inconsistency between the various defenses," such that the doctrine does not apply where "new grounds are compatible with the first one, not contradictory."  *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 2015 WL 4943962, at *1 (E.D. Ark. Aug. 19, 2015).  Even if AT&T has raised additional grounds since 2008, they are compatible, not contradictory, and in any event Plaintiffs suffered no prejudice.

- "California . . . has not adopted the mend the hold doctrine."  *Rupracht v. Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0146LDUSA0701030*, 2012 WL 4472158, at *3 (D. Nev. Sept. 25, 2012).  *But see Genesco, Inc. v. Visa U.S.A., Inc.*, 302 F.R.D. 168, 186 (M.D. Tenn. 2014) (concluding California recognizes the doctrine, based on a California case holding a party could not "mend their hold" by making a new argument *on appeal*, and another that included the sentence "[t]here is nothing in this record to support the claim that the defendant suffered any injury of his rights by plaintiff's 'mending its hold,'" without applying or addressing the doctrine in any way).

- "The 'mend the hold' doctrine has never been adopted in Nevada and has not even been alluded to by the Ninth Circuit in over sixty years."  *First Nat'l Bank of Ely v. Progressive Cas. Ins. Co.*, 2012 WL 5944847, at *9 (D. Nev. Nov. 27, 2012).

---

[10] The common-law "mend the hold" doctrine is a "substantive" contract-law doctrine rather than a "procedural" rule.  *See Bourbon v. Kmart Corp.*, 223 F.3d 469, 475 (7th Cir. 2000).  Hence it should be applied on a state-by-state basis, according to the state law governing a particular ICA.

- "It does not appear Oklahoma has adopted [the 'mend the hold'] doctrine . . . . Oklahoma does recognize the somewhat similar doctrine of equitable estoppel, but the elements of that doctrine include false representation and detrimental reliance." *Fry v. Am. Home Assur. Co.*, 2015 WL 519706, at *2 (E.D. Okla. Feb. 9, 2015).

- A number of older Missouri cases use or quote the phrase "mend the hold" but either without referring to any particular doctrine or in discussing more general principles of estoppel and waiver. *See, e.g.*, *Barnett v. Kemp*, 167 S.W. 546, 551 (Mo. 1914).

- Michigan applies a form of the doctrine under principles of estoppel and wavier, but holds that these principles cannot be used "to bring into existence a contract not made by the parties." *Kirschner v. Process Design Associates, Inc.*, 592 N.W.2d 707, 710 (Mich. 1999). Thus, Plaintiffs cannot use the doctrine to bring into existence a contract that requires the provision of entrance facilities. Further, "under Michigan practice—this doctrine is equitable in nature and applies when it would be unfair to allow an insurer to assert an additional ground for denial after inducing the insured to rely on a different ground for denial to the insured's detriment." *Dahlmann v. Geico Gen. Ins. Co.*, 2016 WL 1125976, at *8 (Mich. Ct. App. Mar. 22, 2016). No such equitable circumstances (including detriment to Plaintiffs) exist here.

- In Ohio, the doctrine does not require a party to identify all its defenses prior to litigation. *Burlington Ins. Co. v. PMI Am., Inc.*, 862 F. Supp. 2d 719, 737-38 (S.D. Ohio Mar. 23, 2012).

- The rule has no application in Texas. One early Texas decision rejected it, concluding: "Appellant lost no right and suffered no detriment by the failure of appellees to inform it of all of their defenses to this suit, and it would be inequitable and unjust to refuse to permit appellees to present any valid defense they may have to appellant's claim. The so–called rule of estoppel invoked by appellant, it seems to us, is but an arbitrary rule of decision, which has not obtained in the courts of this state, and which we cannot think should be applied in this case." *Am. Sulphur Royalty Co. of Texas v. Freeport Sulphur Co.*, 276 S.W. 448, 459 (Tex. App. 1925), *writ granted* (Dec. 10, 1925), *aff'd*, 117 Tex. 439, 6 S.W.2d 1039 (1928). *See also Fed. Ins. Co. v. Infoglide Corp.*, 2006 WL 2050694, at *10 (W.D. Tex. July 18, 2006) ("[T]he Court finds this 'mend the hold' doctrine is not available under Texas law.").

- "[N]o Wisconsin case has adopted this doctrine." *Endl v. Sch. Dist. of Beloit*, 2002 WI App 1, ¶ 9, 249 Wis. 2d 490, 639 N.W.2d 224 (Table) (Wis. Ct. App. 2001). And "[e]ven if the doctrine were part of Wisconsin's common law," it would apply only where a party has "asserted inconsistent claims," not where "it has asserted an *additional* reason." *Id.* (emphasis in original).

### III. In No Event Would Plaintiffs Be Entitled To Cost-Based Rates For Facilities Not Used Solely For Interconnection.

As AT&T has demonstrated, TELRIC-priced entrance facilities can be used *solely* for

purposes of section 251(c)(2) interconnection, and facilities used in whole *or in part* for other

purposes are not eligible for TELRIC prices. AT&T Br. at 20-26. Plaintiffs, however, argue that

if a facility is used in part for interconnection and in part for other purposes, TELRIC rates apply

to the portion of the facility used for interconnection. Pl. Br. at 19-23. Plaintiffs are mistaken.

In *Talk America*, the Supreme Court held that before the FCC's *TRRO*,

> a competitive LEC typically would elect to lease a cost-priced entrance
> facility under *§ 251(c)(3)* since entrance facilities leased under *§ 251(c)(3)*
> could be used for any purpose – *i.e.*, both interconnection and backhauling
> – but ***entrance facilities leased under § 251(c)(2) can be used only for
> interconnection***.

*Talk America*, 131 S.Ct. at 2264 (emphasis added). Plaintiffs urge the Court to disregard the

bolded holding on the theory that it is "general and vague" and that "commingling was not a

topic the Court was even considering." Pl. Br. at 23. But this ignores the context of the bolded

holding, which makes clear that the Supreme Court was contrasting the prior regime, where

entrance facilities could be leased for "both interconnection and backhauling," with the current

regime, where entrance facilities can be leased *only* for interconnection.

Plaintiffs pretend (at 20) that the *TRRO* supports their position because it states that

CLECs will have access to entrance facilities at cost-based rates "to the extent that they require

them to interconnect with the incumbent LEC's network" – as if the phrase "to the extent that"

connotes apportionment. The general and vague phrase "to the extent that," however, cannot

carry that weight. The FCC used the phrase dozens of times in the *TRRO*, and it invariably used

it to mean "if," not to convey the notion of a percentage or ratio.[11] The *TRRO* provides no

support for Plaintiffs' position that a single facility can be used partly for interconnection and

---

[11] Merely by way of example, the first three occurrences of the phrase in the *TRRO* are: ¶ 18, n.51 (certain commitments must be honored until a certain date "except to the extent that they are or have been superseded"); ¶ 20 ("In this section, we address those concerns that relate generally to the standard itself, to the extent that such concerns apply to more than one element."); ¶ 22 ("[T]o the extent that we evaluate whether requesting carriers can compete without unbundled access to particular network elements, we endeavor . . . to draw reasonable inferences").

partly for other services with the pricing pro rated.

Nor do 47 C.F.R. § 51.305(b) or paragraph 972 of *In the Matter of Connect America Fund*, 2011 WL 584497 (FCC Nov. 18, 2011) ("CAF *Order*"), which Plaintiffs cite (at 21) for the proposition that a carrier is entitled to interconnect pursuant to section 251(c)(2) as long as it uses the interconnection for at least some interconnection purposes. Neither 47 C.F.R. § 51.305(b) or *CAF Order* ¶ 972 has anything to do with the *pricing* of interconnection facilities.[12] Similarly, while Plaintiffs suggest (at 22) that the NIM Appendix supports their position when it states that "[i]nterconnection may not be used solely for purposes not permitted under the Act," this provision says nothing about the pricing of entrance facilities.

Further, the Eighth Circuit has upheld a state commission ruling under which entrance facilities are to be used solely for interconnection purposes. *See* AT&T Br. at 22. The Seventh Circuit has done so as well, in a case that originated in the Illinois Commerce Commission ("ICC"). In the ICC, the question was whether an ICA between AT&T Illinois and Sprint should include language, proposed by AT&T Illinois, stating that entrance facilities were to be used "exclusively for Interconnection as defined at 47 C.F.R. section 51.5" Exhibit 7 hereto at 6. The ICC's expert Staff recommended that the ICC adopt AT&T Illinois' proposed language, stating, "the U.S. Supreme Court, FCC and [ICC] have all explicitly stated that an incumbent LEC's obligation to provide cost-based interconnection facilities under Section 251(c)(2) is limited to entrance facilities used exclusively or solely for interconnection under 251(c)(2). . . . Accordingly, AT&T's limiting phrase 'exclusively' and 'solely' . . . is appropriate." *Id.* at 7. The ICC noted the Supreme Court's holding in *Talk America* that entrance facilities leased at TELRIC-based prices can be used only for interconnection, and adopted the ICC Staff's

---

[12] Indeed, the Illinois Commerce Commission, in the decision discussed immediately below, specifically rejected a carrier's reliance on *CAF Order* ¶ 972 to support the same argument Plaintiffs are making here. See Exhibit 7 hereto (Arbitration Decision, ICC Docket No. 12-0550 (June 26, 2013) (excerpted)) at 8.

recommendation.  *Id.* at 8-9.  Sprint appealed, but the ICC's holding was affirmed by the district court and by the Seventh Circuit.  *See SprintCom, Inc. v. Ill. Commerce Comm'n*, 790 F.3d 751, 757 (7th Cir. 2015).

Plaintiffs, playing "gotcha," argue (at 20) that AT&T affiliates that operate as CLECs in Washington and South Dakota once took the position on commingling that Plaintiffs advocate here.  But in the South Dakota proceeding, the commission expressly rejected the AT&T CLEC's argument, holding that the ILEC was "not required to allow the use of excess capacity on an existing special access facility as an interconnection trunk at TELRIC prices."  Order, Docket No. TC01-165 (S. Dak. Pub. Util's Comm'n Sept. 22, 2002) (excerpted in Exhibit 8 hereto), at 18.  In any event, these proceedings took place long before the *TRO*, the *TRRO*, or *Talk America*, which made clear that "entrance facilities leased under § 251(c)(2) can be used *only* for interconnection."  131 S.Ct. at 2264 (emphasis added).

## IV.  AT&T Is Entitled To Summary Judgment On Plaintiffs' Unjust Enrichment Claim.

Plaintiffs argue (at 25) that if the Court agrees with AT&T that the ICAs did not provide for TELRIC-based pricing for the facilities Plaintiffs obtained—in other words, if Plaintiffs *lose* their contract claim—the Court should nevertheless award Plaintiffs damages because it would be "unjust" to allow AT&T to keep the charges it was *permitted* to bill Plaintiffs under the parties' contracts.  This absurd proposition does not merit a lengthy response.[13]

As this Court has held, Plaintiffs may not recover under both an express contract and a theory of unjust enrichment.  *See Franke v. Greene*, 4:11-CV-1860-JCH, at 8 (E.D. Mo. Aug. 6, 2012); ECF No. 35 at 11.  "If the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's

---

[13]  We address the unjust enrichment claim in greater detail in AT&T's opening brief in support of its motion for summary judgment.  *See* AT&T Br. at 26-27.

rights are limited to the express terms of the contract." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. W.D. 2010).

Plaintiffs' suit is for breach of contract. If the ICAs did not permit Plaintiffs to obtain entrance facilities at TELRIC-based rates, then AT&T was *required* to charge Plaintiffs the access rates set out in AT&T's filed tariffs. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (the filed rate doctrine forbids a regulated entity from charging a rate for its services other than the rate on file with the appropriate regulatory authority). Tariffed rates are presumed "just and reasonable," *see* 47 U.S.C. § 201(b). And "[i]ssues regarding the reasonableness of rates have been held by courts to be within the primary jurisdiction of the FCC." *Sw. Bell Tel. Co. v. Allnet Commc'ns Servs., Inc.*, 789 F. Supp. 302, 304 (E.D. Mo. 1992). AT&T cannot have been unjustly enriched by charging the rates set out in its filed tariffs for services that were not governed by the parties' contracts.

**V.     Plaintiffs' Claims Are Barred To The Extent Plaintiffs Failed To Submit Timely Disputes In Accordance With The ICAs And The Federal Two-Year Statute of Limitations (AT&T's Second Affirmative Defense).**

As AT&T's summary judgment motion explains in greater detail (AT&T Br. at 28-31), Plaintiffs' claims arise under federal law and thus are barred by the Communications Act's two-year statute of limitations to the extent Plaintiffs' claims are based on bills issued by AT&T more than two years before Plaintiffs filed their complaint in June 2013. *See Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 674 (8th Cir. 2009) (affirming dismissal of claims relating to interconnection agreements as time-barred under 47 U.S.C. § 415(b) because the alleged wrongful conduct occurred more than two years before the filing of the complaint). Plaintiffs' claims also are barred by the unambiguous terms of the parties' contracts, which establish specific mechanisms, and time limits, for submitting disputes relating to bills issued by AT&T pursuant to the ICAs. *See, e.g.*, Level 3 ICA, § 10.6.1, JA-39 ("[n]o claims shall be brought for

disputes arising under this Agreement or its Appendices more than twenty-four (24) months from the date of [the] occurrence which gives rise to the dispute").[14]

Plaintiffs assert that they did not have to comply with the ICAs' dispute provisions because under Section 22.1 of the ICAs, Plaintiffs "reserved their rights" with respect to certain possible changes in law. And Plaintiffs say their claims are timely because Plaintiffs filed their lawsuit "less than two years" after the Supreme Court's decision in *Talk America.* Pl. Br. 27. But neither the reservation of rights clause nor the *Talk America* decision excused Plaintiffs from complying with the contracts' explicit dispute provisions, or from the effect of the federal statute of limitations for damages claims against carriers.

### A. Plaintiffs' Claims Are Barred To The Extent They Concern Charges Billed More Than Two Years Before Plaintiffs Filed This Lawsuit.

To begin with, Plaintiffs' cause of action for breach of contract did not accrue upon the issuance of *Talk America* in June 2011; rather, the cause of action accrued each time AT&T issued a bill that (allegedly) overcharged Plaintiffs for entrance facilities. "[W]here, as here, the claim alleges over-billing, the claim accrues upon receipt of the allegedly erroneous bill." *American Cellular Corp. v. BellSouth Telecommc'ns., Inc.*, 22 FCC Rcd. 1083, 1092, 2007 WL 268574 at *6 (rejecting plaintiff's argument that its claim accrued only when it acquired the "right to sue" under the ICA's dispute resolution provisions). The two-year federal (and contractual) period during which Plaintiffs could assert claims for damages with respect to a disputed bill expired two years after the issuance of the bill. Most of the bills Plaintiffs contest in this action were issued more than two years before the filing of the complaint in June 2013 and are now time-barred.

---

[14] AT&T's brief in support of its cross motion for summary judgment explains the ICAs' dispute resolution provisions in detail and demonstrates that Plaintiffs' failure to submit disputes in accordance with the governing ICAs forecloses their claims here. *See* AT&T Br. at 32-36.

Contrary to Plaintiffs' suggestion (at 28-30), the "reservation of rights" language in § 22.1 of the Level 3 ICA did not – and could not – extend the time limit for Plaintiffs to file suit. Plaintiffs point (at 29) to a Massachusetts case (notwithstanding the fact that Massachusetts law is not at issue here) for the proposition that a contractual reservation of rights provision can operate as a tolling agreement. But the two-year limitation of 47 U.S.C. § 415 could not be tolled by the parties' private agreement. The FCC has concluded that section 415's limitations period is jurisdictional, such that tolling of the limitations period generally is not permitted, except in cases of fraudulent concealment or deceit by the defendant. *E.g.*, *Valenti v. AT&T*, 12 FCC Rcd. 2611, at ¶¶ 24-25 (1997), available at https://transition.fcc.gov/Bureaus/Common_Carrier/Orders/1997/fcc97026.txt. Thus, the FCC stated, unless the defendant has used fraud or deceit to prevent a plaintiff from becoming aware of a claim, "there is *no way* of . . . tolling the statute of limitations" in Section 415. *Id.* ¶ 24 (emphasis added). Relying on this, another FCC decision stated that "a private agreement to toll the limitations period, without more, simply does not meet these narrow grounds for tolling." *American Cellular*, 22 FCC Rcd. 1083, at ¶ 23 (finding that even if ICA's dispute resolution provision was intended to toll the limitations period, it could not do so).

Plaintiffs' reliance on the reservation of rights in § 22.1 also fails because, as explained above in Section I, the parties expressly waived their § 22.1 rights with respect to the interconnection requirements addressed by the Superseding Amendment – which includes the manner in which Level 3 may provision or obtain facilities to establish interconnection. Thus, § 22.1 simply does not apply. The same is true of the intervening law provision in the Broadwing Further Amendment. *Cf.* Pl. Br. 30.

## B. Plaintiffs' Reliance On AT&T's Tariffs Is Misplaced.

Plaintiffs' argument (at 30-31) that AT&T's *access tariffs* "require retroactive application

of *Talk America*" is frivolous.  The tariff provisions they cite provide that tariffed rates are subject to retrospective adjustment "in the event of any other adjustment pursuant to an order of the Commission or a court."  But Plaintiffs do not and cannot identify any FCC or court decision that ordered AT&T to change its tariffed rates.

*Talk America* had nothing to do with tariffs or switched access services.  It concerned interpretation of the interconnection duties of section 251, which are implemented via *interconnection agreements*, not tariffs.

Further, Plaintiffs cannot in any event collaterally attack a filed federal tariff on a motion for summary judgment in a breach of contract case.  Because the ICAs did not require TELRIC-based pricing for the entrance facilities at issue, AT&T was *required* to charge Plaintiffs its tariffed rate for access services.  *See Hall*, 453 U.S. at 577 (the filed rate doctrine forbids a regulated entity from charging a rate for its services other than the rate on file with the appropriate regulatory authority).  And if Plaintiffs are tacitly admitting that they purchased switched access services *from AT&T's tariffs*, there is nothing left to litigate and the Court should enter judgment in favor of AT&T on all claims.

## C.     Plaintiffs' Attempts To Excuse Their Noncompliance With The ICA Dispute Requirements Are Baseless.

*Talk America* did not affect the ICAs.  As noted above, parties to an ICA can agree to terms—including terms governing interconnection under Section 251(c)(2)—without regard to the requirements of the 1996 Act.  Disputes between parties to an ICA are governed by the terms of their negotiated contract, and not the general provisions of the 1996 Act or Supreme Court interpretations of the Act.  *See, e.g., Mich. Bell*, 323 F.3d at 359 ("once an agreement is approved," the parties are "governed by the interconnection agreement" and "[the] general duties [under the 1996 Act] do not control" and "no longer apply").  *Talk America* did not, and could

not, automatically amend or invalidate the parties' ICAs with respect to either the pricing of the particular entrance facilities Plaintiffs obtained from AT&T, the contractual time limits for Plaintiffs to dispute bills, or the steps Plaintiffs had to take to assert a dispute arising under the ICAs as a precondition to filing a lawsuit. Indeed, this Court has already held that "Section 251(c)(2) expressly requires defendants to provide interconnection 'on rates . . . *in accordance with the* terms and conditions of any agreement.'" ECF No. 35 at 9 (emphasis in original).

The only question, then, is what the contracts say. Plaintiffs candidly acknowledge (at 13) that "the ICAs should be interpreted based on their plain and ordinary meaning." But ignoring the ICAs' express requirements for submitting disputes—as Plaintiffs ask the Court to do—hardly gives them their "plain and ordinary meaning." Plaintiffs' suggestion that the ICAs should be ignored is not only wrong as a matter of law, but is refuted by Plaintiffs' own conduct.

In September 2011, three months after *Talk America*, Plaintiffs submitted approximately $2 million in disputes for alleged entrance facility overcharges in Texas, Kansas, and Michigan. Plaintiffs used the procedures established by the ICAs—the same dispute procedures Plaintiffs had used "millions" of times before but now say do not apply. DUF at 3; Bruny Dep. at 17-18. Plaintiffs obviously did not believe in late 2011 that *Talk America* or § 22.1 excused them from complying with the contractual dispute provisions—otherwise, there would have been no reason for Plaintiffs to submit *any* disputes in the wake of the Supreme Court's ruling. But Plaintiffs did file the disputes. Moreover, in an April 17, 2012 letter to AT&T, Level 3's Regulatory Counsel, Gregory T. Diamond, "initiate[d] Section 10.2 of the dispute resolution section of the ICA" with respect to the September 2011 disputes. DUF at 5. Mr. Diamond noted that Section 10.2 "requires AT&T to appoint an escalation representative to attempt to settle these disputes." *Id.* Plaintiffs would not have needed to file specific disputes and to invoke the ICAs' escalation

procedures if the reservation of rights provision, or *Talk America*, overrode those procedures.

AT&T denied Plaintiffs' Texas, Kansas, and Michigan disputes because the ICAs in those states did not permit Plaintiffs to obtain entrance facilities at TELRIC rates. Pl. SF ¶ 138. As noted above, AT&T repeatedly asked Plaintiffs to identify the ICA provisions Plaintiffs relied on to support their disputes, but Plaintiffs never did so. Nor did Plaintiffs submit additional disputes, even though Plaintiffs conducted an internal investigation and concluded that they had other disputes, and even though the Level 3 employee in charge of the investigation—Sean Herrick—thought Plaintiffs *should* submit those disputes. Herrick Dep. at 21; Level 3 Rule 30(b)(6) Dep. at 31:3-9; DUF at 10. Instead, Plaintiffs filed suit, taking the extraordinary position that the terms of their contracts are irrelevant to their breach of contract action.

This, to put it mildly, is nonsense. A party to a contract is bound by the provisions of that contract, "even if it is somehow perceived to be harsh or unfair." *Express Phone Service, Inc. v. Florida Pub. Serv. Comm'n*, 2013 WL 6536748 at *5 (N.D. Fl. Dec. 12, 2013). There would be no point in negotiating a lengthy and detailed telecommunications contract if its terms could be ignored at the pleasure of one of the contracting parties. Plaintiffs surely understand this: they acknowledge that "[t]he ICAs should be interpreted to avoid rendering any of the terms meaningless." Pl. Br. at 13. But Plaintiffs' position does just that: it renders the ICAs' dispute filing requirements and the ICAs' deadlines for filing claims meaningless.

Plaintiffs suggest (at 35-37) that it would have been futile to submit additional disputes, and that justifies their failure to comply with the ICAs' procedures. That argument is unavailing. Plaintiffs had a team of employees whose job it was to identify, submit and, where necessary, escalate disputes, and Plaintiffs submitted disputes to AT&T on a regular basis. Tim Bruny— Level 3's senior director of network expense during the relevant period—testified that over a 4-

1/2 year period, his team filed "well over a million claims" with AT&T, totaling approximately "$120 million" in usage and facilities disputes. Bruny Dep. at 17-18. Plaintiffs filed specific TELRIC disputes for Texas, Kansas and Michigan, using the ICAs' procedures. Even if Plaintiffs believed that additional disputes would have been denied—and even if those disputes *had* been denied—Plaintiffs were nevertheless required to submit them *to preserve their right to bring suit later. See, e.g.*, Broadwing's California ICA, Attachment 13—Billing Disputes, § 13.1 ("No Party may pursue any claim related to billing unless . . . written notice [describing the dispute] has first been given to the other Party'). That is no small thing: filing a dispute is not "futile" or meaningless if it is a prerequisite to bringing a multi-million dollar lawsuit.

Plaintiffs' statement that "AT&T and Level 3 even reached an agreement that Level 3 would not file more disputes on these issues" (Pl. Br. at 34) mischaracterizes the testimony. The Putman deposition testimony cited by Plaintiffs does not say that the parties reached any sort of agreement to forgo additional disputes. Ms. Putman testified only that she and her AT&T counterpart agreed they would not burden each other's teams with "a large number of disputes *unnecessarily*." Putman Dep. at 63:18-20 (emphasis added). That testimony is a far cry from evidence that the parties had "reached an agreement that Level 3 *would not file more disputes*." In any case, the desire by one low-level employee not to file unnecessary disputes could not, and did not, relieve Plaintiffs of their contractual obligation to file disputes, or the consequences of failing to file additional disputes.[15]

There was no agreement excusing Plaintiffs from filing additional disputes. Plaintiffs admitted that they could have filed additional disputes, and that AT&T did nothing to prevent it.

---

[15] When Level 3 was asked in its Rule 30(b)(6) deposition why no more disputes were filed, Level 3's corporate representative, Gary Black, testified only that Level 3 thought it would have been futile; Mr. Black did *not* say that the parties had "specifically agreed" that Plaintiffs did not need to submit additional disputes. *See* Level 3 Rule 30(b)(6) Dep. at 38. And he admitted that Level 3 could have filed additional disputes. *Id.* at 32-33.

DUF ¶ 9.  In fact, in 2013—long after Ms. Putman had transferred her responsibilities for the disputes to Sean Herrick and Tim Bruny (*see* Putman Dep. at 64:16-21)—Level 3 and AT&T discussed possible "additional disputes" in states other than Michigan, Texas and Kansas.  *See* Bruny Dep. Exh. 14.  There would have been no need for such discussions if the parties had in fact "agreed" that Plaintiffs did not need to file disputes to preserve their claims.  Plaintiffs *chose* not to file additional disputes, with full knowledge that, under the ICAs, claims for breach of the ICAs could be brought only if disputes had been timely filed, and then only within two years of the date of the disputed bills.  Plaintiffs thereby waived their contractual right to bring a lawsuit challenging bills they paid and failed to dispute within two years.

Finally, Plaintiffs argue that AT&T cannot rely on the mandatory bill dispute provisions in the ICAs to defend against Plaintiffs' claims for breach of ICA because AT&T materially breached the ICAs.  Pl. Br. 34.  That argument is frivolous for reasons set forth in the very authority Plaintiffs rely on.  As the court stated in *Monarch Photo, Inc. v. Qualex, Inc.*, 935 F. Supp. 1028, 1033 (D.N.D. 1996):

> It is well settled in American contract law that:
>
> "Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has an election of continuing performance, or of ceasing to perform, or of repudiating the contract.  Any act by the injured party indicating an intent to continue will operate as a conclusive election, not depriving him of his right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part . . . ."  17A Am. Jur. 2d Contracts § 731.

By continuing to perform under the ICAs for years after AT&T's alleged breach and by suing on the contracts, Plaintiffs elected to affirm the contracts and cannot contend that AT&T's alleged breach relieved them from their obligation to comply with the ICAs' bill dispute provisions.

## VI. Plaintiffs Are Not Entitled To Summary Judgment On AT&T's Third And Fourth Affirmative Defenses (Estoppel/Waiver and Unclean Hands).

Plaintiffs argue that AT&T engaged in inequitable conduct in converting Plaintiffs' rates and then refusing to convert them back after *Talk America*, while offering new arguments. In fact, as explained above, many of Plaintiffs' circuits were never "converted" from TELRIC pricing to tariffed rates, but were billed at tariffed rates all along, fully consistent with the parties' contracts. In addition, AT&T notified Plaintiffs long before Plaintiffs filed suit that the contracts did not entitle Plaintiffs to cost-based entrance facilities, but Plaintiffs ignored AT&T's repeated requests that Plaintiffs identify any contract provisions supporting their position. Instead, after paying tariffed rates for many years without dispute, after issuance of *Talk America* Plaintiffs suddenly suggested they were entitled to seek retroactive refunds back to 2005 based on that decision, irrespective of the terms of their contract. By failing to properly and timely dispute AT&T's bills, Plaintiffs waived any right to challenge them, and their attempt to seize on *Talk America* to collect a windfall in refunds of charges they agreed to pay and paid without dispute is inequitable.

## Conclusion

For the reasons explained above, as well as in AT&T's opening brief in support of its cross-motion for summary judgment, Plaintiffs' motion should be denied.

Dated: May 2, 2016    Respectfully submitted,

By:    /s/ Hans J. Germann
Dennis G. Friedman (*pro hac vice*)
Hans J. Germann (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
dfriedman@mayerbrown.com
hgermann@mayerbrown.com
ATTORNEYS FOR DEFENDANTS

<u>**CERTIFICATE OF SERVICE**</u>

       Defendants filed a copy of the foregoing electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system on this 2nd day of May, 2016, upon the following:

Erik O. Solverud
SPENCER FANE, LLP
One N. Brentwood Boulevard
Suite 1000
St. Louis, MO 63105
esolverud@spencerfane.com

Joseph E. Jones
Timothy J. Thalken
FRASER STRYKER PC LLO
409 S. 17th Street
500 Energy Plaza
Omaha, NE 68102
jjones@fslf.com
tthalken@fslf.com

*Attorneys for Plaintiffs*