UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LEVEL 3 COMMUNICATIONS, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13-CV-1080 (CEJ) |
| | ) | |
| ILLINOIS BELL TELEPHONE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross motions for summary judgment on the Phase I issues related to liability.

### I. Background

Defendants Illinois Bell Telephone Company, Indiana Bell Telephone Company, Inc., Michigan Bell Telephone Company, Nevada Bell Telephone Company, Ohio Bell Telephone Company, Pacific Bell Telephone Company, Southwestern Bell Telephone Company and Wisconsin Bell, Inc. are incumbent local telephone companies, or incumbent local exchange carriers ("ILECs"), located in twelve states.  Plaintiffs Level 3 Communications, LLC and Broadwing Communications, LLC are competitive local exchange carriers ("CLECs") offering competing telecommunications services in the twelve states where defendants are ILECs.  Because ILECs were once state-regulated monopolies, the Telecommunications Act of 1966, 47 U.S.C. §§ 151, *et seq.* (hereinafter referred to as the "Act"), was enacted in order to require ILECs to provide interconnection to CLECs at cost-based rates.  *See* 47 U.S.C. §§ 251(c)(2), 252(d).  Interconnection is

the physical act of linking the network lines of two carriers so that CLEC customers can send communications to ILEC customers.  In order to ensure compliance with the Act, the defendants entered into individual interconnection agreements (ICAs) with both of the plaintiffs. Each ICA was reviewed and approved by a state public utility commission.  *See id.* § 252(e) ("Any [ICA] adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.").

In late 2002, plaintiff Level 3 began negotiations with defendants for new ICAs in 13 states.  [Doc. #98, ¶ 23].  The parties were unable to agree upon all of the terms of the new ICAs. [Doc. #98, ¶ 24].  Under the Act, when ILECs and CLECs are unable to agree on the terms of an ICA, the matter is resolved through arbitration proceedings governed by state commissions.  [Doc. #98, ¶ 25].  On August 21, 2003, the FCC issued a ruling known as the Triennial Review Order ("TRO") discussing parties' obligations under the Act.  [Doc. #98, ¶ 19].  In mid-2004, Level 3 filed petitions with 13 state commissions to arbitrate the disputed terms of the ICAs.  [Doc. #98, ¶ 26].  Among the many issues in dispute during the arbitration proceedings between Level 3 and defendants was the extent of defendants' obligation to lease Level 3 entrance facilities used for interconnection. [Doc. #98, ¶ 27].  On February 4, 2005, the FCC released the Triennial Review Remand Order ("TRRO") following D.C. Circuit review of the TRO.  [Doc. #98, ¶ 28-30].

On February 10, 2005, the parties executed a Memorandum of Understanding ("MOU") agreeing to withdraw the arbitration proceedings and

agreeing in concept to the terms of the new ICAs. [Doc. #98, ¶ 33]. Pursuant to the MOU, Level 3 and defendants entered into the current ICAs on February 22, 2005, for the states of Arkansas, California, Illinois, Indiana, Kansas, Michigan, Missouri, Nevada, Ohio, Oklahoma, Texas, and Wisconsin. [Doc. #98, ¶ 34]. The Level 3 ICAs contain 73 pages of general terms and conditions and a series of appendices which are common to all states at issue in this lawsuit. [Doc. #98, ¶ 35]. The ICAs provide the terms on which defendants and Level 3 interconnect with each other's network so that customers on one network can call customers on the other. [Doc. #98, ¶ 37]. Prior to executing the MOU in February of 2005, Level 3 and defendants entered into a "First Amendment Superseding Certain Intercarrier Compensation, Interconnection and Trunking Provisions" (the "Superseding Amendment"). [Doc. #98, ¶ 54]. On January 3, 2007, Level 3 acquired plaintiff Broadwing and its subsidiaries. [Doc. #98, ¶ 178]. Unlike the Level 3 ICAs, the general terms and conditions of which are substantially uniform among the relevant states, the Broadwing ICAs are different from one state to another. [Doc. #98, ¶ 180]. The Broadwing ICAs are also subject to a multi-state "Further Amendment Superseding Certain Intervening Law, Compensation, Interconnection and Trunking Provisions" (the "Further Amendment") which expressly governs and supersedes the Broadwing ICAs. [Doc. #98, ¶ 208].

Following the issuance of the TRRO, defendants developed and implemented a large-scale project to convert prices it was charging for entrance facilities used for local interconnection from lower cost-based rates to higher tariff rates. [Doc. #98, ¶ 66]. Defendants named its price conversion project the "EF2AC Project." [Doc. #98, ¶ 67]. EF2AC was an acronym used by defendants which meant Entrance

Facility to Access Charge. [Doc. #98, ¶ 68]. As a part of its EF2AC Project, defendants monitored proceedings in each state regarding the TRRO's interpretation. [Doc. #98, ¶ 74]. As a part of its EF2AC Project, defendants converted both DS1 and DS3 circuits to higher tariff rates. [Doc. #98, ¶ 78]. DS1s and DS3s are different sizes of entrance facilities. [Doc. #98, ¶ 79]. From December 2007 through February 2009 without amending the ICAs, defendants converted the Level 3 and Broadwing circuits in Texas, Kansas, Oklahoma, Michigan, Ohio, and Arkansas to higher tariff rates. [Doc. #98, ¶ 86].

As a part of the price conversion project in Texas, defendants changed the circuit IDs for the converted circuits and removed the "JK" identifiers from the circuit identification numbers. The JK identifiers identified the circuits as local interconnection circuits eligible for cost-based pricing. [Doc. #98, ¶ 97]. In May, 2008, when plaintiffs first received bills from defendants in which the JK identifiers were removed and which reflected higher rates, plaintiffs contacted defendants about the changes. [Doc. #98, ¶ 98]. Defendants responded to plaintiffs by email dated May 16, 2008, with the following explanation:

> As a result of the FCC's *Triennial Review Order* and *Triennial Review Remand Order* (2005), AT&T is no longer required to provide entrance facilities at TELRIC rates. The EF2AC project will convert the embedded base of Local Interconnection Entrance Facilities to Switched Access tariffed services. Currently we have approval to begin conversion in Texas, Oklahoma, Kansas, Arkansas, Ohio and Connecticut. Conversion will begin immediately in Texas with the other approved states to begin later in 1Q08.

[Doc. #98, ¶ 99].

Plaintiffs also filed three disputes with defendants challenging the removal of the JK identifier and defendants' price increase. [Doc. #98, ¶ 100]. Defendants

denied plaintiffs' disputes and advised that the price increase was justified by the TRRO, stating in its dispute denial remarks:

> Denied - as a result of the FCC's Triennial Review Order and Triennial Review Remand Order (2005), ATT is no longer required to provide entrance facilities at TELRIC rates. The EF2AC project converted the embedded base of Local Interconnection Entrance Facilities to Switched Access tariffed services. Credit for the local interconnection entrance facilities was given on ban 710-550-5062-320.

[Doc. #98, ¶ 101].

Level 3 also disputed AT&T's charge of $246,328.31 in Michigan for AT&T's retroactive true-up. [Doc. #98, ¶ 102]. Litigation over the interpretation of the TRRO was ongoing in multiple jurisdictions, ultimately culminating in the Supreme Court's decision in *Talk America, Inc. v. Michigan Bell Tel. Co.*, 564 U.S. 50, 63, 131 S. Ct. 2254, 2263, 180 L. Ed. 2d 96 (2011).

Plaintiffs bring this action seeking damages and declaratory relief for defendants' failure to provide essential telecommunications wires (called "entrance facilities") at cost-based rates ("TELRIC" rates). [Doc. #46]. In the amended complaint, plaintiffs claim that defendants breached the Level 3 ICAs (Count I), the Broadwing ICAs (Count II), and violated the Telecom Act (Count III) by improperly charging higher rates. Plaintiffs also seek a declaration that the Telecom Act, FCC rulings, and the terms of the ICAs require the defendants to provide interconnection at cost-based rates (Count IV). [Doc. #46]. Plaintiffs also assert a claim of unjust enrichment based on the contention that defendants wrongfully billed them at rates higher than cost-based rates (Count V). [Doc. #46].

The defendants assert various affirmative defenses in their answer. In a counterclaim, defendants Southwestern Bell and Michigan Bell (collectively the

"AT&T ILECs") claim that plaintiffs violated their federal access tariffs by failing to pay the correct amounts for the transport facilities the defendants provided. The AT&T ILECs seek an award of damages and a declaration that the plaintiffs are in violation of the tariffs and are liable for the unpaid amounts.

## II.  **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed.R.Civ.P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).

"Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." *Progressive Cas. Ins. Co. v. Morton*, 140 F. Supp. 3d 856, 860 (E.D. Mo. 2015) (citations omitted). Because "the interpretation and construction of insurance policies is a matter of law, . . . such cases are particularly amenable to summary judgment." *Id.* (quoting *John Deere Ins. Co. v. Shamrock Indus., Inc.*, 929 F.2d 413, 417 (8th Cir. 1991)).

## III.   <u>Discussion</u>

The ICA is a private contract that implements duties imposed by the Telecommunications Act of 1996.  The Court will therefore begin with a brief discussion of the relevant provisions of the Act, the key agency decisions and judicial interpretations, as well as the key provisions of the parties' ICA before turning to the motions for summary judgment.  The Act imposed a number of duties on incumbent providers of local telephone service in order to facilitate market entry by competitors. *AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The Act requires incumbent carriers to share their physical networks with new market entrants, known as "competing carriers," to mitigate the prohibitive cost of building a new network.  *CoreTel Virginia, LLC v. Verizon Virginia, LLC*, 752 F.3d 364, 367–68 (4th Cir. 2014). §251(c)(2) of the Act promotes interconnection, the physical link between two telecommunications networks that allows each carrier's customers to call the other's. The FCC has interpreted §251(c)(2) to require, among other things, that an incumbent carrier lease a competing carrier "entrance facilities" required for

interconnection at TELRIC rates. *See Unbundled Access to Network Elements* ["*Remand Order* "], 20 F.C.C. 2533, ¶ 140 (2005); *Review of the Section 251 Unbundling Obligations of Incumbent Local Exch. Carriers* ["*Triennial Review Order* "], 18 F.C.C. 16978, ¶ 366 (2003); *see also Talk America,* 131 S.Ct. at 2261. Therefore, while an incumbent carrier no longer has a general obligation to provide entrance facilities at TELRIC rates under § 251(c)(3), it remains obligated to provide entrance facilities at TELRIC rates when they are used for interconnection under §251(c)(2*). CoreTel Virginia, LLC v. Verizon Virginia, LLC*, 752 F.3d 364, 368 (4th Cir. 2014) (citing *Talk America,* 131 S.Ct. at 2264–65; *Remand Order,* 20 F.C.C. 1533, ¶ 140; *Triennial Review Order,* 18 F.C.C. 16978, ¶¶ 365, 366).

The ICAs[1] contain several provisions pertaining to the rights and obligations of the parties.   Section 43.1 addresses the scope of the ICA:

> This Agreement is intended to describe and enable specific Interconnection and compensation arrangements between the Parties. This Agreement is the arrangement under which the Parties may purchase from each other the products and services described in Section 251 of the Act and obtain approval of such arrangement under Section 252 of the Act. Except as agreed upon in writing, neither Party shall be required to provide the other Party a function, facility, product, service or arrangement described in the Act that is not expressly provided herein. Nothing herein is intended to affect or abridge either Party's rights or obligations under Section 252(i) of the Act, nor is anything herein intended to modify SBC-13STATE's obligation to provide services and facilities under the Act.

[Doc. #84-2, p. 75, §43.1].

Section 22.1 addresses the law governing the ICA:

> Unless otherwise provided by Applicable Law, this Agreement shall be governed by and construed in accordance with the Act, the FCC Rules and Regulations interpreting the Act and other applicable federal law. To the extent that federal law would apply

---

[1] The Level 3 ICAs are identical in all relevant states.

state law in interpreting this Agreement, the domestic laws of the state in which the Interconnection, Resale Services, Network Elements, functions, facilities, products and services at issue are furnished or sought shall apply, without regard to that state's conflict of laws principles.

[Doc. #84-2, p. 61, §22.1].

Section 2.6.1 addresses the impact of a conflict in provisions:

In the event of a conflict between the provisions of this Agreement and the Act, the provisions of the Act shall govern.

[Doc. #84-2, p. 9, §2.6.1].

The ICA also provides that the terms contained in the agreement and its appendices constitute the entire agreement between the parties with respect to the subject matter contained. [Doc. #84-2, JA-77]. Thus, also incorporated into the ICA is the NIM (Network Interconnection Methods) Appendix. The NIM Appendix[2] sets forth the terms and conditions by which interconnection is provided from the ILEC (defendants) and the CLEC (plaintiffs). Section 1.1 states in relevant part:

This Appendix describes the physical architecture for Interconnection of the Parties' facilities and equipment for the transmission and routing of Telephone Exchange Service traffic and Exchange Access traffic between the respective Customers of the Parties pursuant to Section 251(c)(2) of the Act; provided, however, Interconnection may not be used solely for purposes not permitted under the Act.

[Doc. #84-2, p. 224, §1.1].

Also incorporated into the ICAs are the Superseding Amendment[3] and the Further Amendment[4] which supersede, amend, and modify the applicable provisions of the ICAs. [Doc. #84-2, p. 425, §1.1]; [Doc. #84-17, p. 402, §1.3]. Both the

---

[2] The NIM Appendix is contained in the Level 3, Broadwing, and Level 3/ICG interconnection agreements.
[3] The Superseding Amendment in all twelve of the Level 3 ICAs at issue here are identical.
[4] While each underlying Broadwing ICA is different, the Further Amendment is common to all relevant Broadwing ICAs at issue here.

Superseding Amendment and the Further Amendment were entered into effective January 1, 2005. With respect to any conflicts between the Superseding Amendment and the terms of any future ICAs, the parties agreed that "[a]ny inconsistencies between the provisions of this First Amendment and other provisions of the . . . future interconnection agreement(s) . . . will be governed by the provisions of this First Amendment, unless this First Amendment is specifically and expressly superseded by a future amendment between the Parties." [Doc. #84-2, p. 425, §1.2]. The Further Amendment contains language similar to that in the Superseding Amendment, and provides that "[a]ny inconsistencies between the provisions of this Further Amendment and other provisions of the current ICAs or future interconnection agreement(s) . . . will be governed by the provisions of this Further Amendment, unless this Further Amendment is specifically and expressly superseded by a future amendment between the Parties." [Doc. #84-17, p. 403, §1.4]. Both Level 3 and Broadwing entered into the ICAs at issue in this case after the Superseding and Further Amendments were signed.

### A. <u>Breach of the Interconnection Agreements</u>

Plaintiffs have alleged that defendants breached both the Level 3 and Broadwing ICAs by refusing to provide interconnection through entrance facilities at cost-based rates. Plaintiffs argue that the ICAs require defendants to provide Level 3 and Broadwing with entrance facilities used for interconnection at cost-based rates. Plaintiffs' base their argument upon the Supreme Court's decision in *Talk America, Inc. v. Michigan Bell Tel. Co.,* which found that the Act requires defendants to provide entrance facilities used for local interconnection at cost-based rates. 564 U.S. 50, 63, 131 S. Ct. 2254, 2263, 180 L. Ed. 2d 96 (2011).

To state a claim for breach of contract under Missouri law, plaintiffs must establish (1) the existence of a valid contract; (2) the rights of plaintiff and obligations of defendant under the contract; (3) breach by defendant; and (4) damages resulting from the breach. *Gillis v. Principia Corp.*, 832 F.3d 865, 871 (8th Cir. 2016) (citing *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 5 (Mo. Ct. App. 2013)). There is no dispute that the ICA is a valid contract as interconnection agreements are "the Congressionally prescribed vehicle for implementing the substantive rights and obligations set forth in the Act." *Michigan Bell Tel. Co. v. Strand*, 305 F.3d 580, 582 (6th Cir. 2002); see also *Verizon Maryland, Inc. v. Glob. NAPS, Inc.*, 377 F.3d 355, 364 (4th Cir. 2004) (holding interconnection agreements are the vehicles chosen by Congress to implement the duties imposed in § 251). The initial issue here is determining the parties' rights and obligations under their agreement, then determining whether either party breached those obligations.

According to the terms of the Level 3 ICAs, nothing contained therein is intended to modify AT&T's obligations to provide services and facilities under the Telecom Act and, except as agreed upon in writing, neither party is required to provide the other party a function or facility described in the Telecom Act that is not expressly provided in the ICA. The NIM Appendix provides that the physical architecture for interconnection of the parties' facilities and equipment shall be provided pursuant to § 251(c)(2) of the Act. Both the Broadwing[5] and Level 3/ICG[6]

---

[5] *See* Illinois Broadwing ICA at Doc. #84-17, p. 462, §15.2 ("AT&T is required to provide access to facilities that CLEC requests to interconnect with AT&T's network ... in accordance with the requirements of Section 251(c)(2) of the Act."); Broadwing Illinois ICA at Doc. #84-17, p. 74, §3.12 ("Interconnection shall be ... on rates, terms and conditions consistent with Section 251(c)(2)(D) of the Act."); Broadwing Illinois ICA at Doc. #84-17, p. 64, § 3.2.2 (providing Broadwing may request interconnection facilities as provided by Section 251(c)(2)); Broadwing California ICA at Doc. #84-16, p. 8, §3 (requiring both parties "act in good faith and consistently with the intent of the Act"); Broadwing Michigan ICA at Doc.

ICAs contain similar language imputing the same obligation to provide interconnection pursuant to §251(c)(2) of the Telecom Act as set forth in the Level 3 ICAs.

Section 251(c)(2)(d) of the Act requires an ILEC to provide for the facilities and equipment of any requesting CLEC interconnection on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of § 251 and § 252. 47 U.S.C. §251(c)(2)(d). Section 252 sets forth the pricing standards and provides that the rate for the interconnection of facilities and equipment for purposes of §251(c)(2) shall be cost-based. 47 U.S.C. §252(d)(2)(A). Thus, as the Act obligates defendants to provide interconnection pursuant to §251(c)(2)(d), §43.1 does not modify or abrogate defendants' obligation to provide interconnection.

---

#84-18, p. 16, §3.1 (providing that each Party shall interconnect their networks "pursuant to Section 251(c)(2) of the Act"); Broadwing Michigan ICA at Doc. #84-18, p. 92, §19.2 (requiring each party to comply with all applicable law and stating "[n]othing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law"); Broadwing Texas ICA at General Terms Doc. # 84-19, p. 22, §8.1 ("Nothing in [the ICA] shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law."); Broadwing Texas ICA §40.0 at p.40 ("the Parties will act in good faith and consistently with the intent of the Act."); §1.8 at p.9 (stating that AT&T is obligated to provide "Interconnection under Section 251(c)(2) of the Act").

[6] *See* ICG Ohio ICA at Doc. #84-15, p.72, §25.1 ("Nothing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law."); ICG Ohio ICA at Doc. #84-15, p. 92, §2.6.1 ("In the event of a conflict between the provisions of [the ICA] and the Act, the provisions of the Act shall govern."); ICG Ohio NIM Appendix at Doc. #84-15, p. 230, § 1.1 (allowing ICG to obtain interconnection "pursuant to Section 251(c)2) of the Act."); ICG Indiana ICA at Doc. #84-14, p. 133, §19.2.2 ("Nothing in this Agreement shall be construed as requiring or permitting either Party to contravene any mandatory requirement of Applicable Law."); ICG Indiana ICA at Doc. #84-14, p. 11, §1.3(e) ("In the event of a conflict between the provisions of [the ICA] and the Act, the provisions of the Act shall govern.").

Defendants claim that the provision of entrance facilities was not "expressly provided" for in the ICA. The ICAs define interconnection "as [d]efined in the Act." [Doc. #84, p. 91, § 21.1]. *Talk America* and the FCC have determined that entrance facilities that are a part of ILECs networks for purposes of § 251(c)(2) fall within the definition of interconnection under the Act. *Talk America,* 564 U.S. at 63 ("[e]ntrance facilities, at least when used for the mutual exchange of traffic, seem to us to fall comfortably within the definition of interconnection."). Accordingly, entrance facilities for the purpose of interconnection are expressly provided for in the ICA.

Defendants further argue that their sole obligation under the Act is to provide interconnection under the terms of the parties binding ICAs. The defendants maintain that entrance facilities used for interconnection are not directly attributable to the ICAs because the §251 duties are not directly enforceable pursuant to § 252(a)(1). *See* 47 U.S.C. §§ 251(c)(1), 252(a)(1). Section 252(a)(1) expressly provides that "an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of §251 of this title." 47 U.S.C. §252. Accordingly, the duties stated in §251 subsections (b) and (c) only apply if they are incorporated into an ICA. *CoreTel Virginia, LLC v. Verizon Virginia, LLC*, 752 F.3d 364, 368 (4th Cir. 2014)(citing 47 U.S.C. §252(a)(1).

Defendants argue that §251(c) does not require an ILEC to do anything that is not included in an ICAs, as the ICAs are the sole method which obliges the ILEC to perform its §251 duties. Defendants point to a number of decisions in which

courts have stated that parties are governed by the ICA, rather than by the provisions of the Act. *See e.g. Core Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 18 F.C.C. Rcd. 7568, 7581–82 (2003) *vacated on other grounds by SBC Commc'ns Inc. v. FCC*, 407 F.3d 1223 (D.C. Cir. 2005) (holding that parties to an ICA that explicitly states that a service will not be provided, waived the right to request different terms based on general §251 duties in order to circumvent the terms of the ICA because the ICA is a binding agreement); *see also Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 359 (6th Cir. 2003) (citing *Law Offices of Curtis V. Trinko v. Bell Atlantic Corp.,* 305 F.3d 89, 102 (2nd Cir.2002) (stating that the Act intended for ILECs to be governed by the interconnection agreement rather than the general duties put forth in §251(b) and (c) because once the ICA agreement is approved, the general §251 duties do not control). Defendants are correct that §252(a)(1) explicitly provides that an ICA can override the standards set forth in §251(c)(2). However, that is distinguishable from this situation where the ICA specifically incorporates the requirements and obligations of the Act, as this agreement does by providing that interconnection facilities and equipment are to be provided pursuant to §251(c)(2). Because the responsibilities and obligations to provide interconnection pursuant to §251(c)(2) have been incorporated into the ICAs, the ICAs require defendants to meet those obligations which include providing interconnection at cost-based rates.

Defendants also argue that entrance facilities are only specifically addressed in the Lawful Unbundled Network Elements ("UNE") Appendix to the ICAs which states that entrance facilities have been "declassified" and are no longer available as unbundled network elements. [Doc. #84-19, p. 91, § 1.2.1]. However, this

reference to entrance facilities refers to entrance facilities that were previously unbundled pursuant to §251(c)(3). Defendants argue that the UNE Appendix language is directly applicable and expressly addresses their obligation to provide § 251(c)(2) interconnection. However, this is incorrect—the UNE Appendix specifically addresses unbundled network elements pursuant to §251(c)(3), not §251(c)(2). For example, §1.2.4 of the UNE Appendix provides that the TRRO does not eliminate CLECs' right to obtain interconnection facilities the ILECs are required to provide for §251(c)(2) interconnection. [Doc. #84-19, p. 91, §1.2.4]. § 1.2.4 of the UNE Appendix goes on to say that the interconnection facilities referred to in this Section are those cross-connect facilities necessary to interconnect CLEC's network facilities with an ILEC and are not the physical circuits that link the CLEC switch to an ILEC switch. *Id.*

Defendants also suggest that the Level 3 Superseding Amendment and the Broadwing Further Amendment override the NIM Appendix and other language incorporating the duties of §251(c)(2). However, the text of both Amendments does not support defendants' argument that the NIM Appendix is overridden relative to §251(c)(2). [Doc. #84-2, pp. 428-29, §4.6]. The Amendments as cited by defendants provide for dedicated Special Access facilities, yet the defendants do not explain how those facilities pertain to entrance facilities provided under §251(c)(2) or how this subsection overrides the NIM Appendix. Furthermore, both Amendments only override portions of the ICA that are in conflict with the Amendments, but not the ICA itself. Here, there is no conflict between either Amendment and the NIM Appendix as the Amendments do not purport to disturb the NIM Appendix nor abrogate the obligations of the defendants under §251(c)(2).

Defendants point toward §4 of the Superseding Amendment which addresses "Network Architecture Requirements," to argue that nothing in the Superseding Amendment requires defendants to provide entrance facilities at TELRIC-based rates for interconnection. [Doc. #84-2, pp. 428-31, §4]. However, this provision does not override the NIM Appendix in plaintiffs' contracts that require interconnection pursuant to §251(c)(2), nor does the provision purport to override the actual section in the agreement that provides for the parties obligations under §251(c)(2). Moreover, the defendants increased the pricing from TELRIC-based rates to tariff-based rates two years after the Superseding and Further Amendments were executed, further weakening their claim that the amendments provide for different rights and obligations as included in the Act and the ICA.

Defendants also argue that plaintiffs improperly used the "mend the hold" doctrine to evade the terms of the ICA. This argument stems from plaintiffs' argument that defendants improperly shifted justifications in raising prices from cost-based rates for entrance facilities towards higher tariff prices. Defendants instead state that plaintiffs improperly used outside rationales in their attempts to avoid paying tariff rates, as defendant insists they are entitled to under the ICA. As the court has already determined, under § 251(c)(2), defendants must provide entrance facilities used for interconnection in exchange for cost-based rates. Here, the contract provides all the evidence necessary to determine the rights and obligations of the parties.

Plaintiffs also argue that the change of law provision in the ICA should be immediately incorporated into the ICA. The ICAs specifically provide that the parties reserved their rights related to the TRO and TRRO if any action affected the

rights or obligations of either party addressed by the ICA, and that the affected provisions of the ICA shall be "immediately, invalidated, modified, or stayed" consistent with the action of the court upon the written request of either party. While the TRO and TRRO impacted the rights and obligations of both parties in a number of fashions, neither order impacted the rights and obligations of either party pursuant to §251(c)(2), instead re-affirming that the orders did not impact the parties rights and obligations under §251(c)(2). Because the rights and obligations of either party with respect to §251(c)(2) were not impacted, the change of law provision is not relevant to this discussion.

Defendants argue that plaintiffs are not entitled to cost-based rates for facilities not used solely for interconnection. Plaintiffs argue that if an entrance facility is used for both interconnection and non-interconnection purposes, defendants are required to charge cost-based rates on the portion of the entrance facility used for local interconnection, and may charge higher rates only on any remaining portion of the entrance facility which is not used for interconnection. In *Talk America*, the Supreme Court noted that prior to the issuance of the TRRO, "entrance facilities leased under §251(c)(2) [could] be used only for interconnection." 564 U.S. 50, 64, 131 S. Ct. 2254, 2264, 180 L. Ed. 2d 96 (2011). The TRRO further provides that CLECs will have access to these facilities at cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network. *In the Matter of Unbundled Access to Network Elements*, 20 F.C.C. Rcd. 2533, 2611 (2005). Defendant argues that "to the extent" means if the CLECs use entrance facilities solely for interconnection then they must charge cost-based rates but only if that is the sole use of the entrance facilities, whereas

plaintiffs argue that the phrase means that CLECs are entitled to cost-based rates on any portion of entrance facilities used for interconnection. However, the definition of "to the extent" is immaterial here because the ICAs provide that interconnection facilities are not required to be used solely for interconnection. The NIM Appendix states that plaintiffs can obtain facilities "pursuant to § 251(c)(2) of the Act; provided, however, [i]nterconnection may not be used solely for purposes not permitted under the Act." [Doc. #84-2, p. 224, § 1.1]. This phrase expressly allows plaintiffs to use the facilities for more than one purpose, as long as one of the purposes is interconnection. Furthermore, as defendants pointed out, §252(a)(1) explicitly states that "an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of §251 of this title." 47 U.S.C. §252. Thus, while defendant is not required to charge TELRIC rates for the portion of an entrance facility used for non-interconnection purposes, they are required under the ICAs to charge TELRIC rates to the extent that the entrance facility is used for interconnection.

Defendants also seek a ruling determining what constitutes an entrance facility eligible for cost-based pricing. Defendants acknowledge such a determination is a Phase II damages question. Specifically, defendants contend that plaintiffs would not be entitled to TELRIC pricing on facilities used in whole or in part for (1) delivering plaintiffs own long distance traffic to defendant, (2) indirectly exchanging traffic between plaintiffs' own end users and third party carriers using defendant's facility as an intermediary, or (3) delivering 911 traffic to

defendants. The parties agreed and the Court ordered that this portion of the litigation would be limited to Phase I liability issues, not Phase II damage issues. Accordingly, the Court finds that it would be inappropriate to make any Phase II damage determination without discovery occurring first. The Court finds that the ICA provides that interconnection shall be provided pursuant to §251(c)(2), and that nothing in the ICA modifies defendants obligation to provide interconnection at TELRIC rates. Accordingly, to the extent plaintiffs' claims are not barred by defendants' affirmative defenses, plaintiffs' motion for summary judgment on Count I and II will be granted and defendants' motion will be denied.

### B. **Count III - Violations of the Telecom Act**

Plaintiffs argue that that defendants' refusal to provide interconnection to plaintiffs at TELRIC rates by means of entrance facilities in excess of cost-based rates violates §§ 251(c)(2) and 252(d)(1) of the Telecom Act. As the Act requires the creation of an ICA and the ICA in this case incorporates the requirement of §251(c)(2), defendants were required to provide TELRIC rates for entrance facilities used for interconnection pursuant §251(c)(2). *See Core Commc'ns, Inc. v. Verizon Maryland Inc.*, 18 F.C.C. Rcd. 7962, 7972 (2003) (finding that the Telecommunications Act requires parties to not only enter into interconnection agreements, but also to comply with their terms; thus violating the interconnection agreement constitutes a violation of the Act). Defendants have not presented any arguments that they have not violated the Act if the Court finds that they are in violation of the ICA by failing to provide entrance facilities for interconnection at TELRIC rates. As defendants' have not been providing entrance facilities used for interconnection under TELRIC rates, but rather higher tariff based rates, defendants

are in violation of their obligations under the ICA and thus the Act. Defendants' motion for summary judgment on Count III will be denied and plaintiffs' motion for summary judgment on Count III will be granted.

### C. **Count IV - Declaratory Judgment**

Plaintiffs also seek a declaration regarding that defendants are obligated to provide plaintiffs with entrance facilities at TELRIC rates.  Plaintiffs seek an order declaring that defendant must (1) charge TELRIC rates on all entrance facilities used for local interconnection; (2) allow plaintiffs to order new entrance facilities under the ICAs at TELRIC rates; and (3) charge TELRIC rates for all or any portion of entrance facilities used for interconnection.  Plaintiffs argue that a declaratory judgment is necessary because defendants refuse to charge cost-based rates for any circuits. Defendants have stated that whether a declaratory judgment is proper depends upon whether defendants are obligated to provide plaintiffs with entrance facilities at TELRIC-based rates. The Court has determined that the ICAs require that cost-based rates be charged for the use of entrance facilities for interconnection.  Accordingly, defendants' motion for summary judgment on Count IV is will be denied and plaintiffs' motion for summary judgment on Count IV will be granted.

### D. **Count V - Unjust Enrichment**

In the alternative to their breach of contract claims, plaintiffs argue that defendants have been unjustly enriched by increasing prices from cost-based rates to higher tariff rates, preventing plaintiffs from ordering entrance facilities at cost-based rates, and refusing to charge cost-based rates for local interconnection entrance facilities.  Plaintiffs argue that pursuant to *Talk America*, defendants were

always required to charge cost-based rates.  "A claim for unjust enrichment has three elements: a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of the benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 854 (8th Cir. 2014) (quoting *Hertz Corp. v. RAKS Hospitality, Inc.,* 196 S.W.3d 536, 543 (Mo.Ct.App.2006)).  There can be no unjust enrichment claim, however, where an express contract exists. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 854 (8th Cir. 2014) (citing *Howard v. Turnbull,* 316 S.W.3d 431, 436 (Mo.Ct.App.2010)).

The crux of plaintiffs' claim is breach of contract.  As there is no dispute that an express contract exists, there can be no unjust enrichment claim.  Because the Court has found that plaintiffs can recover under the ICA, plaintiffs are precluded from simultaneously recovering for unjust enrichment. *Owen v. Gen. Motors Corp.*, No. 06-4067 CV CNKL, 2006 WL 2808632, at *2 (W.D. Mo. Sept. 28, 2006) (citing *Banner Iron Works, Inc. v. Amax Zinc Co.*, 621 F.2d 883, 889 (8th Cir.1980) (finding of a valid contract precludes recovery on a quantum meruit theory under Missouri law) and *Krupnick & Associates, Inc. v. Hellmich*, 378 S.W.2d 562, 569-570 (Mo.1964) (holding that an express contract would preclude the existence of the contract necessary to form the basis for recovery in quantum meruit)).  Accordingly, defendants are entitled to judgment as a matter of law on plaintiffs' unjust enrichment claim.

### E.  **Affirmative Defenses**

#### 1.  **Failure to State a Claim**

As their first affirmative defense, defendants assert that the amended complaint fails to state a claim upon which relief may be granted arguing that plaintiffs have not stated any claim regarding the ICG[7]/Indiana Bell ICA.  The amended complaint states: "Defendants Pacific Bell Telephone Company, Ohio Bell Telephone Company, and Southwestern Bell Telephone Company also entered into ICAs with ICG under which Defendants must provide ICG with entrance facilities used for interconnection at cost-based rates." [Doc. #46, ¶ 61].  Defendants note that plaintiffs did not specifically allege the Indiana Bell ICA in the amended complaint and argue that the Indiana Bell ICA is not at issue in this matter.

In their Rule 36 requests for admission, defendants sought plaintiffs' admission that the ICG Indiana ICA was one of the ICAs referenced in plaintiffs' amended complaint.  Plaintiffs complied and admitted that the ICG Indiana ICA was one of the ICAs referenced.  [Doc. 90-2, ¶ 19].  Plaintiffs' argue their Rule 36 admission that they intended the claim to include the Indiana Bell Company established that the ICG/Indiana Bell ICA was at issue.  Rule 36 provides that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). The advisory committee notes to Rule 36 provide that "admissions [made in response to Rule 36 requests] function very much as pleadings do."  Fed. R. Civ. P. 36 (advisory committee notes).  The Federal Rules also provide that "[p]leadings must be construed so as to do justice. Fed. R. Civ. P. 8(e).  While, the Indiana Bell ICA is not included in the complaint, the plaintiffs answered in response that it was included; both parties appeared to accept that it was included and the language of

---

[7] ICG is a predecessor of Level 3.

the Indiana Bell ICA is identical to that in the ICAs at issue here.  The Indiana Bell ICA is clearly relevant to the instant matter as it is identical to the other Level 3 ICAs and the same contractual issues have arisen between plaintiffs and defendants with respect to the Indiana Bell ICA. Accordingly, the plaintiffs are entitled to summary judgment on defendants' affirmative defense of failure to state a claim.

## 2.        Statute of Limitations

Defendants argue that plaintiffs' claims are time-barred.  The Eighth Circuit has held that plaintiffs' claims are subject to the two-year statute of limitations, 47 U.S.C. § 415(b), which provides: "[a]ll complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to subsection (d) of this section."  *See Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 675 (8th Cir. 2009)(citing 47 U.S.C. § 415(b)).  The parties agreed in the ICAs that "neither Party waives, but instead expressly reserves, all of its rights, remedies and arguments with respect to…the TRO and TRRO.  [Doc. #84-2, pp. 59-61, § 21.1].  Plaintiffs argue that the ICAs' reservation of rights and remedies preserved their claim against defendant until the Supreme Court resolved the disputed TRRO issues in *Talk America* on June 9, 2011.  A right is a well-founded or acknowledged claim; a remedy is the means employed to enforce a right or redress an injury.  *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 445, 121 S. Ct. 993, 999, 148 L. Ed. 2d 931 (2001).  Thus, the parties expressly agreed to retain their abilities to enforce their claims stemming from the TRRO.  The parties do not dispute that litigation arose almost immediately after the issuance of the TRRO, culminating in the Supreme Court's decision in *Talk America*.  Beginning in 2008, plaintiffs began to

dispute the tariff-based rates and filed this lawsuit within two years of *Talk America* decision. The plaintiffs' reservation of rights in the ICA tolled their claim until the Supreme Court resolved the dispute in *Talk America* and thereby clarified the parties' obligations.

Defendants also argue that plaintiffs' claims are barred by the terms of the parties' ICAs, which establish the procedures and time limits for submitting disputes. Plaintiffs' ICAs provide that no claims shall be brought for disputes arising under the ICA more than twenty-four months from the date of the occurrence which gives rise to the dispute. [Doc. #84-2, p. 39, § 10.6.1]. The Level 3 ICAs, as well as the Broadwing Texas ICA also provide that "[n]o claims, under this Agreement or its Appendices, shall be brought for disputed amounts more than twelve (12) months from the date of the occurrence which gives rise to the dispute." [Doc. #84-2, p. 38, § 10.1; Doc. #84-19, p. 27, § 11.8.1]. The Broadwing Texas ICA further provides that: "Notwithstanding anything contained in this Agreement to the contrary, a Party shall be entitled to dispute only those charges which appeared on a bill date dated within the twelve (12) months immediately preceding the date on which the Billing Party receives notice of such dispute." [Doc. #84-19, p. 27, § 11.8.1]. The occurrence which gave rise to the dispute was the Supreme Court's decision in *Talk America* per the reservation of rights and remedies embedded in the parties' ICAs. By the terms of the ICAs, plaintiffs were therefore required to present their billing disputes within twelve months of the decision in *Talk America*. Accordingly, plaintiffs' Level 3 and Broadwing Texas ICA claims are barred to the extent they are based on bills plaintiffs received more than twelve months after the *Talk America* decision.

Defendants note that plaintiffs provided written notice as to about $2 million billed by Southwestern Bell and Michigan Bell in Texas, Kansas, and Michigan. Defendants state that even if additional disputes would have been denied, plaintiffs were obligated to submit each and every dispute to preserve their right to bring suit later on. Defendants further argue that by failing to comply with the contracts' disputes procedures, plaintiffs waived any right to seek refunds for all amounts they chose not to dispute and that plaintiffs' claims are barred to the extent plaintiffs failed to submit written disputes in accordance with the parties' interconnection agreements despite the parties' reservation of rights in the ICA. For example, defendants cite the Broadwing California ICA which provides that "[n]o Party may pursue any claim related to billing unless…written notice [describing the dispute] has first been given to the other Party." [Doc. #84-16, p. 358, § 13.1]. The record shows that plaintiffs notified defendants of their billing disputes implicating all of plaintiffs' entrance facilities. Defendants responded that they would "be denying the disputes related to this issue and would expect that Level 3 not resubmit them" and that the ICAs do not provide for TELRIC pricing "making any disputes filed invalid." [Doc. #86-49]. Because it would have been futile for plaintiffs to dispute each and every bill, they should not be penalized for failing to do so. *See Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Accordingly, summary judgment on defendants' affirmative defense that the claims in Counts I and II are barred by the interconnection agreement will be granted in part and denied in part.

### 3.     Unclean Hands

Defendants have further asserted plaintiffs' claims should be barred based on the doctrine of unclean hands. The doctrine of "unclean hands" requires a showing that the plaintiff "has acted wrongfully with respect to the subject of the suit," thus precluding it from obtaining an equitable remedy. *Philadelphia Indem. Ins. Co. v. Greater KC Linc*, Inc., 2016 WL 3129290, at *2 (W.D. Mo. June 2, 2016) (citing *Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd.*, 165 S.W.3d 141, 145 (Mo. 2005)). The availability of an unclean hands defense requires consideration of "all of the facts and circumstances of a particular case." *Id.* Defendants have failed to show that plaintiffs have acted wrongfully with respect to the subject of the suit.

In support of their unclean hands defense, defendants state that plaintiffs ignored defendants' requests to identify contract provisions supporting their position and that plaintiffs failed to dispute paying tariffed rates. However, the record clearly shows that plaintiffs did dispute paying tariffed rates for entrance facilities used for §251(c)(2) interconnection. The Court has also found that the contract provisions in the ICAs support plaintiffs' position. Defendants further argue that plaintiffs are attempting to use *Talk America* to collect a windfall in refunds of charges they agreed to pay. However, the Court has found that plaintiffs' interpretation of *Talk America* is correct. Accordingly, the Court finds that defendants affirmative defense of unclean hands lacks merit. Furthermore, under Missouri law, the "unclean hands" doctrine does not bar a claim for money damages. *Union Elec. Co. v. Sw. Bell Tel. L.P.*, 378 F.3d 781, 788 (8th Cir. 2004) (citing *Marvin E. Nieberg Real Estate Co. v. Taylor–Morley–Simon, Inc.,* 867 S.W.2d 618, 626 (Mo.Ct.App.1993)). In this vein, Missouri courts have found that a

defendant may not raise the equitable defense of unclean hands when a plaintiff is seeking the legal remedy of an amount allegedly owed in a breach of contract dispute. *Howard v. Fid. Nat. Title Ins. Co.*, 2015 WL 5021768, at *9 (E.D. Mo. Aug. 24, 2015) (rejecting an unclean hands affirmative defense noting that equitable defenses are only available when equitable remedies are sought). Thus, even if defendants were able to demonstrate plaintiffs had unclean hands, defendants' application of doctrine of unclean hands would still fail because the issue at hands stems from a breach of contract.

For these reasons, the plaintiffs are entitled to summary judgment on defendants' affirmative defense of unclean hands.

### 4. <u>Estoppel and Voluntary Payment Doctrine</u>

Defendants also assert estoppel and the voluntary payment doctrine as affirmative defenses. Under Missouri law, the elements of estoppel are (1) an admission, statement or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act. *Gannon Int'l, Ltd. v. Lexington Ins. Co.*, No. 4:07-CV-31 CAS, 2008 WL 3244027, at *4 (E.D. Mo. Aug. 6, 2008). Plaintiffs argue that they did not make any statements or take any actions inconsistent with the claims they have presented in this action. Defendants argue that many of plaintiffs' circuits were never converted from cost-based pricing to tariffed rates, but were billed at tariff rates all along, fully consistent with the parties' contracts. Defendants argue that plaintiffs paid the tariff rates for years without complaints, yet suddenly objected after the Supreme Court's ruling in *Talk*

*America*.  However, defendants fail to explain how those arguments meet the elements of estoppel as stated above, and fail to present an explicit argument specific to estoppel.  Furthermore, the record shows that plaintiffs did dispute the tariff rates for entrance facilities used for interconnection under §251(c)(2), and defendants have failed to produce evidence that plaintiffs made an admission, statement, or act inconsistent with the claims asserted and sued upon.  Plaintiffs' statements and actions are consistent with the claims asserted and sued upon. They are entitled to summary judgment on the estoppel affirmative defense.

The voluntary payment doctrine is based on waiver and estoppel in which money, voluntarily paid to another under a claim of right to the payment and with knowledge of the facts by the person making the payment, is not recoverable on the ground that the claim was illegal or that there was no liability to pay in the first instance.  The doctrine applies even when the payor wrongly believes that the demand for payment was legal.  *Edwards v. City of Ellisville*, 426 S.W.3d 644, 666 (Mo. Ct. App. 2013).  The doctrine is also based on waiver and consent but is not applicable to all situations.  *Eisel v. Midwest BankCentre*, 230 S.W.3d 335, 339 (Mo. 2007).

Here, there is no evidence of waiver or consent, and there are sufficient facts in the record showing that plaintiffs did not waive or consent to paying tariff-based rates.  Plaintiffs submitted numerous complaints and withheld payments in three states.  Furthermore, the facts of the payments were at issue prior to the decision in *Talk America* because the parties disagreed as to whether the TRRO permitted defendants to charge tariff-based rates for entrance facilities used for interconnection under § 251(c)(2).  Furthermore, the parties expressly reserved

their rights related to the TRRO through the ICAs.  Until *Talk America* was decided, the factual basis for the payments was in dispute, thus neither party had full knowledge of the factual basis by which the payments were made.  Accordingly, plaintiffs are entitled to judgment as a matter of law on the affirmative defense based on the voluntary payment doctrine.

### F.  <u>Defendant's Motion for Summary Judgment</u>

Defendants have asserted two counterclaims seeking to recover the disputed tariff charges that Level 3 and Broadwing refused to pay for facilities provided in Kansas, Texas, and Michigan.  Defendants' claims are premised upon the contention that §251(c)(2) does not require TELRIC rates for entrance facilities used for interconnection or, in the alternative, that §251(c)(2) does not require cost-based rates when entrance facilities are not solely used for interconnection.  As discussed above, plaintiffs were entitled to TELRIC rates to the extent the entrance facilities were used for interconnection pursuant to §251(c)(2), thus plaintiffs were not required to pay the disputed tariffed charges under the agreement.  Accordingly, defendant's motion for summary judgment on Count I and Count II of the counterclaims will be denied and plaintiff's motion for summary judgment on Count I and Count II of the counterclaims will be granted.

\*  \*  \*  \*  \*

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for summary judgment [Doc. #85] is **granted in part and denied in part** as to Counts I and II**.**

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment [Doc. #89] is **granted in part and denied in part** as to Counts I and II**.**

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment is **granted** and defendants' motion for summary judgment is **denied** with respect to Counts I and II, except to the extent that Counts I and II are based on bills plaintiffs received pursuant to the Level 3 ICAs and the Broadwing Texas ICA more than twelve months after the decision in *Talk America*.

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment [Doc. #85] is **granted** as to Counts III and IV, **denied** as to Count V, and **granted** as to Counts I and II of defendant's counterclaim.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment [Doc. #89] is **denied** as to Counts III and IV, **granted** as to Count V, and **denied** as to Counts I and II of defendant's counterclaim.

**IT IS FURTHER ORDERED** that plaintiffs' request for oral argument is **denied as moot**.

**IT IS FURTHER ORDERED** that the parties shall have until **April 26, 2017,** to submit a joint proposed schedule for Phase II.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 10th day of April, 2017.