UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LEVEL 3 COMMUNICATIONS, LLC, AND BROADWING COMMUNICATIONS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:13-cv-01080-JAR |
| ILLINOIS BELL TELEPHONE COMPANY, et al., | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM & ORDER**

This matter comes before the Court on AT&T's[1] motion for partial summary judgment on damages (Doc. No. 139), Plaintiffs' motion for summary judgment on damages (Doc. No. 144), Plaintiffs' motion to exclude AT&T's Trunk Integrated Record Keeping System ("TIRKS") spreadsheet and related testimony (Doc. No. 151), and Plaintiffs' motion to exclude testimony and evidence regarding AT&T's credit spreadsheet (Doc. No. 153). The motions have been fully briefed and are ready for disposition.

**I.  Background**

The motions before the Court have been filed in Phase II – the damages phase – of this litigation. The Court's previous orders detail the procedural history of Phase I and relevant rulings therein. Thus, the Court will only address facts relevant to the motions before it.

Plaintiffs and AT&T entered into bilateral interconnection agreements ("ICAs"), under which

---

[1]  All references to AT&T refer to Defendants collectively.

AT&T provided interconnection[2] to Plaintiffs in accordance with the Telecommunications Act of 1966, 47 U.S.C. §§ 151, *et. seq.* ("the Act"), which governs the parties. It is undisputed that AT&T charged Plaintiffs higher tariff rates, rather than lower "cost-based" or "TELRIC"[3] rates, for local interconnection. In Phase I of this lawsuit, the Court held that AT&T violated the terms of the ICAs when it charged Plaintiffs for the use of entrance facilities[4] at this higher rate. Thus, the central issue in Phase II of the litigation and the motions before the Court is the amount of Plaintiffs' damages and the methodology employed in calculating them.

Plaintiffs' damages calculation is based on the difference between the amount AT&T charged and the amount that Plaintiffs contend AT&T should have charged for the use of local circuits (hereinafter referred to as "damages circuits"). The calculation employed the following three steps: (1) identifying the local circuits leased from AT&T; (2) determining the percentage that each of those local circuits was used for local interconnection; and (3) calculating the difference between the amount AT&T charged and the amount AT&T should have charged for those circuits.

Plaintiffs explain that they identified the damages circuits from Plaintiffs' order forms submitted to AT&T. Plaintiffs ordered circuits that ranged in size, and each circuit included "trunks," which are the smallest circuits. Plaintiffs purchased "DS1" circuits, which include 24 trunks, and "DS3" circuits, which include 28 DS1s and 672 trunks.[5]

Plaintiffs argue that because AT&T charges its customers based on how the customer orders

---

[2] Interconnection is the physical act of linking the network lines of two carriers so that the customers of incumbent local exchange carriers (AT&T's customers) can send communications to customers of competitive local exchange carriers (Plaintiffs' customers).

[3] "TELRIC" stands for "total element long-run incremental cost."

[4] Entrance facilities are high-capacity transmission circuits used to connect an incumbent local exchange carrier's network with a competitor's network.

[5] "DS1" and "DS3" are different sizes of circuits, also known as entrance facilities. (Plaintiff's Statement of Facts, Doc. No. 146, at ¶ 16).

the trunks riding on the DS1 and DS3 circuits, it was reasonable to use AT&T order forms to identify local circuits that should have been billed at the lower TELRIC rate. Plaintiffs then retained experts to review the order forms to confirm that the circuits were in fact being used for local interconnection.

Next, Plaintiffs identified the percentage of each circuit carrying local versus non-local calls. That percentage was derived from "factor filings," which are "industry-standard reports that AT&T requires Level 3 to file with AT&T each quarter." (Doc. No. 145 at 9). Plaintiffs maintain that factor filings show, for all the circuits leased from AT&T in each state, the percentage of telephone calls that are interstate, long-distance intrastate, and local. For DS3 circuits, Plaintiffs determined which DS1 circuits riding on the DS3 circuit carried local calls and then used the factor filings to calculate the percentage of those DS1 circuits that were used to carry local calls.[6]

After determining the percentage of each circuit being used to carry local calls, Plaintiffs calculated the difference between the amount AT&T charged and the amount AT&T should have charged for those circuits under the terms of the ICAs. Plaintiffs' expert then prepared four spreadsheets that reflect the results of his damages calculations and related information for Level 3 DS1 circuits, Level 3 DS3 circuits, Broadwing DS1 circuits, and Broadwing DS3 circuits. Plaintiffs include in their calculation circuits used to transmit 911 calls.

AT&T states that it intends to use data pulled from TIRKS to demonstrate that Plaintiffs' methodology is flawed. TIRKS is an online system used by AT&T's trunk planners and engineers when they create, augment, and disconnect trunk groups in AT&T's Time Division Multiplexing network—the network that includes the damages circuits. (Doc. No. 158 at 3). AT&T also intends to introduce evidence of "volume discount" credits totaling $2,698,555.68[7] that it argues should apply

---

[6] Plaintiffs do not claim damages on any of the DS1 circuits riding a DS3 circuit that were not carrying local calls.

[7] AT&T initially calculated that Plaintiffs received $10.4 million in credits and discounts. Then, on January 24, 2019, the Court entered an Order that Plaintiffs could not assert damages based

to reduce the amount of damages claimed by Plaintiffs.

**II.     Arguments of the Parties**

Plaintiffs filed a motion for summary judgment on damages, arguing that they produced a detailed and reasonable calculation of their damages consistent with AT&T's practices and guidelines, as well as industry standards, and that AT&T has not materially refuted Plaintiffs' damages or shown that a genuine issue of material fact exists as to how damages were calculated and the amount thereof.

AT&T filed a response in opposition to Plaintiffs' motion for summary judgment, as well as a separate motion for partial summary judgment, advancing the following arguments. AT&T contends that Plaintiffs have not proven that they actually paid the alleged overcharges. Further, AT&T contends that Plaintiffs' methodology for calculating damages is flawed because: (1) Plaintiffs cannot show the extent to which a particular circuit was used for local interconnection; (2) a reasonable jury could find that Plaintiffs have not adequately explained their use of factor filings or could find that factor filings overstate the proportion of local traffic; (3) a jury could find that Plaintiffs' damages are overstated; (4) Plaintiffs did not apply TELRIC rates correctly; and (5) Plaintiffs' motion improperly asks the Court to draw inferences in Plaintiffs' favor.

AT&T also maintains that Plaintiffs' damages calculation fails to account for the credits Plaintiffs received as a result of the alleged overcharges, and that Plaintiffs are not entitled to most of the prejudgment interest claimed because their damages are not readily ascertainable. Lastly, AT&T argues that Plaintiffs are not entitled to damages for 911 circuits, which are not used for interconnection.

Plaintiffs reply that AT&T failed to offer any evidence to dispute Plaintiff's damages or offer

---

on invoices dated before June 7, 2012. (Doc. No. 168). Accordingly, AT&T submitted, with leave of the Court, an updated calculation of credits for the relevant time period.

an alternative damages calculation and that their damages are not overstated. With regard to AT&T's credit argument, Plaintiffs maintain that AT&T failed to timely assert the credit offset as an affirmative defense or counterclaim and that the credits pertain to an agreement entirely separate from the ICAs at issue in this litigation. Further, Plaintiffs assert that 911 circuits are used to carry local calls, and thus should have been charged at TELRIC rates. Lastly, Plaintiffs maintain that state law supports their claim for prejudgment interest.

Plaintiffs also seek to exclude certain evidence and expert testimony. First, Plaintiffs seek the exclusion of AT&T's TIRKS spreadsheet. According to Plaintiffs, the TIRKS spreadsheet contains a highly technical analysis of the damages circuits, thus necessitating an expert; however AT&T has not disclosed any expert witnesses or expert opinions concerning the TIRKS spreadsheet, its contents, its significance, or its connection with whether certain circuits were used to carry local calls. Thus, Plaintiffs argue that the TIRKS spreadsheet improperly requires the jury to speculate and form its own conclusions from looking at the document. Plaintiffs also argue that the TIRKS spreadsheet is a snapshot in time and does not show how the circuits were used during the relevant timeframe. Lastly, Plaintiffs argue that the TIRKS spreadsheet is not relevant or reliable because it only analyzes 10% of the circuits at issue and apportions damages to circuits that Plaintiffs had not included in their calculation.

AT&T responds that Plaintiffs are improperly invoking *Daubert* standards to exclude a document which contains no expert opinions. AT&T states it intends to use the TIRKS spreadsheet to demonstrate that Plaintiffs' damages analysis is flawed, which does not require expert opinion testimony at trial. AT&T further argues the TIRKS spreadsheet merely compiles AT&T's business records. Lastly, AT&T argues the spreadsheet is probative because Plaintiffs' damages claim encompasses the time when the spreadsheet data was pulled. AT&T also maintains that the spreadsheet is relevant and reliable, and that its inclusion of only 10% of the circuits at issue does not

make the data contained therein unreliable.

Plaintiffs also seek to exclude AT&T's credit spreadsheet, arguing that the credits issued by AT&T during the period at issue are not relevant to Plaintiffs' damages calculations since AT&T never required Plaintiffs to pay back any credits. Further, Plaintiffs argue that AT&T failed to assert any affirmative defense or counterclaim related to the issue of credits, and thus, AT&T's arguments are untimely. Lastly, Plaintiffs challenge AT&T's methodology in creating the spreadsheets as unreliable because it combines credits earned over 12 years from different contracts with different applicable statutes of limitations.

AT&T responds that it is not making a claim pursuant to the credit contracts, and thus its position on credits does not constitute an affirmative defense or counterclaim. Rather, AT&T maintains that the credits spreadsheets constitute evidence that Plaintiffs overstated their damages.

### III. Discussion

#### a. Summary Judgment motions

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The initial burden is placed on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate in a particular case, the Court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 619 (8th Cir. 1988).

Plaintiffs ask the Court to enter summary judgment on their damages, and AT&T seeks partial summary judgment on issues related to reducing Plaintiffs' damages amount. The Court will first address AT&T's motion.

**AT&T's motion for partial summary judgment**

### Credits

AT&T seeks summary judgment on the amount of credits Plaintiffs received pursuant to credit contracts entered into by the parties. Specifically, those credit contracts provided Plaintiffs with volume discount credits based on Plaintiffs' payment of tariffed access rates for entrance facilities, including local interconnection. AT&T asserts that Plaintiffs' damages must be reduced by the credits received. Plaintiffs argue that AT&T's credits arguments are an affirmative defense or counterclaim that AT&T failed to raise until Phase II of the litigation.

Here, it is undisputed that the credit contracts are entirely separate from the ICAs at issue in this lawsuit, and there is no evidence to suggest that the credit contracts and the ICAs reference each other or provide for any credit refunds. "Terms not explicit in a contract may be incorporated into the contract by reference" so long as the "intent to incorporate [is] clear." *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 810 (Mo. 2015). Here, there is no connection between the ICAs and the credit contracts that would allow AT&T to seek—by way of an affirmative defense or counterclaim— a reduction in Plaintiffs' damages for AT&T's breach of the ICAs. Accordingly, the motion for partial summary judgment as to credits will be denied.

### Prejudgment Interest

AT&T seeks summary judgment on Plaintiffs' claim for prejudgment interest for damages incurred in the states of Arkansas, California, Illinois, Indiana, Kansas, Michigan, Missouri, Nevada, Ohio, Oklahoma, Texas, and Wisconsin. The parties do not dispute that the ICAs are state law contracts that are governed by the law of each applicable state including, as relevant here, the award

of prejudgment interest. *See, e.g., N. Cty. Commc'ns Corp. of Arizona v. Qwest Corp.*, 824 F.3d 830, 839 (9th Cir. 2016) ("the agreements themselves and state law principles govern the questions of interpretation of the [ICAs] and enforcement of their provisions").

In Arkansas, Illinois, Indiana, Kansas, Missouri, Oklahoma, Nevada, and Wisconsin, prejudgment interest is only awarded on liquidated claims. In other words, the plaintiff's damages must be certain, capable of being made certain, or readily ascertainable for prejudgment interest to be awarded. *See Travis Lumber Co. v. Deichman*, 319 S.W.3d 239, 256 (Ark. 2009) ("Prejudgment interest is allowable where the amount of damages is definitely ascertainable by mathematical computation, or if the evidence furnishes data that make it possible to compute the amount without reliance on opinion or discretion . . . This standard is met if a method exists for fixing the exact value of a cause of action at the time of the occurrence of the event that gives rise to the cause of action."); *Santa's Best Craft, L.L.C. v. Zurich Am. Ins. Co.*, 408 Ill. App. 3d 173, 191 (2010) ("In order to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination."); *Song v. Iatarola*, 76 N.E.3d 926, 939 (Ind. Ct. App. 2017) ("It is well-settled that an award of prejudgment interest in a breach of contract action is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable . . . The test for determining whether an award of prejudgment interest is appropriate is whether the damages are complete and may be ascertained as of a particular time."); *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 925 (2007) ("In Kansas, the general rule is that prejudgment interest is allowable on liquidated claims . . . A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain or when the same become definitely ascertainable by mathematical calculation."); *Travelers Commercial Cas. Co. v. Vac-It-All Servs., Inc.*, 451 S.W.3d 301, 313 (Mo. Ct. App. 2014) ("Prejudgment interest may only be awarded where the claim is liquidated, which means the claimed amount is 'fixed and determined or readily ascertainable by

computation or a recognized standard.'"); *H.B. Krug v. Helmerich & Payne, Inc.*, 362 P.3d 205, 214–15 (Okla. 2015) ("it is well settled that: 1) recovery of prejudgment interest must be predicated on statute; 2) 23 O.S. 2011 § 6 is the governing statute governing prejudgment interest; and 3) prejudgment interest pursuant to § 6 will not be allowed unless the amount of recovery is liquidated or capable of ascertainment by calculation or resort to well-established market values"); *Hornwood v. Smith's Food King No. 1*, 107 Nev. 80, 88 (1991) ("Prejudgment interest on a damage award is only allowed where the damage award is known or ascertainable at a time prior to entry of judgment"); *Winston v. Guelzow*, 855 N.W.2d 432, 437 (Wis. Ct. App. 2014) (holding that prejudgment interest may be awarded only if the amount of damages is ascertainable or determinable prior to determinable prior to judicial determination, i.e., where there is a reasonably certain standard of measurement).

Here, the Court concludes that Plaintiffs' damages are subject to dispute and not liquidated or readily ascertainable. The methodology by which Plaintiffs calculated their damages is complicated and involves data pulled from billing information for the disputed circuits, AT&T's order forms, and state-wide quarterly factor filings. The Court concludes that AT&T could not have reasonably ascertained Plaintiffs' damages by any calculation or recognized standard. Thus, Plaintiffs are not entitled to prejudgment interest under the state laws of Arkansas, Illinois, Indiana, Kansas, Missouri, Oklahoma, Nevada, or Wisconsin. Accordingly, AT&T's motion for partial summary judgment will be granted as it relates to Plaintiff's claims for prejudgment interest for damages incurred in these states.

AT&T also challenges Plaintiffs' demand for prejudgment interest for damages incurred for circuits located in California, Michigan, Ohio, and Texas, which have state laws allowing prejudgment interest under certain circumstances. At this point, based on the record before it, the Court cannot determine whether any of those circumstances would apply. Thus, any ruling on this

issue would be premature.  Accordingly, the Court will deny AT&T's motion for partial summary judgment as it relates to this issue without prejudice, with leave for refiling upon the conclusion of a jury trial.  The Court will also address any disputes related to prejudgment interest rates at that time.

**911 Circuits**

The parties disagree about whether 911 circuits leased by Plaintiffs from AT&T are used for local interconnection, and therefore, whether TELRIC rates should apply.  Plaintiffs argue that "911 circuits are local circuits that carry local calls and are entitled to be charged at TELRIC rates." (Doc. No. 156 at 14).  AT&T argues that the Supreme Court in *Talk America, Inc. v. Michigan Bell Tel. Co.*, held that under Section 251(c)(2) of the Act, "AT&T must lease its existing entrance facilities *for interconnection* at cost-based rates" 564 U.S. 50, 57 (2011) (emphasis added), but that 911 circuits/trunks fall beyond the scope of "interconnection," because a 911 call only travels in one direction and are not used for the "mutual exchange" of traffic.

AT&T relies on two state commission decisions in support of its position.  The first originates from the California Public Utilities Commission.  *See Application by Pacific Bell Telephone Company d/b/a SBC California (U 1001 C) for Arbitration of an Interconnection Agreement with MCImetro Access Transmission Services, LLC (U 5253 C) pursuant to Section 252(b) of the Telecommunications Act of 1996*, Case No. 05-05-027 (April 19, 2006).  There, the California Public Utilities Commission opined that, unlike normal interconnection trunking, 911 trunking is not used for two-way end-user to end-user calling.  Instead, 911 trunking connects to a dedicated private network that is only intended for one way calling to Public Service Answering Point ("PSAP") agencies.  Thus, the California Public Utilities Commission concluded that the facilities connecting one carrier's customers with PSAPs were not interconnection facilities under Section 251(c)(2) of the Act.

AT&T also relies on the Indiana Utility Regulatory Commission's August 5, 2015 decision. *See In the Matter of Sprint Spectrum L.P.'s Petition for Arbitration pursuant to Section 252(B) of the*

*Communications Act of 1934, as amended by the Telecommunications Act of 1996, and the Applicable State Laws for Rates, Terms and Conditions of Interconnection with Indiana Bell Telephone Company, Inc. d/b/a AT&T Indiana*, Cause No. 4449 INT 01, 2015 WL 4873735 (Ind. U.R.C. Aug. 5, 2015) (rev'd on other grounds, *Indiana Bell Tel. Co. v. Stephan*, 247 F. Supp. 3d 978 (S.D. Ind. 2017)). There, the Indiana Utility Regulatory Commission examined arguments identical to those presented here. Specifically, Sprint argued that 911 traffic "is telephone exchange service traffic originated by a Sprint customer that AT&T Indiana switches via a selective router to AT&T Indiana's [PSAP] customer," and that the traffic rides on interconnection facilities purchased at TELRIC rates. AT&T Indiana argued that interconnection facilities purchased at TELRIC rates may not be used for 911 trunks because such trunks are not used for the mutual exchange of traffic between end users of Sprint and AT&T Indiana.

The Indiana Utility Regulatory Commission held that while 911 service may be "part and parcel" with telephone exchange service, it was not, by itself, synonymous with telephone exchange service. It further held that 911 traffic was not a mutual exchange of traffic and instead constituted one-way traffic going from the end user customer to the 911 PSAP. As a result, it held that using interconnection facilities purchased at TELRIC prices for 911 trunks would be improper.

Plaintiffs maintain that these California and Indiana state commission decisions have no bearing on the issues before the Court. First, Plaintiffs argue that the California Public Utilities Commission decision pre-dated *Talk America* and is entirely inconsistent with *Talk America*'s holding on charging TELRIC rates for local interconnection. Further, Plaintiffs argue that AT&T's reliance on the Indiana Commission's decision is misplaced because the language contained in the ICA at issue in that case precluded 911 circuits from qualifying as "interconnection facilities" and that contractual language controlled the outcome of the decision. Plaintiffs assert that no similar language is present in the ICAs at issue in this case.

Plaintiffs instead point the Court to decisions rendered by the Michigan Public Service Commission and the Illinois Commerce Commission, which have addressed similar issues to those present here. Specifically, on December 6, 2013, the Michigan Public Service Commission determined that "interconnection is not limited to the exchange of traffic between the parties' end users." *In the matter of the Petition of Sprint Spectrum L.P. for Arbitration pursuant to Section 252(b) of the Telecommunications Act of 1996 to Establish Interconnection Agreements with Michigan Bell Telephone Company, d/b/a AT&T Michigan*, Case No. U-17349, at 24 (Dec. 6, 2013) ("Sprint Arbitration Decision"). Instead, it held that "911 is an ancillary service that falls under the broad definition of 'Interconnection.'" *Id.* at 25.

The Illinois Commerce Commission reached a similar decision. *See SpringCom, Inc., WirelessCo., L.P. NPCR, Inc. d/b/a Nextel Partners and Nextel West Corp.'s Petition for Arbitration pursuant to Section 252(b) of the Telecommunications Act of 1996 to Establish an Interconnection Agreement with Illinois Bell Telephone Company*, Case No. 12-0550 (June 26, 2013). It held that PSAPs could reasonably be considered to be AT&T end users, and thus, 911 traffic fell within the purview of Section 251 of the Act because it connected a Sprint end user with an AT&T end user. *Id.* at 11.

In Phase I of this litigation, the Court ruled that AT&T was required under the Act to provide entrance facilities to Plaintiffs at cost-based TELRIC rates when they are used for interconnection. By regulation, the Federal Communications Commission ("FCC") has defined "interconnection" to mean "the linking of two networks for the mutual exchange of traffic." 47 C.F.R. § 51.5. Such interconnection occurs at "entrance facilities," which are "the transmission facilities (typically wires or cables) that connect competitive [local exchange carriers'] networks with incumbent [local exchange carriers'] networks." *Talk Am.,* 564 U.S. at 54.

After careful consideration, the Court concludes that 911 circuits are not used for

interconnection, as that term is defined under § 251(c)(2) of the Act.  The Court is not persuaded by the Illinois Commerce Commission's determination that PSAPs can be considered AT&T end users. Instead, the Court agrees with the Indiana Utility Regulatory Commission when it held that a 911 call is one-way traffic going from the end user customer to the 911 PSAP.  Specifically, the Court concludes that 911 traffic is one-way traffic going from Plaintiffs' customers to a PSAP.  Scott McPhee, the Associate Director of Wholesale Regulatory Policy and Support for AT&T Services, stated that Plaintiffs' 911 trunks "are not used to carry non-911 calls or any traffic to or from AT&T ILEC' end users." (Doc. No. 141-3 at ¶ 11).  Thus, there exists no "mutual exchange" of traffic, as required by 47 C.F.R. § 51.5.  Accordingly, AT&T's motion for partial summary judgment as it relates to 911 circuits will be granted.

**Plaintiffs' motion for summary judgment on damages**

Having addressed the merits of AT&T's motion for partial summary judgment, the Court now turns to the remaining issues raised in Plaintiffs' motion for summary judgment.  Plaintiffs maintain that their damages are the difference between the amount AT&T charged Plaintiffs and the amount AT&T should have charged Plaintiffs under the ICAs and the Act.  Plaintiffs argue that they have satisfied their burden under Federal Rule of Civil Procedure 56 to produce evidence demonstrating that there is no genuine issue of material fact regarding their damages calculation.  Further, Plaintiffs claim that AT&T cannot avoid summary judgment in Plaintiffs' favor because it has not disputed the information, factor filings, or rates used by Plaintiffs to calculate their damages, nor proffered an alternative method.

AT&T responds that Plaintiffs' methodology for calculating damages includes a complex series of assumptions, estimates, and inferences to estimate purported damages for certain circuits used for local interconnection, and a reasonable jury could reject Plaintiffs' showing, or conclude that it overstates Plaintiffs' damages.  For instance, a jury could reject Plaintiffs' estimate regarding the

extent to which they used a circuit to carry local calls, or find that Plaintiffs have not adequately explained their use of factor filings, or reject Plaintiffs' approach to determining which circuits should be included in their damages spreadsheets.

The Court concludes that there remain issues of fact regarding Plaintiffs' damages calculation that can only be resolved by a jury. For example, Plaintiff's expert states that a possible discrepancy may exist between the way a circuit is ordered (i.e. whether it was ordered for local interconnection) and the way a circuit is actually used. (Swadburg Depo, Doc. No. 143-6 at 51 ("at the time the order is placed, that's an indication of how that circuit is intended to be used, but at that time, there can be no way of knowing the use of the circuit because it's not in use")).

There also exists an issue of fact as to what extent a particular circuit was used for local interconnection. Plaintiffs' expert admitted that "I'm not aware of any capability or need to know how a given circuit is being used in terms of local versus intrastate." (Swadburg Depo, Doc. No. 143-6). Accordingly, to the degree not already addressed by the Court, Plaintiffs' motion for summary judgment on damages will be denied.

### b. Motions to Exclude

*Daubert v. Merrell Dow Pharm., Inc.* sets the standards for the Court to determine the admissibility of expert testimony. It is not, however, used to evaluate the admissibility of evidence. Here, Plaintiff seeks to exclude AT&T's TIRKS spreadsheet and any related expert testimony, and AT&T responds that it "has identified no expert witness and has no intention of offering expert opinion testimony at trial." (Doc. No. 158 at 2). Based on this representation, Plaintiffs' motion to exclude expert testimony regarding the TIRKS spreadsheet will be denied at this time.

Similarly, Plaintiffs seek to exclude AT&T's credit spreadsheet and any related expert testimony. Once again, Plaintiffs do not identify any expert opinions that they seek to be excluded, nor does the briefing reference any expert opinions to be rendered. Therefore, Plaintiffs' motion to

exclude expert testimony regarding the credit spreadsheet will be denied at this time.

**Conclusion**

Accordingly,

**IT IS HEREBY ORDERED** that AT&T's motion for partial summary judgment on damages (Doc. No. 139) is **GRANTED in part and DENIED in part**, as set forth in this Order.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment on damages (Doc. No. 144) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to exclude AT&T's "TIRKS" spreadsheet and related testimony (Doc. No. 151) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to exclude testimony and evidence regarding AT&T's credit spreadsheet (Doc. No. 153) is **DENIED**.

**IT IS FINALLY ORDERED** that this matter will be set for a scheduling conference by separate order.

Dated this 26th day of September, 2019.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**